## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | EDCV 17-869-GW(FFMx) | Date | July 30, 2018 |
| Title | *Geraldine Rocha v. Scott Kernan, et al.* | | |

| | |
|---|---|
| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE |

| Javier Gonzalez | Katie Thibodeaux | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Lori E. Rifkin | Todd Grabarsky, CAAG |
| Caitlan Lisette McLoon | Danielle R. Hemple |

**PROCEEDINGS:**   DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT [48]

Court hears oral argument. The Tentative circulated and attached hereto, is adopted as the Court's Final Ruling. The Court would grant the Motion as follows: (1) it would dismiss all causes of action against Defendants Kernan, Toche, Harrington, Allison, Tebrock, Hughes and Elliot with leave to amend; and (2) it would dismiss all claims against Defendants Velez and Pulling with leave to amend except for the sixth cause of action where the Motion would be denied. Plaintiffs shall be given until September 17, 2018 to file a Second Amended Complaint with respect to the dismissed causes of action. Defendants will have unitl October 9, 2018.

                                                                                                          :    37

                                                           Initials of Preparer    JG

*Rocha v. Kernan, et al.*; Case No. 5:17-cv-00869-GW-(FFMx)
Tentative Ruling on Motion to Dismiss First Amended Complaint

## I. Background

The estate of Erika Rocha (by and through Geraldine Rocha and Freida Rocha) and Linda Reza (collectively, "Plaintiffs") bring this lawsuit against: 1) the California Department of Corrections and Rehabilitation ("CDCR"); 2) Scott Kernan; 3) Diana Toche; 4) Kelly Harrington; 5) Kathleen Allison; 6) Katherine Tebrock; 7) Kimberley Hughes; 8) Jim Elliot; 9) Paloma Velez; and 10) Matthew Pulling.[1]  *See generally* First Amended Complaint ("FAC"), Docket No. 24.  On April 14, 2016, Erika Rocha ("Erika") committed suicide while an inmate at the California Institute for Women ("CIW").  *Id.* ¶¶ 1, 4.  Plaintiffs claim that Defendants: 1) violated Erika's rights under the Eight Amendment of the United States Constitution by failing to provide mental health treatment; 2) violated Erika's rights under the Eight Amendment of the United States Constitution by failing to protect her from harm; 3) violated Reza's rights under the First and Fourteenth Amendments of the United States Constitution by depriving Reza of her liberty interest in her "parent-child" relationship with Erika without due process of law; 4) discriminated against Erika in violation of the Americans with Disabilities Act ("ADA") and Rehabilitation Act; 5) violated California state law through negligent supervision, hiring, training, and retention; 6) took action resulting in Erika's wrongful death; 7) were negligent with respect to Erika's death; and 8) failed to furnish or summon medical care for Erika.  *See generally id.*

Plaintiffs allege:

Erika's mother died when Erika was seven years old.  *Id.* ¶ 28.  From ages seven until approximately fourteen, Erika lived with family members, at least one of whom physically and sexually abused her.  *Id.* ¶¶ 28-30.  She was ultimately removed from her maternal grandfather's home by the California Department of Child Protective Services.  *Id.* ¶ 30.  At that point Erika was placed in a series of group homes.  *Id.*  While living in these group homes, Erika would periodically run away and live with Reza (Erika's father's partner); and Erika and Reza "developed a close relationship."  *Id.*  Around this time, Erika's social worker interviewed Reza

---

[1] Plaintiffs also named Doe Defendants which the Court ignores in its analysis of the issues presented here.

1

to determine if Reza's home would provide a stable environment for Erika, but no placement was ever made. *Id.* ¶ 32.

On or about February 2, 1996, Erika was placed in the group home International Home for Girls. *Id.* Ten days after Erika was placed in International Home for Girls, Erika and another resident of the group home were arrested and charged with attempted second-degree murder of a group home supervisor. *Id.* Erika was fifteen years old and was tried as an adult. *Id.* ¶ 33. She was convicted and sentenced to a prison term of nineteen years. *Id.* She spent the first two years in solitary confinement to protect her from the adult population. *Id.* After spending close to two decades incarcerated, Erika was scheduled to meet the Parole Board on April 15, 2016. *Id.* ¶ 34. Erika took her life the day before the hearing. *Id.* ¶ 1.

Erika's CDCR records reflect that she began experiencing auditory hallucinations when she was seven years old and that she attempted suicide approximately eight times between the ages of seven and fourteen. *Id.* ¶¶ 35-36. While in CDCR custody, Erika was diagnosed with amphetamine dependence, antisocial personality disorder, psychosis, psychotic disorder, adjustment disorder with anxiety, and continuing diagnoses of major depressive disorder. *Id.* ¶ 38. In 2008 and again in 2014, Erika attempted suicide while in CDCR custody. *Id.* ¶ 43. In October 2014, March 2015, and again in June 2015, Erika was admitted to a Mental Health Crisis Bed ("MHCB")[2]; she was admitted to a MHCB a total of nine times while serving her sentence. *Id.* ¶¶ 41, 44.

