Barbara Enloe Hadsell, Esq. [S.B. # 086021]
Dan Stormer, Esq. [S.B. # 101967]
Caitlan McLoon, Esq. [S.B. #302798]
HADSELL STORMER & RENICK LLP
128 N. Fair Oaks Avenue
Pasadena, California 91103
Telephone: (626) 585-9600
Facsimile: (626) 577-7079
Emails: bhadsell@hadsellstormer.com
        dstormer@hadsellstormer.com
        cmcloon@hadsellstormer.com

Lori Rifkin, Esq. [S.B. # 244081]
HADSELL STORMER & RENICK LLP
4300 Horton Street, #15
Emeryville, California 94608
Telephone: (626) 585-9600
Facsimile: (626) 577-7079
Email: lrifkin@hadsellstormer.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF ERIKA ROCHA, deceased, by and through GERALDINE ROCHA and FREIDA ROCHA, as successors in interest; and LINDA REZA,<br><br>Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILIATION; SCOTT KERNAN; DIANA TOCHE; KELLY HARRINGTON; KATHLEEN ALLISON; KATHERINE TEBROCK; KIMBERLY HUGHES; JIM ELLIOT; PALOMA VELEZ; MATTHEW PULLING; and DOES 1-5, INCLUSIVE,<br><br>Defendants. | Case No.: EDCV 17-0869 GW (FFM)<br><br>[Assigned to the Honorable George H. Wu - Courtroom 9D]<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION, KERNAN, TOCHE, HARRINGTON, ALLISON, AND TEBROCK'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Date: November 8, 2018<br>Time: 8:30 a.m.<br>Crtrm: 9D, 9th Floor<br><br>Complaint Filed: May 4, 2017<br>Discovery Cut-Off: February 8, 2019<br>Motion Hrg. Cut-Off: April 1, 2019<br>Trial: May 7, 2019 |

# TABLE OF CONTENTS

**Page(s)**

Table of Authorities ................................................................................................. iii

INTRODUCTION .................................................................................................... 1

SUMMARY OF PLAINTIFFS' ALLEGATIONS ................................................... 2

I.      Notice of Erika's Serious Mental Illness and Prior Suicide Attempts ...................... 2

II.     Failure to Provide Erika Adequate Mental Health Care ............................................ 3

III.    CDCR's History of Constitutionally Inadequate Mental Health Treatment ............. 5

IV.     Headquarters Defendants Ignored Court Orders in 2015 and 2016 to
        Remediate Identified Inadequacies in Mental Health Treatment and Suicide
        Prevention .............................................................................................................. 6

ARGUMENT ............................................................................................................ 7

I.      Legal Standard ....................................................................................................... 7

II.     Plaintiffs Sufficiently Pled § 1983 Claims Against Headquarters Defendants ........ 8

        A.      Headquarters Defendants Are Not Entitled to Qualified Immunity on
                Plaintiffs' Eighth Amendment Claims ............................................................. 8

                1.      Plaintiffs Alleged Sufficient Facts to State a Claim for
                        Deliberate Indifference Against Headquarters Defendants ................. 9

                        a.      *Defendants were subjectively deliberately indifferent
                                because they knew of substantial risk of serious harm
                                to prisoners in Plaintiff's position but chose not to act* ........... 10

                        b.      *Headquarters Defendants' failure to comply with
                                Coleman orders establishes objective and subjective
                                deliberate indifference to substantial risk of harm to
                                prisoners such as Erika* ......................................................... 12

           c.    *There is a causal connection between Headquarters Defendants' failure to comply with Coleman orders and deficiencies in Erika's treatment resulting in her death* .......... 14

      2.    The Eighth Amendment Right to Adequate Mental Health Treatment, Including Treatment to Address Increased Risk of Suicide, Was Well Established in 2016 ............................................... 16

    B.    Plaintiff Reza has a Constitutionally Recognized Liberty Interest in Her Relationship with Erika .......................................................... 18

III.    Plaintiffs Properly Stated a Claim Under the ADA and Rehabilitation Act ........... 20

IV.    Plaintiffs Properly Pled Their State Law Claims Against Headquarters Defendants ................................................................................................ 21

    A.    Plaintiffs Satisfied the Government Claims Act Requirements ................... 21

    B.    Plaintiffs Pled Cognizable State Law Claims Against Headquarters Defendants ................................................................................................ 23

CONCLUSION ................................................................................................ 25

# TABLE OF AUTHORITIES

Page(s)

### Cases

*Anderson v. Creighton*
    483 U.S. 635 (1987) ................................................................. 16

*Ashcroft v. Iqbal*
    556 U.S. 662 (2009) ................................................................. 7, 8

*Ass'n for Los Angeles Deputy Sheriffs v. Cnty. of Los Angeles*
    648 F.3d 986 (9th Cir. 2011) .................................................... 8

*Backlund v. Barnhart*
    778 F.2d 1386 (1985) ................................................................ 20

*Bell Atl. Corp. v. Twombly*
    550 U.S. 544 (2007) ................................................................. 7, 8

*Brown v. Plata*
    563 U.S. 493 (2011) ................................................................. 18

*Cabrales v. Cnty. of Los Angeles*
    864 F.2d 1454 (9th Cir. 1988) .................................................. 10, 16

*United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*
    637 F.3d 1047 (9th Cir. 2011) .................................................. 7

*Carrea v. California*
    Case No. EDCV 07-1148-CAS, 2009 WL 1770130,
    2009 U.S. Dist. LEXIS 52254 (C.D. Cal. June 18, 2009) ........... 15

*Case v. Anderson*
    No. 16 Civ. 983 (NSR), 2017 U.S. Dist. LEXIS 137118
    (S.D.N.Y. Aug. 25, 2017) ......................................................... 18

*Castro v. Cnty. of Los Angeles*
    833 F.3d 1060 (9th Cir. 2016) .................................................. 16

*City of Stockton v. Sup. Ct.*
    42 Cal. 4th 730 (2007) .............................................................. 22

*Clement v. Gomez*
   298 F.3d 898 (9th Cir. 2002) ................................................................ 11

*Clouthier v. Cnty. of Contra Costa*
   591 F.3d 1232 (9th Cir. 2010) ......................................................... 10, 16

*Coleman v. Brown*
   E.D. Cal. Case No. 2:90-cv-00520-KJM-DB........................................ *passim*

*Coleman v. Wilson*
   912 F. Supp. 1282 (E.D. Cal. 1995) ...................................................... 5

*Conn v. City of Reno*
   591 F.3d 1081 (9th Cir. 2010) ......................................................... 10, 16

*Connelly v. Cty. of Fresno*
   146 Cal. App. 4th 29 (2006) ............................................................... 22

*Cunningham v. Gates*
   229 F.3d 1271 (9th Cir. 2000) ............................................................ 11

*De Vincenzi v. City of Chico*
   592 F. App'x 632 (9th Cir. 2015)........................................................ 10

*Duvall v. Cty. of Kitsap*
   260 F.3d 1124 (9th Cir. 2001) ............................................................ 21

*Erickson v. Pardus*
   551 U.S. 89 (2007) ............................................................................ 7

*Estelle v. Gamble*
   429 U.S. 97 (1976) .......................................................................... 9, 10

*Farmer v. Brennan*
   511 U.S. 825 (1994) ............................................................ 9, 10, 12, 15

*Gibson v. Cnty. of Washoe*
   290 F.3d 1175 (9th Cir. 2002) ............................................................ 11

*Hansen v. Black*
   885 F.2d 642 (9th Cir. 1989) ............................................................. 11

*Kiman v. N.H. Dep't of Corr.*
   451 F.3d 274 (1st Cir. 2006) ............................................................. 21

*Kirkpatrick v. Cnty. of Washoe*
  843 F.3d 784 (9th Cir. 2016) ........................................................................ 19

*Kwai Fun Wong v. United States*
  373 F.3d 952 (9th Cir. 2004) .......................................................................... 9

*Larez v. City of Los Angeles*
  946 F.2d 630 (9th Cir. 1991) ........................................................................ 11

*Lee v. City of Los Angeles*
  250 F.3d 668 (9th Cir. 2001) ........................................................................ 19

*Leer v. Murphy*
  844 F.2d 628 (9th Cir. 1988) ........................................................................ 11