On March 1, 2016, one of Erika's primary clinicians, Paloma Velez, transferred responsibility for Erika's care to another clinician. *Id.* ¶¶ 22, 49. Velez did not create a transition plan for Erika. *Id.* Later that month, on March 31, 2016, Erika expressed suicidal ideation and was placed on continuous observation. *Id.* ¶ 50. The following day, a psychiatrist assessed Erika and noted that she was expressing increasing anxiety about her upcoming parole hearing. *Id.* ¶ 51. Erika denied suicidal ideation, however, and Erika was removed from continuous observation. *Id.* A different clinician determined at that time that Erika had "high" chronic risk of suicide but "low" acute risk of suicide as she denied suicidal ideation. *Id.* ¶ 53.

---

[2] As alleged in the FAC:

> MHCBs, or "crisis bed units" are designed to provide temporary mental health services for prisoners with "[m]arked impairment and dysfunction in most areas (daily living activities, communication and social interaction) requiring 24-hour nursing care," and/or "[d]angerousness to others as a consequence of a serious mental disorder, and/or dangerousness to self for any reason."

FAC ¶ 41.

This clinician failed to adequately complete the evaluation, however, leaving key sections blank and employing cut-and-pasted information from previous assessments. *Id.*

Over the next two weeks until her death, staff and prisoners observed "noticeable behavioral changes," including that Erika was keeping to herself, stayed in her cell, refused psychotropic medication, and fought with her cellmate. *Id.* ¶ 54. On the evening of April 2, 2016, Erika punched a locker. *Id.*

Erika's newly-assigned clinician, Matthew Pulling, saw Erika on April 4, 6, and 11, 2016. *Id.* ¶¶ 56-57. On April 4, Pulling noted: "Discussed the events with [Erika] and asked her to take responsibility for using suicidal threats to get what she wanted, that the behavior was childish and most serious as people do kill themselves. Discussed [Erika's] need to learn different coping mechanisms to get her needs met. Discussed the difference between a child and an adult. Challenged [Erika] to act in an adult fashion." *Id.* ¶ 56. On April 11, Pulling ended his session with Erika "prematurely" reportedly because she "became labile and wanted to go." *Id.* ¶ 57. He did not schedule any follow-up session or make any changes to her treatment plan. *Id.*

After her death, a review of Erika's case by a CDCR Suicide Case Review Committee identified significant lapses in her care, including violations of CDCR's policies and procedures, and determined that Erika's suicide was both foreseeable and preventable. *Id.* ¶ 65. Additionally, Erika's death was reviewed by the Special Master Appointed in *Coleman v. Brown*, E.D. Cal. Case No. 2:90-cv-0052-KJM-DB, a class action filed on behalf of California inmates with serious mental health illness. *See id.* ¶ 41. The Special Master affirmed the CDCR Suicide Case Review Committee findings. *Id.* ¶ 65.

Defendant Kernan is CDCR's Secretary, its highest-ranking official, responsible for administering and overseeing its operations. *Id.* ¶ 15. Defendant Toche is CDCR's Undersecretary of Health Care Services, responsible for the administration of the provision of healthcare to inmates. *Id.* ¶ 16. Defendant Harrington was CDCR's Director of the Division of Adult Institutions from January 2015 until March 2016, and in that role was responsible for supervising the administration of CDCR's adult prison facilities. *Id.* ¶ 17. In April 2016, Defendant Allison replaced Defendant Harrington in that role. *Id.* ¶ 18. Defendant Tebrock is the CDCR's Deputy Director of its Statewide Mental Health Program, responsible for overseeing the provision of mental health care to inmates. *Id.* ¶ 19. Defendant Hughes is the Warden of the California Institution for Women ("CIW"), the institution where Erika was incarcerated from

September 2011 until the time of her death.[3] *Id.* ¶¶ 20, 39. Defendant Elliot was CIW's CEO, and had hiring authority for all health care staff in the institution.[4] *Id.* ¶ 21.

Defendants collectively moved to dismiss the FAC. *See generally* Defendants' Motion to Dismiss ("Motion"), Docket No. 48. Plaintiffs responded, opposing the Motion. *See generally* Opposition to Motion ("Opp'n"), Docket No. 58. Defendants file two replies, categorizing themselves as belonging to the group of "Headquarters Defendants," *i.e.*, Defendants Kernan, Toche, Harrington, Allison, and Tebrock (*see generally* Headquarters Defendants' Reply, Docket No. 67); or the "CIW Defendants," *i.e.*, Defendants Hughes, Elliot, Pulling and Velez (*see generally* CIW Defendants' Reply, Docket No. 70).[5]

## II. Legal Standard

Under Federal Rule of Civil Procedure ("Rule") 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A complaint may be dismissed for failure to state a claim for one of two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal theory. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) ("Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.").