*Lemire v. Cal. Dep't of Corrections and Rehabilitation*
  726 F.3d 1062 (9th Cir. 2013) .................................................................. 11, 20

*Lemire v. Schwarzenegger*
  2:08-cv-455-GEB-EFB, 2010 WL 430818, 2010 U.S. Dist. LEXIS 14793
  (E.D. Cal. Jan. 28, 2010) .............................................................................. 15

*Lopez v. S. Cal. Rapid Transit Dist.*
  40 Cal. 3d 780 (Cal. 1985) ............................................................................ 24

*M.H. v. County of Alameda*
  62 F. Supp. 3d 1049 (N.D. Cal. 2014) ........................................................... 12

*Manzarek v. St. Paul Fire & Marine Ins. Co.*
  519 F.3d 1025 (9th Cir. 2008) ......................................................................... 8

*McKenna v. Wright*
  386 F.3d 432 (2d Cir. 2004) ............................................................................ 9

*Miller v. Cal. Dep't of Social Servs.*
  355 F.3d 1172 (9th Cir. 2004) ....................................................................... 20

*Jun-Sung Kwak ex rel. Nam Soon Jeon v. Island Colony Hotel*
  Civil No. 11-00015 SOM/BMK, 2012 WL 1580465,
  2012 U.S. Dist. LEXIS (D. Haw. May 3, 2012) ............................................ 23

*Nelson v. Cty. of L.A.*
  113 Cal. App. 4th 783 (Ct. App. 2003) ......................................................... 23

/ / /

*NeSmith v. Cty. of San Diego*
  No. 15-cv-629 JLS, 2016 WL 4515857 (S.D. Cal. Jan. 27, 2016) ............................ 17

*Pearson v. Callahan*
  555 U.S. 223 (2009) ..................................................................................... 9

*Penn Dep't of Corr. v. Yeskey*
  524 U.S. 206 (1998) ..................................................................................... 21

*Peralta v. Dillard*
  744 F.3d 1076 (9th Cir. 2014) ..................................................................... 11

*Redman v. Cnty. of San Diego*
  942 F.2d 1435 (9th Cir. 1991) ..................................................................... 11

*Rios v. City of Fresno*
  2005 WL 1829614, 2005 U.S. Dist. LEXIS 50211
  (E.D. Cal. July 25, 2005) ............................................................................ 14

*Roberts v. Cate*
  2013 WL 268709, 2013 U.S. Dist. LEXIS 9232 (E.D. Cal. Jan. 22, 2013) ............... 15

*Roberts v. United States Jaycees*
  468 U.S. 609 (1984) ............................................................................... 18, 20

*Rodriguez v. Cal. Highway Patrol*
  89 F. Supp. 2d 1131 (N.D. Cal. March 13, 2000) ................................... 24, 25

*Saba v. Arizona*
  2017 U.S. Dist. LEXIS 101200 (D. Ariz. June 28, 2017) ............................ 18

*Simmons v. Navajo Cnty.*
  609 F.3d 1011 (9th Cir. 2010) ............................................................... 17, 20

*Smith v. City of Fontana*
  818 F.2d 1411 (9th Cir. 1987) ..................................................................... 19

*Snow v. McDaniel*
  681 F.3d 978 (9th Cir. 2012) ....................................................................... 11

*Starr v. Baca*
  652 F.3d 1202 (9th Cir. 2011) ................................................................. 8, 11

*Stockett v. Assoc. of Cal. Water Agencies Joint Powers Ins. Authority*
  34 Cal. 4th 441 (2004) ................................................................................ 22

*Taylor v. Barkes*
   135 S. Ct. 2042 (2015) ........................................................... 17, 18

*Thompkins v. Belt*
   828 F.2d 298 (5th Cir. 1987) ...................................................... 11

*Wakefield v. Thompson*
   177 F.3d 1160 (9th Cir. 1999) .................................................... 14

*Wheeler v. City of Santa Clara*
   894 F.3d 1046 (9th Cir. 2018) .................................................... 19

*Williams v. Grant Cty.*
   2016 U.S. Dist. LEXIS 123078 (D. Or. Sep. 12, 2016) ............... 18

*Wilson v. Seiler*
   501 U.S. 294 (1976) ................................................................... 10

**Federal Statutes**

42 U.S.C. § 1983 (Deprivation of rights) ..................................... 8, 11

**Federal Rules**

Federal Rule of Civil Procedure
   8(a)(2) ......................................................................................... 7
   12(b)(6) ....................................................................................... 8

**State Statutes**

California Government Code
   § 820.2 ...................................................................................... 24
   § 820.8 ...................................................................................... 24
   § 845.2 ...................................................................................... 25

**Constitutional Provisions**

U.S. Const. amend. I ................................................................... 19

U.S. Const. amend. VIII .......................................................... *passim*

U.S. Const. amend. XIV .......................................................... 2, 19

**INTRODUCTION**

California Department of Corrections and Rehabilitation ("CDCR") Defendants failed to ensure provision of adequate mental health treatment to Erika Rocha while she was incarcerated at the California Institution for Women ("CIW"), in deliberate indifference to her serious mental health needs. As a result, Erika committed suicide on April 14, 2016, just one day prior to her scheduled Parole Board Hearing. The suicide rate at CIW at the time of Erika's death was more than five times the already-elevated rate for all other CDCR prisons, and more than eight times the national rate for women's prisons.

As set forth in Plaintiffs' Second Amended Complaint ("SAC"), a federal court had previously and repeatedly ordered CDCR administrator Defendants to correct the very deficiencies in mental health treatment at CIW that led to Erika's death. On February 3, 2015, and again on April 5, 2016, the Court in *Coleman v. Brown*, E.D. Cal. Case No. 2:90-cv-00520-KJM-DB, ordered CDCR officials to correct specific elements of CDCR's unconstitutional provision of mental health care that had been found to exist at CIW, including:

- failures by mental health clinicians to provide adequate treatment plans, conduct complete Suicide Risk Evaluations, and properly identify and classify at-risk inmates;
- improper identifications of inmates who threaten suicide as "manipulative";
- housing policies that placed inmates discharged from suicide observation status into cells that were not suicide-resistant;
- and improper use of the "five-day follow-up" protocols.

By willfully failing to remediate these deficiencies, CDCR's chain of command responsible for implementing the *Coleman* Court's orders related to mental health—including Defendants Kathleen Allison, Kelly Harrington, Scott Kernan, Katherine Tebrock, and Diana Toche ("Headquarters Defendants")—knowingly ignored substantial risk of serious harm, including suicide, to prisoners with mental illness at CIW. Their failures resulted in Erika's otherwise preventable death.

1    Headquarters Defendants' own actions and omissions directly give rise to Plaintiffs'
2    claims for violations of the Eighth Amendment, Fourteenth Amendment, and various state
3    law claims. Plaintiffs also brought an ADA and Rehabilitation Act claim directly against
4    CDCR, which CDCR moves to dismiss as part of the Headquarters Defendants' motion.
5    This Court should deny the Headquarters Defendants' Motion to Dismiss in its entirety.

6                              **SUMMARY OF PLAINTIFFS' ALLEGATIONS**

7    Plaintiffs' SAC includes detailed allegations regarding each Headquarters
8    Defendant's notice and subjective knowledge of deficiencies in the provision of mental
9    health care at CIW, and how each Defendant's failure to cure those deficiencies resulted in
10   Erika Rocha's inadequate mental health treatment and suicide.

11   **I.    Notice of Erika's Serious Mental Illness and Prior Suicide Attempts**

12   Erika was just 16 years old when she entered CDCR custody in 1997 to serve a 19-
13   year sentence. SAC at ¶ 70. Since the death of her mother when Erika was seven years old,
14   Erika had been abused and neglected for years by various family members in whose care
15   she was placed. *Id.* at ¶¶ 65-66. According to CDCR records, Erika attempted suicide eight
16   times between the ages of 7 and 14. *Id.* at ¶ 73. CDCR personnel placed Erika in the Mental
17   Health Services Delivery System with a diagnosis of Major Depressive Disorder. *Id.* at ¶¶
18   72-75.