In deciding a Rule 12(b)(6) motion, a court "may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007). The court must construe the complaint in the light most favorable to the plaintiff, accept all allegations of material fact as true, and draw all reasonable inferences from well-pleaded factual allegations.

---

[3] Plaintiff aver that Hughes: "as Warden of CIW, was responsible for the safety and security of prisoners at CIW, including ensuring that they received constitutionally adequate mental health treatment. Despite repeated notice that CDCR's policies, procedures, and practices for provision of mental health treatment and suicide prevention at CIW were inadequate, Defendant Hughes failed to undertake necessary corrective action to remedy these deficiencies, resulting in the death of Erika Rocha." FAC ¶ 96.

[4] Plaintiffs aver as to Elliot that: "as CEO at CIW, he was responsible for ensuring that medical staff at CIW provided constitutionally adequate mental health treatment to prisoners including Erika Rocha. Despite repeated notice that medical staff at CIW were not providing adequate and necessary care consistent with the Constitution and CDCR's own requirements, Defendant Elliot failed to undertake necessary corrective action to remedy these deficiencies, resulting in the death of Erika Rocha." FAC ¶ 97.

[5] The CIW Defendants further differentiate between the "Supervisory Defendants," *i.e.*, Hughes and Elliot; and the "Provider Defendants," *i.e.*, Pulling and Velez. *See generally id.*

*Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001), *amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001); *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996).  A court is not required to accept as true legal conclusions couched as factual allegations.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Where a plaintiff facing a Rule 12(b)(6) motion has pleaded "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," the motion should be denied.  *Id.*; *Sylvia Landfield Trust v. City of Los Angeles*, 729 F.3d 1189, 1191 (9th Cir. 2013).  But if "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged − but it has not show[n] . . . the pleader is entitled to relief."  *Iqbal*, 556 U.S. at 679 (citations omitted).

If a court dismisses certain claims, "[l]eave to amend should be granted unless the district court 'determines that the pleading could not possibly be cured by the allegation of other facts.'"  *Knappenberger v. City of Phoenix*, 566 F.3d 936, 942 (9th Cir. 2009) (quoting *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc)).

**III. Discussion**

    A.  <u>First and Second Causes of Action: Eighth Amendment Violations</u>

Prison officials violate the Eighth Amendment if they are "deliberate[ly] indifferen[t] to [a prisoner's] serious medical needs."  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  A medical need is serious if failure to treat it will result in "'significant injury or the unnecessary and wanton infliction of pain.'"  *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc)).  The Ninth Circuit recognizes that a heightened risk of suicide can present a serious medical need.  *Simmons v. Navajo Cty., Arizona*, 609 F.3d 1011, 1018 (9th Cir. 2010) (citing *Conn v. City of Reno*, 591 F.3d 1081, 1096 (9th Cir. 2010)).  In the context of an Eighth Amendment claim stemming from a prisoner's suicide, a plaintiff states an actionable claim if an official knows of an inmate's particular vulnerability to suicide and was recklessly or deliberately indifferent to that vulnerability.  *See Taylor v. Barkes*, 135 S. Ct. 2042, 2045 (2015) (citing *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (1991)).  However, deliberate indifference is a high legal standard; mere malpractice or negligence does not constitute an Eighth Amendment violation.  *See Estelle*, 429 U.S. at 105-06; *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004).

5

To establish an Eighth Amendment violation, a prisoner "must satisfy both the objective and subjective components of a two-part test." *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (citation omitted). First, there must be a demonstration that the prison official deprived the prisoner of the "minimal civilized measure of life's necessities." *Id*. (citation omitted). Second, a prisoner must demonstrate that the prison official "acted with deliberate indifference in doing so." *Id*. (citation and internal quotation marks omitted).

A prison official acts with "deliberate indifference . . . only if the [prison official] knows of and disregards an excessive risk to inmate health and safety." *Gibson v. County of Washoe, Nevada*, 290 F.3d 1175, 1187 (9th Cir. 2002) (citation and internal quotation marks omitted). Under this standard, the prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but that person "must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk." *Gibson*, 290 F.3d at 1188 (citation omitted). This "subjective approach" focuses only "on what a defendant's mental attitude actually was." *Farmer*, 511 U.S. at 839.

Alternatively, a plaintiff may state a claim if policymakers knew that their policy, practice or order would pose a serious risk to someone in plaintiff's situation and nevertheless made that decision which resulted in injury. *See Lemire v. California Dept. of Corrections and Rehabilitation*, 726 F.3d 1062, 1078 (9th Cir. 2013) (in a facility housing mentally-ill inmates where an extended absence of floor officers is generally considered unacceptable, evidence of supervisory defendants' decision to remove all floor officers from the ward for a period of three and a half hours was sufficient to establish an objectively substantial risk of harm to unsupervised mentally-ill inmates).