19   Erika was incarcerated at Central California Women's Facility for 14 years until
20   September 2011, when she was transferred to CIW. SAC ¶ 76. During her incarceration,
21   CDCR personnel admitted Erika to a Mental Health Crisis Bed ("MHCB") at least nine
22   times. SAC at ¶ 77. MHCBs, or "crisis bed units," are designed to provide temporary
23   mental health services for, among other things, prisoners exhibiting "dangerousness to self
24   for any reason." *Id.* Around 2013, after her third admission to a crisis bed unit, CDCR
25   elevated Erika's level of care for mental health treatment to the Enhanced Outpatient
26   Program ("EOP") and moved her to a "Support Care Unit." *Id.* at ¶ 78. EOP level of care
27   is for prisoners with "acute onset or significant decompensation of a serious mental
28   disorder" or "[i]nability to function in [the] General Population." *Id.*

Erika attempted suicide, engaged in self-harm, and/or reported suicidal ideation in at least March 2014, October 2014, March 2015, and June 2015. SAC at ¶ 79. Throughout this period, Erika's records "reflected a fairly consistent recent pattern of emotional lability, interpersonal struggles, anxiety, depression, isolation, fear of paroling, and continued self-injury (e.g., scratching her face, hitting walls)," and CDCR clinicians assessed her as having a "high" chronic risk for suicide. *Id.* at ¶ 80.

## II.   Failure to Provide Erika Adequate Mental Health Care

Despite Erika's numerous risk factors for self-harm, her CIW mental health treatment team—led by her primary mental health clinician, Defendant Velez, until March 2016, and then by Defendant Pulling—consistently failed to appropriately assess Erika, create treatment plans, or implement appropriate interventions to address her increasing depression and anxiety in 2016.  SAC at ¶¶ 81, 84. For example, the treatment plans authored by Defendants Velez and Pulling for more than one year (from March 2015 until Erika's death in April 2016) contain identical clinical summaries, and no meaningful plans for achieving treatment "goals" such as "addressing depression." *Id.* at ¶ 83.

Around February 29, 2016, Erika told Defendant Velez that her upcoming parole hearing was making her anxious, other inmates were making her stressed, and she had been isolating herself. SAC at ¶ 86. However, on March 1, 2016, Defendant Velez, who had been Erika's assigned clinician for approximately two years, abruptly transferred Erika to another treating clinician without making a transition plan or conducting any transitional or closure sessions with Erika. *Id.*

On March 4, 2016, Erika met with her new assigned primary mental health clinician, Defendant Pulling. SAC at ¶ 87. Despite being told that Erika needed help with anxiety, Defendant Pulling failed to provide a treatment plan to address anxiety or any of Erika's other reported symptoms. *Id.* Defendant Pulling consistently left Erika's treatment plans blank despite her increasing symptoms. *Id*. at ¶¶ 87-89.

While CDCR policy requires that individual treatment planning for a patient at the EOP level of care includes a meeting of the Interdisciplinary Treatment Team and the

1   inmate-patient at least every 90 days for the purpose of identifying treatment needs, Erika's
2   medical records contain no record of Interdisciplinary Treatment Team meetings for the
3   eight months between September 2015 and her death in April 2016. SAC at ¶ 85. This
4   means that Erika was not receiving necessary individualized treatment planning to address
5   her reports of increasing anxiety and depression as her parole hearing neared. *Id.*

6       On the afternoon of March 31, 2016, Erika expressed suicidal ideation, and CDCR
7   staff placed her on continuous observation in "alternative housing" overnight. SAC at ¶ 91.
8   The required placement for a prisoner on suicide watch, per CDCR policy, was an MHCB,
9   but the MHCB unit at CIW was full.[1] *Id.* The next day, April 1, a psychiatrist assessing
10  Erika noted that she expressed increasing anxiety about her parole hearing in two weeks.
11  *Id.* at ¶ 92. Nevertheless, the psychiatrist discharged her from alternative housing back to
12  the Support Care Unit with a medication adjustment and "five-day step down" by mental
13  health staff. *Id.* Despite upcoming hearing and potential release dates being well-
14  established suicide risk factors, the psychiatrist did not include any other treatment
15  modifications to address Erika's anxiety or her expressed suicidal ideation and did not refer
16  her to the MHCB, as should have been done. *Id.* at ¶¶ 92-93. Another clinician conducted
17  a Suicide Risk Evaluation that same day, but left key sections of the Suicide Risk
18  Evaluation assessment form blank, and filled out other sections by simply cutting and
19  pasting information from previous assessments. *Id.* at ¶ 94.

20      Over the next two weeks Erika exhibited "noticeable behavioral changes," including
21  absences from programming, staying in her cell, refusing psychotropic medication, and
22  fighting with her cellmate, which medical staff failed to address. SAC at ¶¶ 95. Despite
23  these marked changes in Erika's behavior, notes from mental health staff daily rounds from
24  April 2-6 simply state that Erika was presenting as calm, cooperative, and well-groomed.
25  *Id.* On April 4, 2016, Defendant Pulling met with Erika  and "asked her to take
26  responsibility for using suicidal threats to get what she wanted, that the behavior was

27

28  [1] "Alternative housing units" have been determined to inappropriately discourage inmates
    from reporting suicidal ideation. SAC at ¶ 91.

childish and most serious as people do kill themselves," scolded her about "the difference between a child and an adult," and "[c]hallenged" Erika to "act in an adult fashion." *Id.* at ¶ 97. After seeing Erika again on April 11, despite her changes in behavior and approaching parole hearing date, Pulling did not schedule Erika for a follow-up appointment or make any changes to her treatment plan. *Id.* at ¶¶ 98-99.

On April 14, 2016, the day before her scheduled parole hearing, custody staff found Erika hanging in her cell. SAC at ¶ 102. Erika was already in a state of rigor mortis, indicating that she had been hanging for several hours before she was found. *Id.* at ¶ 103. The CDCR Suicide Case Review Committee identified significant lapses in Erika's mental health treatment, including violations of CDCR policies and procedures, and determined that her suicide was both foreseeable and preventable. *Id.* at ¶ 106.

## III. CDCR's History of Constitutionally Inadequate Mental Health Treatment

In 1990, prisoners with serious mental illness filed a federal class action alleging inadequate provision of mental health treatment by CDCR in violation of the Eighth Amendment. *Coleman v. Wilson*, E.D. Cal. Case No. S-90-cv-00520 KJM-DB. SAC at ¶ 36. In 1995, the *Coleman* Court held CDCR was providing constitutionally inadequate mental health treatment. *See Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal. 1995). *Id.* at ¶ 37. The *Coleman* Court ordered CDCR to remedy deficiencies in mental health treatment and appointed a Special Master to monitor implementation of the remedy, including with respect to "suicide prevention." *Id.* at ¶¶ 38-39.

The *Coleman* Court has consistently made findings and issued corresponding orders over the past decades relating to CDCR's inadequate suicide prevention policies and practices that are reviewed directly by the CDCR statewide chain of command responsible for oversight and implementation of mental health treatment policies, procedures, and practices, including the Secretary of CDCR, the Undersecretary of Health Care Services, the Director of the Division of Adult Institutions, and the Deputy Director of the Statewide Mental Health Program for CDCR. SAC ¶ 42. In 2013, for example, the *Coleman* Court found that suicide rates in CDCR remained "nearly 80% higher than the national average

for prison populations," and that "more than seventy percent of inmate suicides in California involve significant inadequacies about which defendants have known for years." *Id.* at ¶¶ 46-47.

## IV.   Headquarters Defendants Ignored Court Orders in 2015 and 2016 to Remediate Identified Inadequacies in Mental Health Treatment and Suicide Prevention

On February 3, 2015—more than a year before Erika's death—the *Coleman* Court entered an order adopting the Special Master's recommendations addressing serious deficiencies in CDCR's provision of mental health care to prisoners at risk of suicide, including: (i) improved training for dealing effectively with prisoners perceived to be manipulative and those at risk for suicide despite their denials of suicidality; (ii) improved training regarding the completion of accurate Suicide Risk Evaluations and regular audits to ensure compliance; (iii) implementation of policies that require "[a]ny inmate discharged from suicide observation status . . . [to] be initially housed in a suicide-resistant, retrofitted cell"; (iv) implementation of training on treatment planning for suicidal prisoners; (v) corrective training regarding "[t]he perception that all inmates who threaten suicide are manipulative"; and  (vi) complete revision of the "Five-Day Follow-up" protocol. SAC at ¶¶ 50-51. The Court ordered implementation of these changes because of "poor" suicide prevention practices at CIW and other prisoners that put inmates at extremely high risk of death. *Id.* at ¶¶ 48-49.