    1. CIW Defendants
        i. <u>Provider Defendants (Velez and Pulling)</u>

The FAC alleges that Defendant Velez was "one of Erika's primary clinicians" for two years. *See* FAC ¶ 49. Approximately forty-five days before Erika was to meet the Parole Board, Velez transferred responsibility for Erika's care to another provider without making a transition plan or conducting any transitional or closure sessions with Erika. *See id.* Defendant Pulling thereafter treated Erika on April 2, 6, and 11, 2016. *Id.* ¶¶ 56-57. Plaintiffs allege that others at

6

CIW observed noticeable changes to Erika's behavior while Pulling treated Erika yet Pulling made no changes to Erika's treatment plan and, after terminating the April 11, 2016 treatment session, did not schedule Erika for any additional treatment prior to the Parole Board meeting. *Id.* ¶ 57.

Regarding Velez and Pulling, while it is clear that Plaintiffs have alleged a failure of care amounting to negligence or malpractice, they have not established a basis for deliberate indifference. For example, as to Velez, Plaintiffs' only specified factual charge against her is that she transferred responsibility for Erika's care to another clinician without making a transition plan or conducting any transitional or closure sessions. However, as admitted by Plaintiffs, Velez was only one of Erika's primary clinicians. Moreover, Erika was also being seen by psychiatrists during the relevant period. Plaintiffs have not alleged that it is known and/or obvious that the failure by one of a potentially suicidal patient's primary clinicians to prepare a transition plan or to conduct a closure session when transferring responsibility over the patient to another primary clinician raises a substantial risk of the patient's committing suicide, and that Velez in fact was aware of that risk. *See Toguchi*, 391 F.3d at 1057.

Likewise to Pulling, Plaintiffs refer to his noted observations as to Erika at the April 4 and 11 sessions and his failure to schedule another appointment with her or to make any changes to her treatment plan after the April 11 session was terminated prematurely because Erika "became labile and wanted to go." Again, Plaintiffs have not alleged that Pulling was aware of specific facts from which an inference could be drawn that his actions (or inaction) raised a substantial risk of serious harm and/or that he drew the inference and acted improperly anyway.

In light of the above, the Court would find that Plaintiffs have not alleged either the objective or subjective components of an Eighth Amendment violation for deliberate indifference to an inmate's serious medical needs; they have alleged, at best, negligent care or malpractice. However, because Plaintiffs may be able to meet the applicable criteria with additional factual averments, they will be granted leave to amend.

In the alternative, the Provider Defendants assert that they are entitled to qualified immunity. *See* CIW Defendants' Reply at 13-15. The doctrine of qualified immunity protects government officials "from liability insofar as their conduct does not violate clearly established or constitutional rights of which a reasonable person would have known." *Stanton v. Sims*, 571 U.S. 3, 4-5 (2013) (*per curiam*) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

7

Whether a defendant is entitled to qualified immunity is a two-part inquiry that asks: "(1) Was the law governing the official's conduct clearly established? (2) Under that law, could a reasonable officer have believed the conduct was lawful?" *Mackinney v. Nielsen*, 69 F.3d 1002, 1005 (9th Cir. 1995) (quoting *Act Up! Portland v. Bagley*, 988 F.2d 868, 871 (9th Cir. 1993)). In *Anderson v. Creighton*, the Supreme Court instructed courts to examine whether the "contours of the right" in the action were sufficiently clear so that a reasonable official would understand that he or she was violating the right. 483 U.S. 635, 640 (1987).

In *Taylor v. Barkes*, the Supreme Court held that an incarcerated person's right to "the proper implementation of adequate suicide prevention protocols" was not clearly established in November 2004. 135 S. Ct. 2042, 2044 (2015). Provider Defendants rely on this case in asserting that each is entitled to qualified immunity because the contours of the Eighth Amendment's application to mental health care is not clearly established. *See generally* CIW Defendants' Reply at 14. In response, Plaintiff directs the Court to the Supreme Court's decision in *Brown v. Plata*, 563 U.S. 493 (2011), an appeal of a remedial order issued in the *Coleman* litigation referenced throughout Plaintiffs' FAC. In that case, the Supreme Court found that severe overcrowding of California prisons led to the provision of medical and mental health care that fell short of the minimum constitutional requirements imposed by the Eight Amendment and failed to meet prisoners' basic health needs. *Id.* at 501.