During 2015 and 2016, there were five CDCR officials (Headquarters Defendants) primarily responsible for reviewing the *Coleman* Court's orders, making necessary changes to CDCR policies, procedures, practices, and trainings, and ensuring that these changes were actually implemented through CDCR: (1) Defendant Scott Kernan, Secretary of CDCR; (2) Defendant Diana Toche, Undersecretary of Health Care Services for CDCR; (3) Defendant Kelly Harrington and (4) Defendant Kathleen, Allison, Directors of the Division of Adult Institutions for CDCR, respectively, during this time period; and (5) Katherine Tebrock, Deputy Director of the Statewide Mental Health Program for CDCR. SAC at ¶¶ 21-25, 44, 48, 51. Indeed, Defendants Kernan, Toche, and Tebrock were named

1    defendants in the *Coleman* case in their official capacities. Inspections of CIW and other
2    prisons in 2016 by the Special Master showed that Headquarters Defendants failed to act
3    to ensure effective implementation of the *Coleman* Court's February 3, 2015 order. *Id.* at
4    ¶¶ 52-55. As a result, the *Coleman* Court issued a new order on April 5, 2016, directing
5    again that these CDCR officials follow its February 3, 2015 order. *Id.* at ¶¶ 56-57.

6         Headquarters Defendants' failure to ensure implementation of the *Coleman* Court's
7    orders at CIW in 2015 and 2016 resulted in inadequate mental health treatment and suicide
8    prevention for Erika in a time of increasing anxiety leading up to her parole hearing,
9    culminating in her suicide. SAC at ¶¶ 58-64. In 2016, the California State Auditor found
10   that the CDCR state-level chain of command responsible for mental health treatment in the
11   prisons had not provided sufficient oversight and leadership to ensure that staff at CIW
12   were adequately trained in suicide prevention and response to attempted suicide, or to
13   ensure that CDCR mental health treatment and suicide prevention policies were actually
14   implemented. *Id.* at ¶ 10, 59-64.

## ARGUMENT

### I.   Legal Standard

15        Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the
18   claim showing that the pleader is entitled to relief." "Specific facts are not necessary; the
19   statement need only 'give the defendant fair notice of what the . . . claim is and the grounds
20   upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atl. Corp.*
21   *v. Twombly*, 550 U.S. 544, 555 (2007)). On a motion to dismiss, the Court must determine
22   whether the complaint's factual allegations, accepted as true, together with all reasonable
23   inferences, state a plausible claim for relief. *United States ex rel. Cafasso v. Gen. Dynamics*
24   *C4 Sys., Inc.*, 637 F.3d 1047, 1054 (9th Cir. 2011) (citing *Ashcroft v. Iqbal*, 556 U.S. 662,
25   678-79 (2009)).

26        "Rule 8(a) '*does not impose a probability requirement at the pleading stage*; it
27   simply calls for enough fact to raise a reasonable expectation that discovery will reveal
28   evidence' to support the allegations." *Starr v. Baca*, 652 F.3d 1202, 1217 (9th Cir. 2011)

1  (quoting *Twombly*, 550 U.S. at 556) (emphasis in *Starr*); *see also Iqbal*, 556 U.S. at 678

2  ("A claim has facial plausibility when the plaintiff pleads factual content that allows the

3  court to draw the reasonable inference that the defendant is liable for the misconduct

4  alleged."). The federal notice pleading standard requires only that a complaint contain

5  sufficient allegations of underlying facts to "plausibly suggest an entitlement to relief," and

6  "to give fair notice and enable the opposing party to defend itself effectively." *Starr*, 652

7  F.3d at 1216. "The theory of the federal rules is that once notice-giving pleadings have

8  been served, the parties are to conduct discovery in order to learn more about the underlying

9  facts." *Id.* at 1212.

10      Dismissal under Federal Rule of Civil Procedure 12(b)(6) is proper only "if it

11  appears beyond doubt that the non-movant can prove no set of facts to support its claims."

12  *Ass'n for Los Angeles Deputy Sheriffs v. Cnty. of Los Angeles*, 648 F.3d 986, 991 (9th Cir.

13  2011). Any such dismissal under Rule 12(b)(6) must be made with leave to amend, "unless

14  it is clear . . . that the complaint could not be saved by any amendment." *Manzarek v. St.*

15  *Paul Fire & Marine Ins. Co.*, 519 F.3d 1025 (9th Cir. 2008).

16  **II.    Plaintiffs Sufficiently Pled § 1983 Claims Against Headquarters Defendants**

17      Plaintiffs assert three claims under 42 U.S.C. § 1983 against Headquarters

18  Defendants: (1) failure to provide mental health treatment in violation of the Eighth

19  Amendment; (2) failure to protect from harm in violation of the Eighth Amendment; and

20  (3) deprivation of Linda Reza's right to familial relationship in violation of the First and

21  Fourteenth Amendments. Headquarters Defendants argue that they are entitled to qualified

22  immunity on all three claims, and that Ms. Reza does not have a constitutionally protected

23  relationship. For the reasons stated below, this Court should reject Defendants' arguments.

24      **A.    Headquarters Defendants Are Not Entitled to Qualified Immunity on**

25          **Plaintiffs' Eighth Amendment Claims**

26      Qualified immunity protects government officials from suits for money damages

27  only "insofar as their conduct does not violate clearly established statutory or constitutional

28  rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S.

223, 231 (2009). A plaintiff can rebut a qualified immunity defense in a motion to dismiss by proving two elements: (1) the facts alleged state a violation of a constitutional right, and (2) the right was clearly established at the time of the alleged misconduct. *Id.* at 232. The SAC includes detailed factual allegations that Headquarters Defendants are liable for their own acts in failing to remediate known substantial risk of serious harm to individuals in Erika's position in violation of clearly established law requiring adequate mental health treatment for prisoners with serious mental health needs. Accordingly, Defendants are not entitled to qualified immunity at the pleading stage.

Notably, the Ninth Circuit has warned that ruling on qualified immunity at the motion to dismiss stage puts the court in the untenable position of attempting to decide "far-reaching constitutional questions on a nonexistent factual record." *Kwai Fun Wong v. United States*, 373 F.3d 952, 957 (9th Cir. 2004). Accordingly, courts should rarely dismiss a case on qualified immunity grounds at such an early stage, particularly when discovery will "readily reveal" whether Plaintiffs' claims have merit. *Id.*; *see also McKenna v. Wright*, 386 F.3d 432, 434-36 (2d Cir. 2004) (explaining the defense of qualified immunity faces a "formidable hurdle" when asserted on a motion to dismiss, because a plaintiff "is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense").

### 1.   Plaintiffs Alleged Sufficient Facts to State a Claim for Deliberate Indifference Against Headquarters Defendants

As the Court has acknowledged in its prior orders in this case, a prisoner establishes a violation of her Eighth Amendment rights if she can show that a prison official acted with "deliberate indifference" to "a substantial risk of serious harm," *Farmer v. Brennan*, 511 U.S. 825, 836 (1994), or to a prisoner's "serious medical needs," *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Generally, proof of an Eighth Amendment violation under either of these theories has two components: (1) an objective component that identifies a significant risk to prisoner safety or a serious medical concern, and (2) a subjective component that requires a finding that each defendant knew of an excessive risk to health or safety but

1 failed to respond adequately to that risk. *Estelle*, 429 U.S. at 106; *Wilson v. Seiler*, 501 U.S.
2 294, 298-99 (1976).

3       Headquarters Defendants do not dispute that Plaintiffs satisfied the pleading
4 standards for the "objective" components of their Eighth Amendment claims: Plaintiffs
5 sufficiently pled deficiencies in provision of medical care to Erika and the failure by
6 Defendants to protect her from the serious harm of suicide. Indeed, courts have long
7 recognized that failure to address an inmate's particular vulnerabilities to suicide that were
8 known or should be known constitutes deliberate indifference under the Eighth
9 Amendment. *See e.g. Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1245 (9th Cir.
10 2010); *Conn v. City of Reno*, 591 F.3d 1081 (9th Cir. 2010); *De Vincenzi v. City of Chico*,
11 592 F. App'x 632, 634 (9th Cir. 2015); *Cabrales v. Cnty. of Los Angeles*, 864 F.2d 1454,
12 1461-62 (9th Cir. 1988).