The Court would find that while a prisoner's right to adequate suicide prevention protocols may not have been established in November 2004, by the time Erika took her life in April 2016, the Eighth Amendment's application to the provision of mental health care was well established as a general matter. *See Brown*, 563 U.S. at 201; *see also Simmons*, 609 F.3d at 1018. However, given the fact that the Court has found that Plaintiffs have not sufficiently alleged the specific factual bases for their claim of deliberate indifference to Erika's serious need for adequate mental health care, a ruling on the Provider Defendants' qualified immunity contentions cannot be made at this point. Depending on their amendments to the pleading, the Court will determine at that point whether the Defendants' alleged deficiencies were more akin to the failure to provide proper implementation of adequate suicide prevention protocols (circa 2004) or something more clearly established. As such, the Court would not find that dismissal on the basis of qualified immunity is appropriate at this stage of the litigation.

      ii.  <u>Supervisory Defendants (Hughes and Elliot)</u>

Defendant Hughes, Warden of CIW, is named in only three paragraphs in the FAC. *See* FAC ¶¶ 20, 96, 115. Hughes is alleged to be "responsible for the safety and security of prisoners at CIW," including ensuring that each received constitutionally adequate mental health treatment. *Id.* ¶ 96. Defendant Elliot, CEO of CIW, is similarly named in only three paragraphs. *See id.* ¶¶ 21, 97, 116. Plaintiffs allege that he was "responsible for ensuring that medical staff at CIW provided constitutionally adequate mental health treatment to prisoners . . . ." *Id.* ¶ 97.

Under 42 U.S.C. § 1983, supervisory officials are not liable for actions of subordinates on any theory of vicarious liability. *See Hansen v. Black*, 885 F.2d 642, 645-46 (9th Cir. 1989). A supervisor may be liable only if: (1) he or she is personally involved, or (2) there is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. *Snow v. McDaniel*, 681 F.3d 978, 989 (9th Cir. 2012), overruled in part on other grounds by *Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014). A causal connection can include: "1) [the supervisors'] own culpable action or inaction in the training, supervision, or control of subordinates; 2) their acquiescence in the constitutional deprivation of which a complaint is made; or 3) [their] conduct that showed a reckless or callous indifference to the rights of others." *See Lemire*, 726 F.3d at 1075 (quoting *Cunningham v. Gates*, 229 F.3d 1271, 1292 (9th Cir. 2000)).

Plaintiffs do not allege that either Hughes or Elliot had any actual interaction with Erika or that either was aware that Erika was at risk. While Plaintiffs generally aver that the Supervisory Defendants' are "responsible for the safety and security of prisoners at CIW," they fail to identify any specific policy, practice or procedure enacted by either Defendant (such as a staffing decision or suicide protocol) that had an actual impact on the treatment which Erika did (or did not) receive.[6] In opposing this Motion, Plaintiffs' brief is devoid of any allegation that would form the basis of § 1983 liability, instead arguing that Hughes and Elliot are liable by virtue of their titles and general responsibilities at CIW. *See* Opp'n at 15 ("Defendant Hughes was CIW Warden, responsible for oversight of all CIW operations (FAC at ¶ 20); and Defendant Elliot is CEO for CIW, the hiring authority for all CIW health care staff (FAC at ¶ 21)."). The Court would find that these sparse allegations fail to state a claim against either Supervisory Defendant and would thus dismiss the first and second claims for relief against each.

---

[6] For example, did the court or special master in the *Coleman* litigation order or report on a *specific* practice or protocol as to mentally ill inmates to prevent or reduce suicides at the CIW that applied to Erika's treatment which a Supervisory Defendant was aware and failed to implement during the relevant period?

9

### 2. *Headquarters Defendants*

Plaintiffs' allegations regarding the Headquarters Defendants also merely amount to a recitation of their roles and responsibilities in the CDCR. *See, e.g.*, FAC ¶ 94 ("Defendant Kernan, as Secretary of CDCR, and Defendants Harrington and Allison, as Directors of DAI, were responsible for ensuring the safety and security of prisoners within CDCR, including ensuring that they received constitutionally adequate mental health treatment. Despite repeated notice that CDCR's policies, procedures, and practices for provision of mental health treatment and suicide prevention at CIW were inadequate, Defendants Kernan, Harrington, and Allison failed to undertake necessary corrective action to remedy these deficiencies, resulting in the death of Erika Rocha."). Plaintiff does not allege that any Headquarters Defendant ever interacted with Erika or was aware of her mental health diagnoses or risk of suicide. The Headquarters Defendants assert that Plaintiffs' "omission of individualized, non-conclusory facts linking the personal participation of the Headquarters Defendants with [Erika's] suicide belies Plaintiffs' protestation that they are not basing their claims upon a theory of vicarious liability." Headquarters Defendants' Reply at 3.

In opposing dismissal of the Headquarters Defendants, Plaintiffs argue that the FAC sufficiently alleges a claim because the decades-long *Coleman* litigation, referenced repeatedly in the FAC, provided notice to all Defendants that "their policies and practices failed to provide constitutionally adequate mental health care and created a substantial risk of harm to inmates in Erika's position."[7] Opp'n at 12. In at least one instance, the existence of system-wide litigation has been found insufficient to support a finding that high-ranking defendants were aware that their policies would pose a risk to someone in the plaintiff's situation. *See Carrea v. California*, Case No. EDCV 07-1148-CAS, 2009 WL 1770130, at *6 (C.D. Cal. June 18, 2009) ("[P]laintiff cannot hold these defendants individually liable for damages merely by showing that, because of high-profile litigation or for other reasons, they must be aware of the prison conditions of which plaintiff complains. Even if defendants were aware of and failed to rectify system-wide deficiencies of constitutional magnitude, they will not be liable to plaintiff for damages, unless there is a sufficient causal relationship between their wrongful acts or omissions and his injuries."); *but see Starr v. Baca*, 652 F.3d 1202, 1207-12 (9th Cir. 2011).