13       Rather, Headquarters Defendants move to dismiss claiming Plaintiffs fail to plead
14 sufficient facts to establish the subjective prong of deliberate indifference as to each of
15 them individually. Specifically, they argue that the SAC "does not plausibly allege that
16 they were actually aware that Erika was in 'substantial danger' of killing herself, yet
17 deliberately ignored that risk" and that the SAC "contains no allegations that any
18 Headquarters Defendant directly interacted with Erika or with any of her treating
19 clinicians." HQ MTD at 14.

20       *a.*      ***Defendants were subjectively deliberately indifferent because***
21             ***they knew of substantial risk of serious harm to prisoners in***
22             ***Plaintiff's position but chose not to act***

23        Defendants' argument regarding subjective deliberate indifference misstates
24 binding precedent: under the Eighth Amendment, liability does not rest on whether
25 Headquarters Defendants were individually familiar with Erika specifically, but, rather,
26 whether they were deliberately indifferent to conditions that placed prisoners situated
27 similarly to Erika at substantial risk of harm. *Farmer*, 511 U.S. at 843-44 ("[I]t does not
28 matter . . . whether a prisoner faces an excessive risk . . . for reasons personal to him or

because all prisoners in his situation face such a risk"); *see also Redman v. Cnty. of San Diego*, 942 F.2d 1435 (9th Cir. 1991) (same); *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1191 (9th Cir. 2002) ("As long as a jury can infer that the policymakers knew that their policy of not screening certain incoming detainees would pose a risk to someone in [plaintiff's] situation, we must reverse the summary judgment in favor of the County.").

Indeed, this Court has already explained that "a plaintiff may state a claim if policymakers knew that their policy, practice or order would pose a serious risk to someone in plaintiff's situation and nevertheless made that decision which resulted in injury." ECF No. 71 at 6 (citing *Lemire v. Cal. Dep't of Corrections and Rehabilitation*, 726 F.3d 1062, 1078 (9th Cir. 2013)); *see also Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989) (quoting *Thompkins v. Belt*, 828 F.2d 298, 303-304 (5th Cir. 1987)) (explaining liability can exist "even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation"); *Clement v. Gomez*, 298 F.3d 898, 905 (9th Cir. 2002) (same); *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).

Thus, while a supervisory official is not liable under § 1983 for the actions of subordinates on a vicarious liability theory, a supervisor is liable for his or her own actions "where there is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." ECF 71 at 9 (citing *Snow v. McDaniel*, 681 F.3d 978, 989 (9th Cir. 2012), overruled in part on other grounds by *Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014)). As this Court explained, a causal connection can include: "(1) [the supervisors'] own culpable action or inaction in the training, supervision, or control of subordinates; (2) their acquiescence in the constitutional deprivation of which a complaint is made; or (3) [their] conduct that showed a reckless or callous indifference to the rights of others." ECF No. 71 at 9 (citing *Lemire*, 726 F.3d at 1075 (quoting *Cunningham v. Gates*, 229 F.3d 1271, 1292 (9th Cir. 2000))); *see also Starr*, 652 F.3d at 1205-06; *Larez v. City of Los Angeles*, 946 F.2d 630, 645-46 (9th Cir. 1991). Failure to train prison staff may serve as the basis for liability where the failure to train amounts to deliberate

indifference to the rights of persons with whom custody staff will foreseeably come into contact. *See M.H. v. County of Alameda*, 62 F.Supp.3d 1049, 1081-82 (N.D. Cal. 2014).

> **b.** **Headquarters Defendants' failure to comply with** *Coleman* *orders establishes objective and subjective deliberate indifference to substantial risk of harm to prisoners such as Erika*

It is also well-established that "evidence showing that a substantial risk of harm was longstanding, pervasive, well-documented, or expressly noted in the past and the official had been exposed to information concerning the risk . . . could be sufficient to permit a trier of fact to find that the official had actual knowledge of the risk." *Farmer*, 511 U.S. at 842-43. Plaintiffs' SAC includes detailed allegations about identified deficiencies in mental health treatment and suicide prevention the *Coleman* Court ordered Headquarter Defendants to correct prior to Erika's death, SAC at ¶¶ 10-12, 42-58; the *Coleman* Court's findings about Defendants' failures to implement the Court's orders with respect to mental health treatment and suicide prevention practices, *id.* at ¶¶ 10-12, 53-55, 59-64; and how these particular omissions by Defendants were linked to deficiencies in Erika's treatment that led directly to her death, *id.* at ¶¶ 10-12, 76-101, 106-115.

Specifically, on February 3, 2015—more than a year before Erika's death—the *Coleman* Court ordered CDCR officials to implement certain changes to correct serious deficiencies the Special Master had identified in provision of mental health care to suicidal inmates in CDCR. These changes included:

- Improved training for suicide prevention that specifically covers "(1) self-injurious v. suicidal behavior and dealing effectively with inmates perceived to be manipulative; [and] (2) identifying inmates at risk for suicide despite their denials of risks";

- Improved training and mentoring regarding the completion of accurate Suicide Risk Evaluations (SREs) and regular audits of clinicians' SREs to ensure they were being completed thoroughly;

- Corrections to housing policies to require "[a]ny inmate discharged from suicide observation status and arriving in administrative segregation from either a Mental Health Crisis Bed or alternative housing [to] be initially housed in a suicide-resistant, retrofitted cell";

- The development of a timetable for training all mental health clinicians on treatment planning for the suicidal inmate, both in connection with SREs and as a regular treatment practice;

- Corrective training regarding "[t]he perception that all inmates who threaten suicide are manipulative," which "persists among the treatment teams as a misguided mindset," and "should be repeatedly addressed at different levels of training; and

- Complete revision of the "Five-Day Follow-up" protocol, which includes mandatory 30-minute safety checks "regardless of the housing units to which they are transferred" that continues past five days as "determined on a case-by-case basis by the mental health clinician" and "clinically justified in the inmate's treatment plan" and which forbids "five-day follow-up assessments . . . as an alternative to MHCB or alternative housing for an inmate expressing suicidal ideation and/or engaging in self-injurious behavior."

SAC at ¶¶ 50-51. The Court ordered officials to implement these changes in part because CIW and other prisons had such "poor" suicide prevention practices that were putting inmates at an extremely high risk of death. *Id.* at ¶¶ 48-49.

Plaintiffs specifically allege that *each* of the Headquarters Defendants individually was on notice of these *Coleman* orders and Special Master reports—including Kernan, Toche, and Tebrock, who were named defendants in the *Coleman* litigation at that time. SAC at ¶¶ 21-25. Plaintiffs further allege that, given each Headquarters Defendant's respective responsibilities within the CDCR mental health chain of command, *each* was responsible for ensuring compliance with the *Coleman* Court's orders, but failed to do so. *Id.* at ¶¶ 10, 12, 21-25, 44, 48, 51, 58-64. In their respective positions, Headquarters

Defendants had responsibility for determining what prison mental health and suicide prevention policy would be and how it was implemented, taking any corrective action necessary, and ensuring the safety and security of the inmates in their care during the relevant time period. *Id.* at ¶¶ 21-25. Plaintiffs do not rely solely on Defendants' job titles, but on findings by the *Coleman* Court and the California State Auditor about the failures of CDCR corrections and mental health leadership, and these particular Headquarters Defendants' involvement in, for example, a statewide suicide prevention management working group, a statewide suicide prevention summit, and CDCR leadership's responses to the Auditor's report. *See, e.g.*, *id.* at ¶¶ 56-64, 109-110, 48 62, 21. Defendants' suggestion that Plaintiffs must be able to identify exactly which Defendant individually committed each act or omission at which exact time markedly overstates the pleading standard. *See Rios v. City of Fresno*, 2005 WL 1829614 at *5 (E.D. Cal. July 25, 2005); *Wakefield v. Thompson*, 177 F.3d 1160, 1163 (9th Cir. 1999). Moreover, even were that the pleading standard, the detailed allegations of the SAC demonstrate Headquarters' Defendants personal involvement in review and implementation of these mental health treatment and suicide prevention policies, procedures, and training.[2]

> c.   **There is a causal connection between Headquarters Defendants' failure to comply with Coleman orders and deficiencies in Erika's treatment resulting in her death**