More to the point, however, Plaintiffs' allegations as to the Headquarters Defendants are

---

[7] *But see* footnote 6, *supra*.

either amorphous or implausible. First, the FAC fails to identify: (1) any exact policy or procedure which a Headquarter Defendant enacted or adopted which was improper and directly affected Erika's treatment at the CIW, or (2) any existing governmental or institutional policy or procedure which a Headquarter Defendant intentionally or recklessly failed to enforce. Second, Plaintiffs do base their claims on the fact that the CDCR Suicide Case Review Committee found (after Erika's suicide) significant lapses in Erika's care, "*including violations of CDCR's policies and procedures*," findings which were affirmed by the *Coleman* special-master. *See* FAC ¶ 65 (emphasis added). Thus, Plaintiffs argue that the CIW Defendants should be held liable for failing to adhere to policy while the Headquarters Defendants should be held liable for implementing that very policy. The obvious tension is apparent in Plaintiffs' opposition brief which argues that Headquarters Defendants' liability is premised on the "known deficienc[y] in [their] policies, practices, and training" which includes that "treatment plans were 'copied and pasted' from one report to another." Opp'n at 12. It is implausible to suggest, and Plaintiffs have not specifically alleged, that the Headquarters Defendants implemented a *policy* of "cutting and pasting." Rather, the FAC alleges that the CDCR Suicide Case Review Committee found that the CIW Defendants disregarded the Headquarters Defendants' policies as it relates to the care Erika received. *See, e.g.*, FAC ¶ 65. For that reason, the Court would find that the FAC fails to state a § 1983 claim against the Headquarters Defendants in that it fails to allege any specific policy that led or contributed to Erika's death. Thus, the Court would dismiss the first and second causes of action against those defendants.

    B.  Third Cause of Action: Substantive Due Process Violation

In the third cause of action, Plaintiff Reza alleges that Defendants' "aforementioned acts and/or omissions" of deliberate indifference to Erika's serious medical need deprived Reza of her liberty interest in the parent-child relationship in violation of Reza's substantive due process rights pursuant to the First and Fourteenth Amendments of the United States Constitution. *See* FAC ¶ 120. Preliminarily, the Court would find that Plaintiffs have failed to state a deliberate indifference § 1983 claim against the Defendants and therefore this third cause of action must be dismissed. *See Lemire*, 726 F.3d at 1075 ("Just as the deliberate indifference of prison officials to the medical needs of prisoners may support Eighth Amendment liability, such indifference may also 'rise to the conscience-shocking level' required for a substantive due process violation.") (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849-50 (1998)).

Additionally, the Defendants also argue that the claim must be dismissed because Reza was not a natural, adoptive, or custodial parent of Erika and therefore the relationship is not afforded constitutional protection. *See* CIW Reply at 11. Although it need not, the Court would give its initial thoughts on this claim.

"[I]ntimate association receives protection as a fundamental element of personal liberty. Such protection, however, extends only to certain kinds of highly personal relationships." *Erotic Serv. Provider Legal Educ. & Research Project v. Gascon*, 880 F.3d 450, 458 (9th Cir. 2018) (citations omitted). Neither side has directed the Court to any case in which a "parental figure" (as opposed to an actual parent) was held to have a substantive due process right to familial association. Similarly, neither side has directed the Court to any case in which such an argument was advanced and rejected. In the absence of binding or even persuasive authority on this point, the Court must consider whether any precedent lends support to the notion that a "parental figure" may raise a constitutional claim predicated on a state actor's alleged interference with the right to intimate association.

> It is well established that a parent has a "fundamental liberty interest" in "the companionship and society of his or her child" and that "[t]he state's interference with that liberty interest without due process of law is remediable under Section 1983." *Kelson v. City of Springfield*, 767 F.2d 651, 654-55 (9th Cir. 1985) (citing *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)). "[T]his constitutional interest in familial companionship and society logically extends to protect children from unwarranted state interference with their relationships with their parents." *Smith v. City of Fontana*, 818 F.2d 1411, 1418 (9th Cir. 1987) *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999). Moreover, "the First Amendment protects those relationships, including family relationships, that presuppose 'deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.'" *Board of Dir. v. Rotary Club*, 481 U.S. 537, 545, 107 S. Ct. 1940, 95 L. Ed. 2d 474 (1987) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 619-20, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984)); *see also Conti v. City of Fremont*, 919 F.2d 1385, 1388-89 (9th Cir. 1990).