Headquarters Defendants also argue that the *Coleman* litigation cannot constitute evidence of notice to high-level prison officials of deficiencies in the provision of mental-health care to specific prisoners. *See* HQ MTD at 14-15. The cases Defendants cite for this

---

[2] To the extent that the Court is again inclined to dismiss any of Plaintiffs' constitutional deliberate indifference claims against Headquarters Defendants, Plaintiffs request that it do so without prejudice to further amendment, given the very recent report by CDCR's chief prison psychologist alleging that CDCR administrators have been presenting inaccurate and misleading data to the *Coleman* Court regarding mental health treatment in CDCR. *See* https://www.sacbee.com/news/state/california/article219790940.html and https://www.sacbee.com/news/local/crime/article219930315.html. This information was not public at the time Plaintiffs filed their SAC, and the *Coleman* Court is currently holding hearings to determine whether top-level CDCR officials have committed "fraud on the court," and whether to unseal the chief psychologist's report. *See* E.D. Cal. Case No. 2:90-cv-00520-KJM-DB, ECF No. 5967, filed 10/17/18.

proposition, however, actually establish that the *Coleman* litigation can demonstrate notice, if there is a causal connection between the *Coleman* finding and the plaintiff's specific harm. *See also Farmer*, 511 U.S. at 842-43.

In *Carrea v. California*, Case No. EDCV 07-1148-CAS, 2009 WL 1770130, at *15-16 (C.D. Cal. June 18, 2009), the court explained that "if defendants were aware of and failed to rectify systemwide deficiencies of constitutional magnitude, they will [] be liable to plaintiff for damages [if] there is a sufficient causal relationship between their wrongful acts or omissions and his injuries." However, in *Carrea* no such causal relationship had been established. Similarly, in *Roberts v. Cate*, No. 2:08-cv-2624 JAM KJN P, 2013 U.S. Dist. LEXIS 9232, 2013 WL 268709, at *12 (E.D. Cal. Jan. 22, 2013), the court granted summary judgment for a defendant prison official *after discovery* because the plaintiff did not produce any evidence that the official ever received the *Coleman* report at issue, much less show a connection between the deficiencies in mental health care identified the *Coleman* report and the decision to transfer the plaintiff to a different prison facility, which was the basis of the plaintiff's claim. In *Lemire v. Schwarzenegger*, No. 2:08-cv-00455-GEB-EFB, 2010 WL 430818, at *13 (E.D. Cal. Jan. 28, 2010), the court found that the plaintiffs "have not alleged Defendants knew their subordinates were violating the mandates of *Coleman* or any regulation concerning [the plaintiff's] medical or mental-health treatment."

In stark contrast, Plaintiffs in the instant case allege each Headquarters Defendant had direct notice and knowledge of the relevant *Coleman* reports and orders, each Headquarters Defendant had responsibility for implementing the *Coleman* Court's orders, and the uncorrected inadequacies in Erika's mental health treatment leading to her death were the precise problems the *Coleman* Court twice directly ordered Defendants to correct, including: dismissing Erika as manipulative rather than assessing and appropriately treating her, relying on her denial of suicidality instead of assessing objective symptoms, failing to conduct complete suicide risk evaluations, placing her in a cell with obvious suicide hazards, and using ineffective 5-day follow-up protocols. SAC at ¶¶ 58-64, 83-101.

1  Indeed, CDCR's internal review process found that Erika's death was the "foreseeable and
2  preventable" result of these very issues. *Id*. at ¶¶ 106-107. Thus, Plaintiffs have sufficiently
3  established causation here.

### 2. The Eighth Amendment Right to Adequate Mental Health Treatment, Including Treatment to Address Increased Risk of Suicide, Was Well Established in 2016

7  Headquarters Defendants argue that, even if Plaintiffs sufficiently alleged Eighth
8  Amendment violations of Erika's right to necessary mental health treatment and protection
9  from harm, Defendants are entitled to qualified immunity because that right was not clearly
10 established at the time of the alleged misconduct. The Supreme Court has instructed courts
11 to examine whether the "contours of the right" in the action were sufficiently clear so that
12 a reasonable official would understand that he or she was violating a right. *Anderson v.*
13 *Creighton*, 483 U.S. 635, 640 (1987).

14 Here, the "contours" of an inmate's Eighth Amendment right to be free from
15 deliberate indifference to a known serious mental health need and related risk of harm were
16 sufficiently clear to CDCR Headquarters Defendants in 2016. *See, e.g.*, *Clouthier v. Cty.*
17 *of Contra Costa*, 591 F.3d 1232, 1245 (9th Cir. 2010) (inmate's rights to adequate suicide
18 prevention measures were clearly established as of 2005), overruled on other grounds by
19 *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016); *Conn v. City of Reno*, 591
20 F.3d 1081, 1094-95, 1102 (9th Cir. 2010), cert. granted, judgment vacated on other
21 grounds, 563 U.S. 915 (2011), and opinion reinstated in relevant part, 658 F.3d 897 (9th
22 Cir. 2011) (holding it was clearly established that the Eighth Amendment "protects against
23 deliberate indifference to a detainee's serious risk of suicide"); *Simmons v. Navajo Cnty.*,
24 609 F.3d 1011, 1018 (9th Cir. 2010); *Cabrales v. Cty. of Los Angeles*, 864 F.2d 1454, 1461-
25 62 (9th Cir. 1988), cert. granted, judgment vacated, 490 U.S. 1087 (1989), and opinion
26 reinstated, 886 F.2d 235 (9th Cir. 1989) (upholding verdict against county and jail
27 commander who showed deliberate indifference to inmate's risk of suicide).

28 Defendants cite *Taylor v. Barkes*, 135 S. Ct. 2042 (2015), for the proposition that

1   there is no established Eighth Amendment right "to the proper implementation of adequate
2   suicide prevention protocols." *Taylor* is inapposite. The decedent in *Taylor* was a detainee
3   who committed suicide in 2004 within 24 hours of being taken into custody, after the
4   screening process did not identify him as suicidal. *Id.* at 2043-44. The question presented
5   was whether it was clearly established in 2004 that he had a constitutional right to certain
6   suicide prevention protocols to determine whether he may have suicidal tendencies. Here,
7   in contrast, Erika was already receiving mental health treatment from CDCR because of
8   her known serious mental illness and high risk factors for suicide. The relevant question
9   presented for qualified immunity purposes is thus whether it was clearly established in
10  2016 that the Eighth Amendment required provision of adequate and necessary mental
11  health treatment to Erika in light of her known illness and risk factors. The Supreme Court
12  made this distinction explicit in *Taylor*:

13      [Third Circuit precedent] said that if officials "know or should know of the particular
14      vulnerability to suicide of an inmate," they have an obligation "not to act with
15      reckless indifference to that vulnerability." . . . The decision did not say, however,
16      that detention facilities must implement procedures to identify such vulnerable
17      inmates, let alone specify what procedures would suffice.

18  *Id.* at 2045. It is only on this second question that the Court found no affirmative clearly
19  established right.

20      This Court has already noted that *Taylor* is readily distinguishable from cases in
21  which the Supreme Court and the Ninth Circuit have concluded a prisoner's right to
22  adequate mental health treatment is clearly established. ECF No. 71 at 8.[3] Numerous courts
23  have similarly recognized this distinction in *Taylor*, and concluded that, as of 2016, the
24  Ninth Circuit had repeatedly recognized a "clearly established right" to treatment,
25  including suicide prevention, for serious mental health needs. *See, e.g., Williams v. Grant*

26
27  [3] Defendants' citation to *NeSmith v. Cty. of San Diego*, No. 15CV629 JLS (JMA), 2016
    WL 4515857, at *8 (S.D. Cal. Jan. 27, 2016), an unpublished District Court case, is
28  similarly unpersuasive, as the district court in that case inaccurately lays out the
    procedural history of *Conn.*

*Cty.*, No. 2:15-CV-01760-SU, 2016 U.S. Dist. LEXIS 123078, at *13-15 (D. Or. Sep. 12, 2016); *Saba v. Arizona*, No. CV 17-00775-PHX-DJH (ESW), 2017 U.S. Dist. LEXIS 101200, at *13-14 (D. Ariz. June 28, 2017); *Case v. Anderson*, No. 16 Civ. 983 (NSR), 2017 U.S. Dist. LEXIS 137118, at *43-48 (S.D.N.Y. Aug. 25, 2017).