*Lee v. City of Los Angeles*, 250 F.3d 668, 687 (9th Cir. 2001). In *Roberts v. United States Jaycees*, 468 U.S. 609 (1984), the Supreme Court considered a large civic organization's categorical exclusion of women. The state of Minnesota enacted legislation requiring the

organization to admit women; the organization brought suit in federal district court seeking declaratory and injunctive relief to prevent enforcement of the legislation. *See id.* Beginning with the proposition that "[t]he Court has long recognized that, because the Bill of Rights is designed to secure individual liberty, it must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State," the Court went on to describe in *dicta* the potential application of this right. *See id.* at 618-19.

> The personal affiliations that exemplify these considerations, and that therefore suggest some relevant limitations on the relationships that might be entitled to this sort of constitutional protection, are those that attend the creation and sustenance of a family – marriage, *e.g.*, *Zablocki v. Redhail*, [434 U.S. 374, 383-86 (1978)]; childbirth, *e.g.*, *Carey v. Population Services International*, [431 U.S. 678, 684-86 (1977)]; the raising and education of children, *e.g.*, *Smith v. Organization of Foster Families*, [431 U.S. 816, 844 (1977)]; and cohabitation with one's relatives, *e.g.*, *Moore v. East Cleveland*, [431 U.S. 494, 503-04 (1977) (plurality opinion)]. Family relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life. Among other things, therefore, they are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship. As a general matter, only relationships with these sorts of qualities are likely to reflect the considerations that have led to an understanding of freedom of association as an intrinsic element of personal liberty. Conversely, an association lacking these qualities − such as a large business enterprise − seems remote from the concerns giving rise to this constitutional protection. Accordingly, the Constitution undoubtedly imposes constraints on the State's power to control the selection of one's spouse that would not apply to regulations affecting the choice of one's fellow employees. *Compare Loving v. Virginia*, 388 U.S. 1, 12 (1967), *with Railway Mail Assn. v. Corsi*, 326 U.S. 88, 93-94 (1945).

*Id.* at 619-20. The Court went on to state that determining whether a relationship is afforded constitutional protection "unavoidably entails a careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments." *Id.* at 621. The Court declined to "mark the potentially significant points

13

on this terrain with any precision" and instead noted that factors that may be relevant include "size, purpose, policies, selectivity, congeniality, and other characteristics that in a particular case may be pertinent." *Id.*

Application of this standard produces somewhat inconsistent results as the objective characteristics of any particular relationship will vary and must be carefully assessed. For instance, in *Piscottano v. Murphy*, 511 F.3d 247, 278-80 (2d Cir. 2007), the Second Circuit entertained an argument that members of the Outlaws Motorcycle Club could assert a claim predicated on "close personal friendship" but found that the friendships there did not meet the *Roberts* standard because there was insufficient evidence to show the Outlaws were either a small or particularly selective group. On the other hand, some cases have found that friendships, seemingly regardless of the degree of closeness, are not afforded constitutional protection. *See, e.g.*, *Silverstein v. Lawrence Union Free Sch. Dist. No. 15*, No. 10-CV-10-933, 2011 U.S. Dist. LEXIS 34200, 2011 WL 1261122, at *6 (E.D.N.Y. Feb. 15, 2011), *report and recommendation adopted*, No. 10-CV-10-933, 2011 U.S. Dist. LEXIS 34239, 2011 WL 1261114 (E.D.N.Y. Mar. 30, 2011); *Cf. Dupont v. New Jersey State Police*, No. 08-CV-10220, 2009 U.S. Dist. LEXIS 71990, 2009 WL 2486052, at *9 (S.D.N.Y. Aug. 14, 2009) (finding no clearly established law protecting friendship in the qualified immunity context).[8]

Here, Plaintiffs allege that Reza was Erika's father's partner for 21 years. *See* FAC ¶ 13. While Erika was incarcerated, she and Reza "maintained [a] close relationship" and that Reza "frequently visited Erika while she was in custody at CIW." *Id.* This close relationship is alleged to have lasted for at least twenty years. *See id.* ¶ 31. In light of *Robert*'s directive to make a "careful assessment" of the factors pertinent to a particular case before determining if a relationship is afforded constitutional protection, the Court would find that − before it could decide the issue of whether Plaintiff Reza has sufficiently pleaded a claim for violation of her constitutional right to association with Erika − it would have to ascertain more of the details of her relationship with the decedent. The Court would decline to rule on the dismissal of the third cause of action and instead permit discovery as to the precise nature of Reza's relationship with Erika. Only thereafter could the Court make its careful assessment of whether their relationship

---

[8] As another example of the seemingly inconsistent application, the First Circuit has found that the relationship between unmarried cohabitants is not afforded protection, *see Poirier v. Mass. Dep't. of Corr.*, 558 F.3d 92, 96 (1st Cir. 2009), while the Second Circuit has found that the relationship between a betrothed couple is afforded protection, *see Matusick v. Cnty. Water Auth.*, 757 F.3d 31, 58-59 (2d Cir. 2014).