Furthermore, in light of the U.S. Supreme Court's 2011 decision in *Brown v. Plata*, 563 U.S. 493, 520 (2011), discussing CDCR's placement of suicidal prisoners in cells with known suicide hazards as evidence of CDCR's failure to provide constitutionally adequate mental health care, and the *Coleman* Court's 2013 findings of "constitutional deficiencies" in the "assessment, treatment, [and] intervention" of prisoners with known suicidality at CDCR, *see* 938 F. Supp. 2d 955, 970, 974 (E.D. Cal. 2013), it is particularly unreasonable for a CDCR official to claim he or she was unaware that an inmate in Erika's position may have an Eighth Amendment claim for deliberate indifference arising out of inadequacies in the provision of mental health treatment.

### B.   Plaintiff Reza has a Constitutionally Recognized Liberty Interest in Her Relationship with Erika

Headquarters Defendants, joined by Defendants Hughes, Elliot, Velez, and Pulling (*see* ECF No. 87), renew their argument that Plaintiff Linda Reza's substantive due process claim must be dismissed because Ms. Reza can have no protected liberty interest in her relationship with Erika as she was a "stepmother" without a legal or custodial parental relationship. However, this Court has already addressed this issue, and correctly concluded that this issue cannot be resolved until after discovery because determination of whether a relationship is afforded constitutional protection "unavoidably entails a careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments," an assessment that requires the weighing of numerous factors. ECF No. 71 at 13-14 (citing *Roberts v. United States Jaycees*, 468 U.S. 609, 621 (1984)). This Court found that, "before it could decide the issue of whether Plaintiff Reza has sufficiently pleaded a claim for violation of her constitutional right to association with Erika—it would have to ascertain more of the details of her

1  relationship with the decedent." ECF No. 71 at 14.

2       Citing the Ninth Circuit's recent decision in *Wheeler v. City of Santa Clara*, 894

3  F.3d 1046 (9th Cir 2018), Defendants ask the Court to revisit its decision and conclude that

4  Ms. Reza's claim fails as a matter of law. However, *Wheeler* (decided prior to this Court's

5  July 30, 2018 order in the instant case), is consistent with this Court's analysis. In *Wheeler*,

6  the Ninth Circuit found that a biological parent who had given her child up for adoption as

7  an infant and had not maintained "consistent involvement in [the] child's life," was not

8  entitled to Fourteenth Amendment protections purely due to the biological connection. *Id.*

9  at 1058. The *Wheeler* Court recognizes that the central question is the nature of the

10 particular relationship, and not any automatic test based on the legal or biological nature

11 of the relationship with the child. *Id.*; *see also Kirkpatrick v. Cnty. of Washoe*, 843 F.3d

12 784, 789-90 (9th Cir. 2016) (looking to the nature of the contact between the parent and

13 child). Indeed, the *Wheeler* Court explicitly declined to address the issue as to children

14 "raised in non-traditional family arrangements" more broadly, as each case must be

15 examined on the basis of its own facts. *Id.*

16      The *Wheeler* decision is consistent with the Ninth Circuit's prior conclusion that the

17 right to companionship protected under the First and Fourteenth Amendments arises out of

18 the emotional nature of the familial relationship, not out of a custodial interest or right to

19 parent a minor child. *Smith v. City of Fontana*, 818 F.2d 1411, 1419 (9th Cir. 1987), cert.

20 denied, 484 U.S. 935 (1987); *Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001)

21 (explaining First Amendment protects "those relationships, including family relationships,

22 that presuppose deep attachments and commitments to the necessarily few other

23 individuals with whom one shares not only a special community of thoughts, experiences,

24 and beliefs but also distinctively personal aspects of one's life").[4]

25

26 ───────────
   [4] The other cases cited by Defendants are unhelpful to this analysis, as they analyze the
   contours of a substantive due process right to familial integrity in a different context. *See,*

27 *e.g.*, *Backlund v. Barnhart*, 778 F.2d 1386, 1389-90 (1985) (determining foster parents do
   not have the same constitutional protections as parents because the relationship "is a

28 creature of . . . child welfare statutes," which "confer no new due process rights"); *Miller*
   *v. California*, 355 F.3d 1172 (9th Cir. 2004) (same).

From the time Erika was 14 until her death at 35, Ms. Reza was her primary parental figure. SAC at ¶¶ 19, 68-69. Just before Erika was incarcerated, her social worker was working towards placing Erika with Linda at her home. *Id.* at ¶ 69. If, as Defendants allege, substantive due process rights attach only to those parents who were able to interact with a child on a daily basis, it would deny Erika—who was incarcerated at a young age and whose biological parents predeceased her—from having a protected liberty interest in the parental relationship she held most dear. Because Linda acted as Erika's parent since 1996, she has a liberty interest in the loss of her relationship and companionship with Erika.

Plaintiffs have sufficiently pled Linda's due process claim. As Defendants acknowledge, "[a] prison official's deliberately indifferent conduct will generally 'shock the conscience' so long as the prison official had time to deliberate before acting or failing to act in a deliberately indifferent manner." *Lemire*, 726 F.3d at 1075. Moreover, as this Court noted, the right of a nonbiological and nonadoptive parent to a claim for substantive due process has been established since at least 1984 with the Supreme Court's decision in *Roberts*, 468 U.S. at 621, and thus qualified immunity does not apply.

### III.    Plaintiffs Properly Stated a Claim Under the ADA and Rehabilitation Act

Defendant CDCR moves to dismiss Plaintiffs' fourth claim for violation of the ADA and Rehabilitation Act, arguing that under *Simmons*, 609 F.3d at 1022, Plaintiffs' claim fails because "[t]he ADA prohibits discrimination because of disability, not inadequate treatment for disability." HQ MTD at 18-19.

However, Plaintiffs do not argue that the inadequate treatment Erika received from CDCR agents and employees is itself the violation of the ADA and Rehabilitation Act. Rather, CDCR's willful failure "to properly train and supervise CDCR staff, employees and officers on how to appropriately treat, monitor, and interact with disabled persons" violated her rights to equal treatment on the basis of her disability. SAC at ¶ 164. Plaintiffs claim that Defendants discriminated against Erika by failing to respond reasonably in dealing with a mentally ill person experiencing an episode of psychological distress— penalizing her for her symptoms and "dismissing her mental health complaints as childish

and manipulative" based not on assessment of her mental health condition, but, rather, on poor training and stereotypes about persons with mental illness. *Id.; Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274 (1st Cir. 2006) ("[A] plaintiff may argue that her physician's decision was discriminatory on its face, because it rested on stereotypes of the disabled rather than an individualized inquiry into the patient's condition.").

Plaintiffs also allege that CDCR's failure to train staff and resulting discriminatory dismissal of Erika's mental health complaints resulted in the loss of benefits of services such as mental health follow-up and supervision, to which she would otherwise have had access. SAC at ¶ 165. These claims are cognizable under the ADA and Rehabilitation Act. *See Penn Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998) (holding activities, services, and programs in prisons qualify as "benefits" under the ADA, specifically including medical services); *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001).

## IV. Plaintiffs Properly Pled Their State Law Claims Against Headquarters Defendants

Plaintiffs bring three state law claims against Headquarters Defendants: (1) negligent supervision, hiring, training, and retention; (2) wrongful death; and (3) negligence.[5] Headquarters Defendants argue that these claims must be dismissed for failure to comply with the Government Claims Act's claim-presentation requirements. They further renew their arguments that Plaintiffs' allegations are insufficient to state cognizable state law claims or overcome the Headquarters Defendants' entitlement to governmental immunities. For the reasons stated below, Defendants' arguments each fail.

### A. Plaintiffs Satisfied the Government Claims Act Requirements

Headquarters Defendants, joined by Defendants Hughes, Elliot, Velez, and Pulling (*see* ECF No. 87), argue for the first time in their third motion to dismiss that Plaintiffs' state law claims must be dismissed because Plaintiffs Geraldine Rocha and Freida Rocha filed their government claim on their own behalf, and not in their representative capacity

---

[5] A fourth state law claim for failure to furnish / summon medical care was brought against Defendant Jaimez and Does 3-5, who have not yet made an appearance in the case.