"involve[d] the deep attachments and commitments" necessary for constitutional protection. *See Roberts*, 468 U.S. at 619.

### C.  Fourth Cause of Action: Violations of the ADA and Rehabilitation Act

Plaintiffs allege that CDCR "violated the ADA and Rehabilitation Act by: (a) failing to provide services or reasonably accommodate Erika with access to CDCR programs and services; (b) failing to properly train and supervise CDCR staff, employees and officers on how to appropriately treat, monitor, and interact with disabled persons, such as Erika; (c) discriminating against Erika on the basis of disability by dismissing her mental health complaints as childish and manipulative and failing to provide her necessary treatment." FAC ¶ 131.

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  The Rehabilitation Act similarly prohibits discrimination based on disability, and the same factors apply for analyzing a Rehabilitation Act claim and an ADA claim. *See Duffy v. Riveland*, 98 F.3d 447, 455 (9th Cir. 1996).  To state a claim, the plaintiff must allege that: (1) she is an individual with a disability; (2) she is otherwise qualified to participate in or receive the benefit of the public entity's services, programs, or activities; (3) she was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of her disability. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002).

Both the ADA and the Rehabilitation Act apply in the state prison context, and prevent disabled prisoners from being excluded from participation in prison programs or discriminated against in the various aspects of prison life. *Armstrong v. Wilson*, 124 F.3d 1019, 1022-24 (9th Cir. 1997).  However, courts have held that the ADA and Rehabilitation Act are not violated by a prison's failure to adequately address the medical needs of disabled inmates. *See Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) (so holding, and noting that "the courts have labored mightily to prevent the transformation of the Eighth Amendment's cruel and unusual punishments clause into a medical malpractice statute for prisoners.  We would be exceedingly surprised to discover that Congress had made an end run around these decisions in the Americans with Disabilities Act"); *see also Simmons*, 609 F.3d at 1022 ("The ADA prohibits

15

discrimination because of disability, not inadequate treatment for disability."); *Arreola v. California Dept. of Corrections and Rehabilitation*, Case No. CV-16-3133-JD, 2017 WL 1196802, at *2-3 (N.D. Cal. Mar. 31, 2017) (dismissing prisoner's ADA claim for failure to allege denial of participation in prison programs or services for being disabled).

The Court would find that the FAC's allegations relate to the treatment Erika received while incarcerated, and not any bar or discrimination as to the treatment. Plaintiffs have made no allegation that Erika was denied participation in any program or services as a result of her mental health. To the contrary, the FAC is replete with allegations that Erika was participating in and receiving care from prison staff (albeit maybe not fully adequate care). Plaintiffs allege that the care she received was inadequate, negligent, or worse, but that is insufficient to state a claim under the ADA or Rehabilitation Act. *See Bryant*, 84 F.3d at 249. Accordingly, the Court would dismiss Plaintiff's fourth cause of action for failure to state a claim.

### D.  Fifth, Sixth, Seventh and Eighth Causes of Action: State Law Claims

Plaintiffs' fifth, sixth, seventh, and eighth causes of action allege state law claims against all Defendants. As described above, Plaintiffs' allegations regarding the Headquarters Defendants and the CIW Supervisory Defendants amount to allegations of their titles and general responsibilities. Pursuant to California Government Code § 820.8 "a public employee is not liable for an injury caused by the act or omission of another person." It is apparent that Plaintiffs allege a theory of respondeat superior, a doctrine that has no application here. *See id.* As such, the Court would dismiss the fifth, sixth, seventh, and eighth causes of action for failure to state a claim against the Headquarters and CIW Supervisory Defendants.

Having dispatched with those Defendants, the Court is left only with the sixth cause of action – wrongful death – alleged against the CIW Provider Defendants. The elements of a California wrongful death claim are: "(1) a 'wrongful act or neglect' on the part of one or more persons that (2) 'cause[s]' (3) the 'death of [another] person.'" *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 390 (Cal. 1999) (quoting Cal. Civ. Proc. Code § 377.60). The Provider Defendants assert this cause of action should similarly be dismissed because "[t]here are no allegations that either Provider Defendant was aware of an imminent risk of suicide." CIW Defendants' Reply at 21. The Court considered that argument in the context of the first and second causes of action and rejected it. For the same reasons, the Court would find that Plaintiffs have stated a claim for wrongful death against Defendants Velez and Pulling based upon averments amounting to their

16

alleged negligent treatment of Erika.

## IV. Conclusion

Based on the foregoing discussion, the Court would grant the Motion as follows: (1) it would dismiss all causes of action against Defendants Kernan, Toche, Harrington, Allison, Tebrock, Hughes and Elliot with leave to amend; and (2) it would dismiss all claims against Defendants Velez and Pulling with leave to amend except for the sixth cause of action where the Motion would be denied. Plaintiffs shall be given until August 24, 2018 to file a Second Amended Complaint with respect to the dismissed causes of action.