1  on behalf of Erika's Estate. HQ MTD at 22 ("Erika's Estate was required to submit a

2  separate government claim in order for it to bring state-law claims that complied with the

3  GCA claim-presentation requirements."). This argument fails for three distinct reasons.

4  First, Geraldine and Freida in fact did file their claim on both their own behalf and

5  on behalf of Erika's Estate. Under the category "Claimant Information," a box on the

6  Government Claim Form directs that, "If your claim relates to another claim or claimant,

7  please provide the claim number or claimant's name in section 8." *See* Defts' Request for

8  Judicial Notice at 4. Plaintiffs filled in section 8 with the name "Erika Rocha." *Id.*

9  Additionally, under the category "Attorney or Representative Information," Geraldine and

10  Freida Rocha identified themselves as representatives of the "claimant," and identified

11  their relationship to the "claimant" as "sisters." Thus, Geraldine and Freida Rocha

12  effectively placed the government on notice that "Erika Rocha" was an additional claimant

13  for the claims listed in the form, and that they were serving in a representative capacity on

14  her behalf.

15  Second, Plaintiffs filed their Government Claim Form *pro se*, and thus, even if they

16  failed to meet exact technical compliance with the claims-presentation requirements, such

17  failure is not fatal to their state law claims. These requirements are intended to "provide

18  the public entity sufficient information to enable it to adequately investigate claims and to

19  settle them, if appropriate, without the expense of litigation." *City of Stockton v. Sup. Ct.*,

20  42 Cal. 4th 730, 738 (2007). "[T]he statute should not be applied to snare the unwary where

21  its purpose is satisfied." *Stockett v. Assoc. of Cal. Water Agencies Joint Powers Ins.*

22  *Authority*, 34 Cal. 4th 441, 446 (2004); *Connelly v. Cty. of Fresno*, 146 Cal. App. 4th 29,

23  37-38 (2006). Here, where Geraldine and Freida Rocha effectively identified that they were

24  both claimants and representatives of a third claimant, whom they specifically named—the

25  government was fully on notice that claims would be made both on an individual and

26  representative capacity. Unlike in *Nelson v. Cty. of L.A.*, 113 Cal. App. 4th 783, 797 (Ct.

27  App. 2003), Plaintiffs did not narrow their damages to loss of companionship, but rather

28  indicated the damages included those belonging to Erika.

Third, even if this Court finds the Governmental Claim did not preserve the state law claims of Erika's Estate, the wrongful death claim would survive on behalf of Geraldine and Freida Rocha in their individual capacities. While the SAC states that the wrongful death claim was brought only on behalf of the Estate, this is a drafting error, and the claim under section 377.60 is brought on behalf of both the Estate and Geraldine and Freida Rocha individually. This is clear from the text of the claim itself, which states that "Plaintiffs incurred expenses for funeral and burial expenses," SAC at ¶ 174, and "suffered the loss of the services, society, care, and protection of the decedent, as well as the loss of the present value of her future services to her family," *Id.* at ¶ 176. Thus, Plaintiffs should be permitted to litigate their wrongful death claim on their own behalf, as preserved in their Government Claim. *See Jun-Sung Kwak ex rel. Nam Soon Jeon v. Island Colony Hotel*, No. CIV 11-00015 SOM, 2012 WL 1580465, at *4 (D. Haw. May 3, 2012) ("The simple error in the language of the complaint is a mere technical difficulty that can be corrected in an amended complaint and refiled.").[6]

## B. Plaintiffs Pled Cognizable State Law Claims Against Headquarters Defendants

Defendants also assert that Plaintiffs' state law claims must be dismissed for failure to state a claim because "the SAC lacks plausible allegations that the Headquarters Defendants had any direct, personal participation in Erika's mental health treatment or the events leading up to her suicide." HQ MTD at 22. As discussed in detail in Section II(A)(1) above, Plaintiffs allege that each of the Headquarters Defendants' own actions and omissions directly contributed to Erika's death.

Specifically, Plaintiffs satisfied the pleading standard for negligent supervision, training, hiring, and retention by alleging that Defendants breached their individual duties

---

[6] If necessary to correct this error, Plaintiffs request an opportunity to amend their complaint for the purpose of identifying that the wrongful death claim is brought by both the Estate and on behalf of Geraldine and Freida Rocha individually. Plaintiffs have already stipulated based on meeting and conferring with Headquarters Defendants that Plaintiffs are not seeking punitive damages through a wrongful death claim brought by Geraldine and Freida Rocha under CCP sec. 377.60 on their own behalf.

1   to ensure that their employees and/or agents did not engage in the acts/or omissions

2   described in the complaint, including but not limited to failing to provide constitutionally

3   adequate mental health treatment. Plaintiffs sufficiently pled their negligence claim by

4   alleging, *inter alia*, that Defendants failed to enact appropriate standards, policies, and

5   procedures to prevent harm to Erika, resulting in injuries and damages to Plaintiffs. With

6   respect to their wrongful death claim, Plaintiffs allege that the actions and/or omissions of

7   Defendants described above, including their failure to adhere to standards of supervision

8   and administration, were the direct and proximate cause of Erika's injuries and damages.

9       Headquarters Defendants' citation to California Government Code § 820.8 is

10  irrelevant because Plaintiffs do not assert liability based on a theory of "*respondeat

11  superior*," but, rather, assert each Defendant is liable for his or her own tortious acts, such

12  as failing to supervise and/or train, and failing to enact appropriate standards and policies.

13      California Government Code § 820.2 is also inapplicable because Plaintiffs assert

14  claims of deliberate indifference and intentional discrimination. Section 820.2 "confers

15  immunity only with respect to those 'basic policy decisions' which have been committed

16  to coordinate branches of government, and does not immunize government entities from

17  liability for subsequent ministerial actions taken in the implementation of those basic

18  policy decisions." *Rodriguez v. Cal. Highway Patrol*, 89 F. Supp. 2d 1131, 1138 (N.D. Cal.

19  March 13, 2000) (quoting *Lopez v. S. Cal. Rapid Transit Dist.*, 40 Cal. 3d 780 (Cal. 1985)).

20  Where a plaintiff alleges actions that could go beyond "basic policy decisions," the

21  applicability of the immunity cannot be resolved at the motion to dismiss stage. *Id.* In

22  *Rodriguez*, plaintiffs alleged that state supervisory personnel were consciously aware of

23  the racially discriminatory nature of a police officer training program and encouraged

24  discriminatory tactics. *Id.* The *Rodriguez* Court held the allegations were broad enough to

25  encompass conduct outside the scope of the immunity provisions, and it would therefore

26  be error to resolve the immunity issue at the pleading stage. *Id.* Similarly, here, Plaintiffs

27  allege that the actions and omissions of Headquarters Defendants went beyond "basic

28  policy decisions," into the purposeful and deliberate failure to correct policies and

PLTFS' OPP TO CDCR DEFTS' MOTION TO
DISMISS 2ND AMENDED COMPLAINT          -24-

procedures Defendants knew posed a substantial risk of serious harm to suicidal prisoners. *See id.* "Under California law, government defendants have the burden of proving the actions of government employees fall within the scope of statutory immunity." *Id.* Defendants have not met their burden of establishing that each Headquarter Defendant's acts fall within the statute, and this issue cannot be resolved at the pleading stage. *Id.*

Finally, Headquarters Defendants' reference to immunity under California Government Code § 845.2 is inapplicable because Plaintiffs do not assert that Headquarters Defendants failed to provide adequate personnel and facilities to treat mentally ill inmates; rather Plaintiffs allege that Defendants are liable for their acts and omissions in failing to ensure that existing personnel complied with policies and were adequately trained to provide mental health treatment.

Headquarters Defendants are not entitled to any governmental immunities for their intentional acts and omissions.

## **CONCLUSION**

For the foregoing reasons, this Court should deny Defendants' motion to dismiss. Alternatively, should the Court grant any portions of Defendants' motion, the Court should grant leave to amend the complaint to cure any pleading deficiencies.

Dated: October 18, 2018        Respectfully Submitted,
                               HADSELL STORMER & RENICK LLP

                          By:   /s/ - Caitlan McLoon
                               Lori Rifkin
                               Barbara Hadsell
                               Dan Stormer
                               Caitlan McLoon
                          Attorneys for Plaintiffs