# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | EDCV 17-869-GW(FFMx) | Date | December 21, 2018 |
|---|---|---|---|
| Title | *Geraldine Rocha v. Scott Kernan, et al.* | | |

Present: The Honorable    GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | None Present | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Present | None Present |

**PROCEEDINGS:**    **IN CHAMBERS - FINAL RULING ON:**

**DEFENDANTS CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION, KERNAN, TOCHE, HARRINGTON, ALLISON, AND TEBROCK'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT [84];**

**DEFENDANTS K. HUGHES, J. ELLIOT, M. PULLING AND P. VELEZ'S MOTION TO DISMISS SECOND AMENDED COMPLAINT [86]**

Attached hereto is the Court's Final Ruling on Motions to Dismiss Second Amended Complaint.

Initials of Preparer    JG

_Rocha v. Kernan, et al._; Case No. 5:17-cv-00869-GW-(FFMx)
Final Ruling on Motions to Dismiss Second Amended Complaint

## I.    Background

The estate of Erika Rocha, by and through Geraldine Rocha and Freida Rocha; and Linda Reza (collectively, "Plaintiffs") bring this lawsuit against: 1) the California Department of Corrections and Rehabilitation ("CDCR"); 2) Scott Kernan; 3) Diana Toche; 4) Kelly Harrington; 5) Kathleen Allison; 6) Katherine Tebrock; 7) Kimberley Hughes; 8) Jim Elliot; 9) Paloma Velez; 10) Matthew Pulling; and 11) D. Jaimez.[1]  _See generally_ Second Amended Complaint ("SAC"), Docket No. 79.  Plaintiffs claim that Defendants: 1) violated Erika Rocha's rights under the Eight Amendment of the United States Constitution by failing to provide mental health treatment; 2) violated Erika Rocha's rights under the Eight Amendment of the United States Constitution by failing to protect her from harm; 3) violated Reza's rights under the First and Fourteenth Amendments of the United States Constitution by depriving Reza of her liberty interest in her parent-child relationship with Erika Rocha without due process of law; 4) discriminated against Erika Rocha in violation of the Americans with Disabilities Act ("ADA") and Rehabilitation Act; 5) violated California state law through negligent supervision, hiring, training, and retention; 6) took action resulting in Erika Rocha's wrongful death; 7) were negligent with respect to Erika Rocha's death; and 8) failed to furnish or summon medical care for Erika Rocha.  _See generally id._

Plaintiffs allege:

Erika Rocha's mother died when Erika was seven years old.  _Id._ ¶ 65.  From ages seven until approximately fourteen, Erika lived with family members, at least one of whom physically and sexually abused her.  _Id._ ¶¶ 65-66.  She was ultimately removed from her maternal grandfather's home by the California Department of Child Protective Services.  _Id._ ¶ 67.  At that point Erika was placed in a series of group homes.  _Id._  While living in these group homes, Erika would periodically run away and live with Reza (Erika's father's partner), and Erika and Reza "developed a close relationship."  _Id._ ¶ 68.

---

[1] Defendant D. Jaimez was not named in the First Amended Complaint ("FAC").  _See_ Docket No. 24.  Jaimez was added to the SAC but was not served until October 17, 2018.  _See_ Proof of Service, Docket No. 92.  Jaimez's deadline to answer the SAC was after the filing of these motions and, therefore, he does not take any part herein.

On or about February 2, 1996, Erika was placed in the group home International Home for Girls. *Id.* ¶ 69. Around this time, Erika's social worker interviewed Reza to determine if Reza's home would provide a stable environment for Erika. *Id.* Ten days after Erika was placed in International Home for Girls, and before she could be moved to Reza's abode, Erika and another resident of the group home were arrested. *Id.* Erika was fifteen years old and was set to be tried as an adult. *Id.* ¶ 70. She pled guilty and was sentenced to a prison term of nineteen years. *Id.* She spent the first two years in solitary confinement to protect her from the adult population. *Id.* In September 2011, she was transferred from Central California Women's Facility to the California Institution for Women ("CIW"). After spending close to two decades incarcerated, Erika was scheduled to meet the Parole Board on April 15, 2016. *Id.* ¶ 71. Erika took her life the day before the hearing, on April 14, 2016. *Id.* ¶ 1.

Erika's CDCR records reflect that she began experiencing auditory hallucinations when she was seven years old and that she attempted suicide approximately eight times between the ages of seven and fourteen. *Id.* ¶¶ 72-73. While in CDCR custody, Erika was diagnosed with amphetamine dependence, antisocial personality disorder, psychosis, psychotic disorder, adjustment disorder with anxiety, and continuing diagnoses of major depressive disorder. *Id.* ¶ 75. While incarcerated, Erika was admitted to a Mental Health Crisis Bed ("MHCB") a total of nine times. *Id.* ¶¶ 77-79. CDCR clinicians usually assessed Erika's chronic risk for suicide as "high." *Id.* ¶ 80.

On February 29, 2016, Erika told Velez (her clinician at the time) that her upcoming parole hearing was making her anxious. *Id.* ¶ 86. On March 1, 2016, Velez transferred responsibility for Erika's care to another clinician, Matthew Pulling. *See id.* ¶¶ 29, 86. From March 2015 until Erika's death on April 14, 2016, all of the clinical summaries regarding Erika were identical despite medical records reflecting increased depression and suicidal ideation on November 3, 2015, November 6, 2015, March 8, 2016, April 4, 2016, and April 11, 2016. *Id.* ¶¶ 83-84. Before transferring responsibility for Erika's care, Velez did not create a transition plan for Erika. *Id.* Erika met with Pulling a number of times in March 2016, but Pulling failed to provide a treatment plan to address Erika's symptoms. *Id.* ¶¶ 87-89.

Later that month, on March 31, 2016, Erika expressed suicidal ideation and was placed on continuous observation. *Id.* ¶ 91. Per CDCR policy, the required placement for a prisoner on suicide watch was an MHCB, but the MHCB was full. *Id.* The following day, a psychiatrist

assessed that Erika was expressing increasing anxiety about her upcoming parole hearing.  *Id.* ¶ 92.  Erika denied suicidal ideation, however, and Erika was removed from continuous observation.  *Id.*  Despite upcoming hearing and potential release dates being well-established suicide risk factors, the psychiatrist did not include any other treatment modifications for Erika.  *Id.*  A different clinician determined at that time that Erika had "high" chronic risk of suicide but "low" acute risk of suicide as she denied suicidal ideation.  *Id.* ¶ 94.  This clinician failed to adequately complete the evaluation, however, leaving key sections blank and employing cut-and-pasted information from previous assessments that was inaccurate.  *Id.*

Over the next two weeks until her death, staff and prisoners observed "noticeable behavioral changes," including that Erika was keeping to herself, stayed in her cell, refused psychotropic medication, and fought with her cellmate.  *Id.* ¶ 95.  On the evening of April 2, 2016, Erika punched a locker.  *Id.*  Pulling, saw Erika on April 4,  6, and 11, 2016.  *Id.* ¶¶ 97-99.  During the April 4 meeting, in regards to Erika's recent placement on continuous observation, Pulling noted:

> Discussed the events with [Erika] and asked her to take responsibility for using suicidal threats to get what she wanted, that the behavior was childish and most serious as people do kill themselves. Discussed [Erika's] need to learn different coping mechanisms to get her needs met.  Discussed the difference between a child and an adult. Challenged [Erika] to act in an adult fashion."

*Id.* ¶ 97.

On April 14, 2016, Defendant Jaimez found Erika hanging in her cell.  When she was discovered, Erika was already in a state of rigor mortis and Plaintiffs allege that Jaimez had not conducted a safety check for more than two hours.  *Id.* ¶ 102.

After her death, a review of Erika's case by a CDCR Suicide Case Review Committee identified significant lapses in her care, including violations of CDCR's policies and procedures, and determined that Erika's suicide was both foreseeable and preventable.  *Id.* ¶ 106.  Additionally, Erika's death was reviewed by the Special Master Appointed in *Coleman v. Brown*, E.D. Cal. Case No. 2:90-cv-00520-KJM-DB,[2] a class action filed on behalf of California inmates with serious mental health illness.  *See id.* ¶¶ 36, 107.  The Special Master affirmed the CDCR

---

[2] The *Coleman* court ruled that the State of California, through CDCR, was violating the Eighth Amendment of the U.S. Constitution by failing to provide adequate mental health treatment to prisoners with serious mental illness. *See Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal. 1995); SAC ¶ 37.

Suicide Case Review Committee findings.  *Id.* ¶ 107.

Plaintiffs allege that the Headquarters Defendants were responsible for reviewing the *Coleman* Special Master's findings and recommendations and the court's orders.  *Id.* ¶ 44.  In April 2013, the *Coleman* court issued an order stating:

> [F]or over a decade a disproportionately high number of inmates have committed suicide in California's prison system. Review of those suicides shows a pattern of identifiable and describable inadequacies in suicide prevention in the CDCR. Defendants have a constitutional obligation to take and adequately implement all reasonable steps to remedy these inadequacies. The evidence shows they have not done so. In addition, while defendants represent that they have fully implemented their suicide prevention program, they have not. An ongoing constitutional violation therefore remains.

*Id.* ¶ 46.  On February 3, 2015 the *Coleman* Court entered an order adopting the Special Master's recommendations addressing deficiencies in CDCR's provision of mental health care to prisoners at risk of suicide, including: (i) improved training for dealing effectively with prisoners perceived to be manipulative and those at risk for suicide despite their denials of suicidality; (ii) improved training regarding the completion of accurate Suicide Risk Evaluations and regular audits to ensure compliance; (iii) implementation of policies that require "[a]ny inmate discharged from suicide observation status . . . [to] be initially housed in a suicide-resistant, retrofitted cell"; (iv) implementation of training on treatment planning for suicidal prisoners; (v) corrective training regarding "[t]he perception that all inmates who threaten suicide are manipulative"; and (vi) complete revision of the "Five-Day Follow-up" protocol.  *Id.* at ¶¶ 50-51. In early 2016, the *Coleman* Special Master conducted a "Re-Audit and Update on Suicide Prevention in the Prisons of the [CDCR].)"  *Id.* ¶ 52.  The Re-Audit found ongoing problems with the issues highlighted in the 2015 report.  *See id.* ¶¶ 53-55.  The *Coleman* court issued a new order on April 5, 2016, directing again that the responsible official follow the February 3, 2015 order.  *Id.* at ¶¶ 56-57.  In 2016, the California State Auditor also reviewed the CDCR policies, procedures, and practices for suicide prevention and reduction.  *Id.* ¶ 59.  The State Auditor found several failures by CDCR, including that leadership had known about issues related to suicide prevention and response for years but failed to implement solutions.  *See id.* ¶¶ 60-64.  Specifically, the Auditor explained that the CDCR and CIW officials had failed to address the *Coleman* Special Master's January 2015 recommendation:

> [T]hat Corrections expand the length and content of certain suicide prevention trainings by including various topics, such as dealing with effectively with inmates perceived to be manipulative . . . . Without required content, Corrections' training will lack effectiveness in preventing suicides and improving responses to attempted suicides. For example, if Corrections' staff assume inmates are expressing suicidal thoughts in order to obtain some benefit—in other words, are being manipulative—the staff may miss important warning signs of impending suicide attempts.

*Id.* ¶ 64.

Defendant Kernan is CDCR's Secretary, its highest-ranking official, responsible for administering and overseeing its operations. *Id.* ¶ 21. Defendant Toche is CDCR's Undersecretary of Health Care Services, responsible for the administration of the provision of healthcare to inmates. *Id.* ¶ 22. Defendant Harrington was CDCR's Director of the Division of Adult Institutions from January 2015 until March 2016, and in that role was responsible for supervising the administration of CDCR's adult prison facilities. *Id.* ¶ 23. In April 2016, Defendant Allison replaced Defendant Harrington in that role. *Id.* ¶ 24. Defendant Tebrock is the CDCR's Deputy Director of its Statewide Mental Health Program, responsible for overseeing the provision of mental health care to inmates. *Id.* ¶ 25. Defendant Hughes is the Warden of CIW, the institution where Erika was incarcerated from September 2011 until the time of her death. *Id.* ¶ 26. Defendant Elliot was CIW's CEO, and had hiring authority for all health care staff in the institution. *Id.* ¶ 27.

Defendants filed two motions to dismiss, categorizing themselves as belonging to the group of "Headquarters Defendants," *i.e.*, Defendants Kernan, Toche, Harrington, Allison, and Tebrock (*see generally* Headquarters Defendants' Motion to Dismiss SAC ("HQ Motion"), Docket No. 84); or the "CIW Defendants," *i.e.*, Defendants Hughes, Elliot, Pulling and Velez (*see generally* CIW Defendants' Motion to Dismiss ("CIW Motion"), Docket No. 86).[3] Plaintiffs oppose both motions. *See generally* Opposition to HQ Motion ("HQ Opp'n"), Docket No. 89; Opposition to CIW Motion ("CIW Opp'n"), Docket No. 90.

## II.   Legal Standard

Under Federal Rule of Civil Procedure ("Rule") 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A

---

[3] The CIW Defendants further differentiate between the "Supervisory Defendants," *i.e.*, Hughes and Elliot; and the "Provider Defendants," *i.e.*, Pulling and Velez. *See generally* CIW Motion.

complaint may be dismissed for failure to state a claim for one of two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal theory.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) ("Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.").

In deciding a Rule 12(b)(6) motion, a court "may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice."  *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007).  The court must construe the complaint in the light most favorable to the plaintiff, accept all allegations of material fact as true, and draw all reasonable inferences from well-pleaded factual allegations.  *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001), *amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001); *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996).  A court is not required to accept as true legal conclusions couched as factual allegations.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Where a plaintiff facing a Rule 12(b)(6) motion has pleaded "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," the motion should be denied.  *Id.*; *Sylvia Landfield Trust v. City of Los Angeles*, 729 F.3d 1189, 1191 (9th Cir. 2013).  But if "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged − but it has not show[n] . . . the pleader is entitled to relief."  *Iqbal*, 556 U.S. at 679 (citations omitted).

If a court dismisses certain claims, "[l]eave to amend should be granted unless the district court 'determines that the pleading could not possibly be cured by the allegation of other facts.'"  *Knappenberger v. City of Phoenix*, 566 F.3d 936, 942 (9th Cir. 2009) (quoting *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc)).

## III.   Discussion

### A.  First and Second Causes of Action: Eighth Amendment Violations

Prison officials violate the Eighth Amendment if they are "deliberate[ly] indifferen[t] to [a prisoner's] serious medical needs."  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  A medical need is serious if failure to treat it will result in "'significant injury or the unnecessary and wanton infliction of pain.'"  *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting

*McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc)).  The Ninth Circuit recognizes that a heightened risk of suicide can present a serious medical need.  *Simmons v. Navajo Cty., Arizona*, 609 F.3d 1011, 1018 (9th Cir. 2010) (citing *Conn v. City of Reno*, 591 F.3d 1081, 1096 (9th Cir. 2010) *cert. granted, judgment vacated on other grounds*, 563 U.S. 915 (2011), *and opinion reinstated in relevant part*, 658 F.3d 897 (9th Cir. 2011)).  In the context of an Eighth Amendment claim stemming from a prisoner's suicide, a plaintiff states an actionable claim if an official knows of an inmate's particular vulnerability to suicide and was recklessly or deliberately indifferent to that vulnerability.  *See Taylor v. Barkes*, 135 S. Ct. 2042, 2045 (2015) (citing *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (1991)).  However, deliberate indifference is a high legal standard; mere malpractice or negligence does not constitute an Eighth Amendment violation.  *See Estelle*, 429 U.S. at 105-06; *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004).

To establish an Eighth Amendment violation, a prisoner "must satisfy both the objective and subjective components of a two-part test."  *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (citation omitted).  First, there must be a demonstration that the prison official deprived the prisoner of the "minimal civilized measure of life's necessities."  *Id*. (citation omitted).  Second, a prisoner must demonstrate that the prison official "acted with deliberate indifference in doing so."  *Id*. (citation and internal quotation marks omitted).

A prison official acts with "deliberate indifference . . . only if the [prison official] knows of and disregards an excessive risk to inmate health and safety."  *Gibson v. County of Washoe, Nevada*, 290 F.3d 1175, 1187 (9th Cir. 2002) (citation and internal quotation marks omitted).  Under this standard, the prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but that person "must also draw the inference."  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  "If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk."  *Gibson*, 290 F.3d at 1188 (citation omitted).  This "subjective approach" focuses only "on what a defendant's mental attitude actually was."  *Farmer*, 511 U.S. at 839.

Under 42 U.S.C. § 1983, supervisory officials are not liable for actions of subordinates on any theory of vicarious liability.  *See Hansen v. Black*, 885 F.2d 642, 645-46 (9th Cir. 1989).  A

supervisor may be liable only if: (1) he or she is personally involved, or (2) there is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. *Snow v. McDaniel*, 681 F.3d 978, 989 (9th Cir. 2012), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014).   A causal connection can include: "1) [the supervisors'] own culpable action or inaction in the training, supervision, or control of subordinates; 2) their acquiescence in the constitutional deprivation of which a complaint is made; or 3) [their] conduct that showed a reckless or callous indifference to the rights of others." *See Lemire v. Cal. Dept. of Corr. and Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013) (quoting *Cunningham v. Gates*, 229 F.3d 1271, 1292 (9th Cir. 2000)).

Where a plaintiff seeks damages against an official in his or her individual capacity, "the causation inquiry between the deliberate indifference and the eighth amendment deprivation must be more refined [than the inquiry for injunctive or declaratory relief.]" *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).   Courts "must take a very individualized approach which accounts for the duties, discretion, and means of each defendant." *Id.* at 633-34.   And courts "must focus on whether the individual defendant was in a position to take steps to avert the [incident giving rise to the deprivation], but failed to do so intentionally or with deliberate indifference." *Id.* at 633.   The Ninth Circuit recently stated that   "[t]he requisite causal connection [for liability in a defendant's individual capacity] can be established ... by [the defendant] setting in motion a series of acts by others, or by knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury." *King v. Cty. of L.A.*, 885 F.3d 548, 559 (9th Cir. 2018) (quoting *Starr v. Baca*, 652 F.3d 1202, 1207–08 (9th Cir. 2011)) (alterations in *King*)

Alternatively, a plaintiff may state a claim if policymakers knew that their policy, practice or order would pose a serious risk to someone in plaintiff's situation and nevertheless made that decision which resulted in injury. *See Lemire*, 726 F.3d at 1078 (in a facility housing mentally-ill inmates where an extended absence of floor officers is generally considered unacceptable, evidence of supervisory defendants' decision to remove all floor officers from the ward for a period of three and a half hours was sufficient to establish an objectively substantial risk of harm to unsupervised mentally-ill inmates).

  *1. CIW Defendants*

    i.  <u>Provider Defendants (Velez and Pulling)</u>

The Provider Defendants first argue that Plaintiffs have not sufficiently alleged facts that demonstrate that Velez[4] or Pulling knew of and disregarded a substantial acute risk of suicide. CIW Motion at 12-13.  Specifically, Provider Defendants assert that there are no allegations that Erika told Pulling or Velez that she was contemplating suicide in the days immediately before her death, or that there are allegations that Velez and Pulling received any information from anyone else that Erika was an acute risk of suicide.  *Id.* at 13.  Plaintiffs respond that allegations of circumstantial evidence demonstrate Provider Defendants' subjective knowledge.  CIW Opp'n at 15-17.

The SAC alleges that approximately forty-five days before Erika was to meet the Parole Board, Velez transferred responsibility for Erika's care to another provider without making a transition plan or conducting any transitional or closure sessions with Erika.  *See* SAC ¶ 86. Plaintiffs also allege that Velez, until March 2016, and then Pulling afterwards failed to create treatment goals or identify interventions to address Erika's depression, self-injurious behavior, and medication compliance.  *Id.* ¶¶ 81-83.  Plaintiffs further allege that Erika's mental health treatment plans from March 2015 until her death contain identical clinical summaries with no updates, despite increasing depression and suicidal ideation.  *See id.*  ¶¶ 83-84.  Plaintiffs do not specify if Erika expressed suicidal ideation between June 2015 and March 31, 2016.  *See id.* ¶¶ 79, 91.  Additionally, Erika's record contains no mention of an Interdisciplinary Treatment Team ("IDTT") meeting between September 2015 and her death.  *Id.* ¶ 85.[5]  Just before Velez transferred responsibility for Erika to Pulling, Erika expressed that her upcoming parole hearing was making her anxious.  *Id.* ¶ 86.  Erika expressed similar anxiety to Pulling.  *Id.* ¶¶ 87-90.  On March 31, Erika expressed suicidal ideation and another clinician conducted a Suicide Risk Evaluation but left a key section blank.  *Id.* ¶¶ 91-94.  On April 4, Pulling met with Erika and "asked her to take responsibility for using suicidal threats to get what she wanted, that the behavior was childish and most serious as people do kill themselves."  *Id.* ¶ 97.  Defendant Pulling thereafter treated Erika on April 6, and 11, 2016.  *Id.* ¶¶ 56-57.  Plaintiffs allege that

---

[4] Plaintiffs do not allege the second cause of action against Velez.

[5] In Exhibit 7 (Hayes Review) to the SAC, Hayes does mention a February 23, 2016 IDTT meeting.  *See* SAC, Exhibit 7 at 42.  If Plaintiffs choose to file a Third Amended Complaint, they should be sure to include clear allegations within the complaint, rather than rely on hundreds of pages of exhibits for the Court to sift through.  In truth, the Court finds the allegations in the SAC and attached exhibits to be a bit scattershot and encourages Plaintiffs to clearly and succinctly allege what they consider to be the most problematic behavior on the part of the Provider Defendants.

others at CIW observed noticeable changes to Erika's behavior while Pulling treated Erika yet Pulling made no changes to Erika's treatment plan and, after terminating the April 11, 2016 treatment session, did not schedule Erika for any additional treatment prior to the Parole Board meeting.  *Id.* ¶¶ 95, 99.  However, there are also allegations that Erika seemed calm and well-groomed.  *Id.* ¶ 95.

While the Court thinks that these allegations may be enough to state a claim for negligence on the part of Velez and Pulling, without clearer allegations that Velez and Pulling knew that their actions constituted an excessive risk to Erika, the Court would dismiss the first two causes of action.  As to Velez, Plaintiffs merely allege that: (1) Velez failed to update Erika's medical treatment plans to include interventions to address Erika's symptoms; (2) that Velez ignored Erika's statement that she was feeling anxious about her upcoming parole hearing; and (3) that Velez transferred Erika's care to Pulling without a transition plan.[6]  Without more, the Court would not find that Plaintiffs have alleged that Velez took these actions (or failed to take appropriate actions) with deliberate indifference.  For one, there is no indication that Erika expressed suicidal ideation to Velez in the months leading up to the suicide.  *See id.* ¶¶ 79, 91.  Simply alleging that Erika expressed increasing anxiety about her upcoming parole hearing does not allege that Velez *knew* of Erika's risk of suicide.  Likewise, the failure to document goals or interventions to alleviate Erika's symptoms does not establish that Velez subjectively knew of and disregarded the imminent risk of suicide.  On the other hand, the review of Erika's suicide highlights "recommendations for corrective action" that identify some of Velez's actions as issues to fix.  *See* Exhibit 7 at 42.  And because the review concludes that Erika's death "was both foreseeable and preventable," the Court would grant Plaintiffs leave to amend.  *Id.* at 43.  The Court encourages Plaintiffs to be clear and specific and to include any information from the exhibits in the body of the amended complaint.

The question is closer as to Pulling, Plaintiffs' allegations of subjective knowledge boil down to the charge that Pulling *must have known* of an acute risk of suicide.  But these claims do not allege that Pulling actually drew the inference that a substantial risk existed.  *See Farmer*, 511 U.S. at 837.  For example, on March 4, Pulling met with Erika and Erika told him that she needed help with anxiety, but Pulling failed to provide a treatment plan.  *See* SAC ¶ 87.  On

---

[6] Plaintiffs fail to delineate what exactly a transition plan is and what source exactly requires or recommends that such a plan be prepared prior to a transfer of care from one clinician to another.

March 28, 2016, Erika expressed she was really paranoid and Pulling gave her a treatment plan consisting of a Tibetan chant as a calming tool. *Id.* ¶ 90. Then, on March 31, 2016 Erika expressed suicidal ideation and was placed in "alternative housing" overnight. *Id.* ¶ 91. It is unclear from the allegations whether Pulling had a role in placing Erika in alternative housing. The next day, Erika told a psychiatrist that she was anxious about her upcoming parole hearing, but denied suicidal ideation. *Id.* ¶ 92. Based on Erika's denial of suicidal ideation, the psychiatrist (and apparently *not* Pulling) discharged Erika from alternative housing. *Id.*

The next alleged meeting with Pulling occurred on April 4, 2016 and Pulling asked Erika to take responsibility for using suicidal threats to get what she wanted. *Id.* ¶ 97. Plaintiff alleges that Pulling's comments (that Erika was being manipulative) demonstrate a "failure to meaningfully assess Erika's suicide risk" and constituted a violation of *Coleman*-ordered training. *Id.* Further, Plaintiffs allege that Pulling ended Erika's suicide watch follow-up precautions on April 6, 2016 without conducting a suicide risk assessment. *Id.* ¶ 98. Pulling's last meeting with Erika occurred on April 11, where Erika "became labile and wanted to go," but Pulling did not schedule a follow-up meeting or make any substantive changes to Erika's treatment plan. *See* SAC ¶ 99.

While these allegations are troubling, they ultimately do not demonstrate that Pulling actually thought Erika was a high risk for imminent suicide. Because of the high standard for deliberate indifference, the Court does not believe that Plaintiffs have successfully stated a claim against him. *See Simmons*, 609 F.3d at 1018 (noting that plaintiff must demonstrate a substantial risk of imminent suicide). Specifically, Pulling's "failure to meaningfully assess Erika's suicide risk" suggests not that he disregarded a known risk, but rather that he *negligently* failed to identify the risk. Likewise, when Erika told Pulling that she was really paranoid, and he offered her the Tibetan chant, it is not clear to the Court that Pulling was ignoring a known risk. Again, he may have underestimated the risk of suicide, and prescribed a chant rather than a more serious intervention, but this does not plausibly allege deliberate indifference. Finally, it is unclear what role Pulling played – if any – in removing Erika from alternative housing. As currently pleaded, it sounds like Erika was released from alternative housing when another psychiatrist deemed Erika non-suicidal on April 1. Surely, it is plausible that Pulling was relying on this psychiatrist's determination that Erika was no longer suicidal. As such, the Court does not think that Plaintiffs have sufficiently pleaded a claim of deliberate indifference against Pulling.

11

Nonetheless, because there are multiple troubling allegations, the Court will grant Plaintiffs one more chance to amend.

Provider Defendants also argue that Plaintiffs did not allege a causal connection between Provider Defendants' actions or omissions and Erika's suicide. CIW Motion at 15-16. Plaintiffs argue that they have established causation by citing Paragraphs 106 and 107 of the SAC, which state in general that Erika's death was "foreseeable and preventable."

The Court concludes that Plaintiffs have not presently alleged causation as it pertains to Provider Defendants. It is true that the CDCR report concludes that Erika's death was foreseeable and preventable, but Plaintiffs have not sufficiently connected the dots between the Provider Defendants' alleged transgressions and Erika's death.

Given the fact that the Court has found that Plaintiffs have not sufficiently alleged the specific factual bases for their claim of deliberate indifference to Erika's serious need for adequate mental health care but is allowing an opportunity to amend, a ruling on the Provider Defendants' qualified immunity contentions cannot be made at this point. The Court notes that if Plaintiffs are able to state a claim in any forthcoming Third Amended Complaint, they should also be prepared to discuss why the Provider Defendants are not entitled to qualified immunity.

### ii. Supervisory Defendants (Hughes and Elliot)

The Court previously stated that Plaintiffs had "fail[ed] to identify any specific policy, practice or procedure enacted by either Defendant (such as a staffing decision or suicide protocol) that had an actual impact on the treatment which Erika did (or did not) receive." *See* Minutes of Defendants' Motion to Dismiss First Amended Complaint ("First Dismissal Order"), Docket No. 71, at 9. The Court further specified possible examples: "did the court or special master in the *Coleman* litigation order or report on a specific practice or protocol as to mentally ill inmates to prevent or reduce suicides at the CIW that applied to Erika's treatment which a Supervisory Defendant was aware and failed to implement during the relevant period?" *Id.* at 9, n.6.

In the SAC, the bulk of Plaintiffs' allegations against the Supervisory Defendants pertain to their alleged failure to implement the *Coleman* court's ordered practices and protocols. *See* SAC at ¶¶ 10-12, 42-58, 106-10. Plaintiffs also argue that the Supervisory Defendants knew about the suicide hazards where Erika was housed (the exposed vent) but failed to retrofit the cells to reduce the risk of suicide. *Id.* ¶¶ 112-14. Supervisory Defendants argue that the alleged

12

facts do not demonstrate that the Supervisory Defendants were actually aware of any specific and detailed unconstitutional actions, let alone that they condoned or acquiesced in them.   CIW Motion at 10.

Plaintiffs focus their argument on the implementation of the February 3, 2015 *Coleman* court order that called for: (i) improved training for dealing effectively with prisoners perceived to be manipulative and those at risk for suicide despite their denials of suicidality; (ii) improved training regarding the completion of accurate Suicide Risk Evaluations and regular audits to ensure compliance; (iii) implementation of policies that require "[a]ny inmate discharged from suicide observation status . . . [to] be initially housed in a suicide-resistant, retrofitted cell"; (iv) implementation of training on treatment planning for suicidal prisoners; (v) corrective training regarding "[t]he perception that all inmates who threaten suicide are manipulative"; and (vi) complete revision of the "Five-Day Follow-up" protocol.   SAC ¶¶ 50-51.   Plaintiffs further allege that in April 2016, the *Coleman* Court recognized that some of these policies had not been implemented.   *See id.* ¶¶ 55-57.   According to Plaintiffs, the 2016 Re-Audit identified significant ongoing failures from the 2015 Audit, including, but not limited to:

> (1) "[I]nstruction on perceived manipulative inmate behavior was limited";
>
> (2) Suicide Risk Evaluations not being completed for patients discharged from MHCB or alternative housing placements for suicidal behaviors;
>
> (3) CDCR had refused to place all inmates discharged from suicide observation status into suicide-resistant retrofitted cells;
>
> (4) Only 50% of clinicians had received additional training on conducting adequate treatment planning, and there were "continued problems with adequacy of treatment planning for patients previously identified as suicidal," including many clinicians who failed to provide "specific plans to reduce inmate's risk of suicide";
>
> (5) Inconsistent monitoring regarding safety checks;
>
> (6) "Program Guide requirements for five-day clinical follow-up of assessments continued to be problematic."

*Id.* ¶ 55.   Plaintiffs continue that the failure to correct these deficiencies constituted a knowing failure to remediate a substantial risk of serious harm.   *Id.* ¶ 58.   And that the failure to correct these deficiencies rendered Erika's death foreseeable and preventable.   *Id.* ¶¶ 106-07.

Supervisory Defendants respond that Plaintiffs fail to set forth the requisite notice and

13

causation because Plaintiffs cannot solely rely on high-profile litigation to establish that Hughes and Elliot were aware of the prison conditions.  *See* CIW Reply at 6.  Supervisory Defendants also point out that none of Plaintiffs' allegations show that the Supervisory Defendants had any contact with Erika or knew that she was at risk.  CIW Motion at 9.

In a nutshell, therefore, the Court must decide whether Plaintiffs' allegations demonstrate that the Supervisory Defendants were on notice about the deficiencies, and whether their failure to implement the policies is sufficiently causally related to Erika's suicide.  *See Carrea v. California*, Case No. EDCV 07-1148-CAS, 2009 WL 1770130, at *6 (C.D. Cal. June 18, 2009) ("[P]laintiff cannot hold these defendants individually liable for damages merely by showing that, because of high-profile litigation or for other reasons, they must be aware of the prison conditions of which plaintiff complains. Even if defendants were aware of and failed to rectify system-wide deficiencies of constitutional magnitude, they will not be liable to plaintiff for damages, unless there is a sufficient causal relationship between their wrongful acts or omissions and his injuries.").

First, the Court recognizes that the existence *alone* of system-wide litigation has been found insufficient to support a finding that high-ranking defendants were aware that their policies would pose a risk to someone in the plaintiff's situation.  *See id.*; *see also Roberts v. Cate*, No. 2:08-cv-2624 JAM KJN P, 2013 WL 268709, at *12 (E.D. Cal. Jan. 22, 2013). However, here, Plaintiffs allege that Hughes and Elliot "were responsible for implementing the *Coleman* Court's orders at CIW . . . . [and] directly received and/or were directly informed of the orders and recommendations of the *Coleman* Court and the reports of the *Coleman* Special Master as they pertained to CIW, including the 2015 and 2016 suicide reports, prior to Erika's death in April 2016."  *See* SAC ¶ 13; *see also id.* ¶ 45.  The Supervisory Defendants argue that the reports of the *Coleman* Special Master are not sufficient to put the Supervisory Defendants on notice because they relate to all of the CDCR prisons rather than CIW specifically.[7]  CIW Reply at 7.

---

[7] The Court would note that the Special Master Reports do specifically characterize CIW as "a problematic institution that exhibited numerous poor practices in the area of suicide prevention" (*see* Docket No. 79-1, Exhibit 5 at 106); and also referenced "the recently elevated suicide rate at the California Institution for Women.  Although female inmates account for about 4 percent of Corrections' total inmate population, they accounted for 11 percent of inmate suicides from 2014 through 2016.  This report concludes that Corrections should provide increased oversight and leadership to ensure that prisons follow its policies related to suicide prevention and response." (*Id.*, Exhibit 10 at iii).

The Court concludes that Plaintiffs have sufficiently alleged that the Supervisory Defendants were on notice about the alleged deficiencies and failed to act. As the Court mentioned in the First Dismissal Order, Plaintiffs should come forward with specific practices or protocols recommended in the *Coleman* litigation to prevent or reduce suicides at CIW. *See* First Dismissal Order at 9, n.6. Plaintiffs pretty much did just that in the SAC. Plaintiffs specify certain policies that CDCR failed to implement in its prisons between February 2015 and April 2016 that related to mental health care and suicide reduction. *See* SAC ¶ 55. It is true that the *Coleman* reports and re-audits relate to system-wide deficiencies, but CIW is part of that system and the Court thinks that is sufficient to survive a motion to dismiss. Additionally, Plaintiffs allege that the state auditor noted that "[t]he Joint Legislative Audit Committee (Audit Committee) asked us to evaluate the adequacy of the mental health and suicide prevention training specifically for CIW staff, and we found that the prison did not ensure that its staff received the required training." *Id.* ¶ 63. This allegation could relate to the Supervisory Defendants' responsibility "for implementing the *Coleman* Court's orders at CIW, ensuring that inmates at CIW were receiving constitutionally adequate mental health care, and fixing known problems in the provision of mental health care and suicide prevention." *Id.* ¶ 13. Even considering the more individualized approach that the Court must take when considering defendants sued in their individual capacities, the Court thinks that these allegations are sufficient to causally connect the Supervisory Defendants to Erika's alleged harm. Put simply, the allegations about the Supervisory Defendant's duties are distinguishable from the general allegation of knowledge against Governor Schwarzenegger in *Carrea*. 2009 WL 1770130, at *6.

Moreover, the Court is inclined to conclude that Plaintiffs have sufficiently alleged that Supervisory Defendants' failure to act caused Erika's injury. This is so because some of the problems identified in the 2016 Re-Audit are alleged to have been issues in Erika's death, such as the failure to complete Suicide Risk Evaluations and possible problems with Pulling's perceiving Erika as being manipulative. *See* SAC ¶¶ 94, 96. As the Supervisory Defendants themselves put it, "Plaintiffs' core allegations are that the Supervisory Defendants are responsible for overseeing operations or portions thereof at CIW, the *Coleman* court ordered certain changes in response to deficiencies identified in audits, the Supervisory Defendants were aware of the court orders, and that Supervisory [Defendants] failed to remedy certain deficiencies." Because certain of these specified deficiencies are alleged to have played a role in

Erika's death, the Court thinks that Plaintiffs have sufficiently alleged an Eighth Amendment violation. The Court would find that the present averments are different than conclusory allegations that the Supervisory Defendants generally failed to comply with *Coleman*. *Cf. Lemire v. Schwarzenegger*, No. 2:08-CV-00455-GEBEFB, 2010 WL 430818, at *4 (E.D. Cal. Jan. 28, 2010) (holding that *general allegations* that defendants failed to "change their practices, hire, train and supervise their employees" in compliance with *Coleman* were not sufficiently individualized).

Conversely, the allegations about the vent in Erika's cell constituting a suicide hazard do not establish that the Supervisory Defendants knew about the potential hazard. *See* SAC ¶ 112. Although, the SAC alleges that there were strings hanging from the vent which *could have* put a person on notice about the suicide risk, there is no allegation that the Supervisory Defendants knew about this or that Erika was in such a cell.

As currently alleged, the Court would therefore deny CIW's Motion as it pertains to the first and second causes of action against the Supervisory Defendants.

### 2. *Headquarters Defendants*

Headquarters Defendants first argue that Plaintiffs' § 1983 claims under the Eighth Amendment must be dismissed because Plaintiffs do "not plausibly allege that they were actually aware that Erika was in 'substantial danger' of killing herself, yet deliberately ignored that risk." HQ Motion at 14. Headquarters Defendants continue that "[t]he SAC contains no allegations that any Headquarters Defendant directly interacted with Erika or with any of her treating clinicians." *Id.* Central to Headquarters Defendants' argument is their assertion that Plaintiffs sued them in their individual rather than their official capacities. *Id.* at 14. Plaintiffs respond that Defendants need not have been individually familiar with Erika but rather that they were deliberately indifferent to conditions that put prisoners similarly-situated to Erika at substantial risk of serious harm. HQ Opp'n at 10.

As the Court previously noted, it does not believe that Plaintiffs must allege that the Headquarters Defendants specifically knew about any risk to Erika. First Dismissal Order at 6. Instead, "a plaintiff may state a claim if policymakers knew that their policy, practice or order would pose a serious risk to someone in plaintiff's situation and nevertheless made that decision which resulted in injury." *Id.*

Plaintiffs rely on nearly the same allegations against the Headquarters Defendants as

those they argued in relation to the Supervisory Defendants. *Compare* HQ Opp'n at 12-14 *with* CIW Opp'n at 11-13. The Court again thinks that these are the type of individualized allegations that plausibly state a claim.[8]  Plaintiffs allege that each of the Headquarters Defendants had a role in the mental health care and security of inmates in the CDCR prisons, which include CIW. *See* SAC ¶¶ 21-25.  Plaintiffs allege that Kernan "was responsible for promulgation and implementation of policies and procedures in CDCR, including at CIW, and was responsible for the care, custody, and control of all prisoners housed in CIW," and demonstrated potential individual involvement and responsibility for deficiencies at CIW by "personal[ly] respon[ding] to the audit of suicides at CIW from 2014 through 2016 − which includes the suicide of Erika Rocha − and corresponding recommendations for change issued by the California State Auditor of suicides at CIW from 2014 through 2016." *Id.* ¶ 21.  As to Toche, Plaintiffs allege she "is and was responsible for supervising the day-to-day administration of all Health Care Services for the 33 CDCR adult prison facilities, including CIW, and responsible for overseeing and implementing policies, procedures, and practices related to the provision of mental health care services at these facilities." *Id.* ¶ 22.  Harrington was also allegedly "responsible for supervising the day-to-day administration of the 33 CDCR adult prison facilities, including CIW, and responsible for overseeing and implementing policies, procedures, and practices related to the operations of these facilities." *Id.* ¶ 23.  Same as to Allison from April 2016.[9]  *Id.* ¶ 24.  As to Tebrock, Plaintiffs allege she "is responsible for overseeing provision of mental health care in CDCR, promulgating and implementing policies and procedures, supervision of practices, and taking corrective action when necessary to ensure provision of constitutionally adequate care." *Id.* ¶ 25.

While some of these allegations are a bit conclusory and general, they set out the Headquarters Defendants' alleged roles, day-to-day duties, and access to the *Coleman* orders describing alleged deficiencies at prisons, including CIW.  *See King*, 885 F.3d at 558-59 (deciding on summary judgment that the *record* did not establish that defendant "supervised the day-to-day operations of [the plaintiff's jail], that he was personally involved in any constitutional deprivation King may have suffered, or the requisite causal connection for liability

---

[8] As a general aside, many of the cases that Defendants rely on were decided on summary judgment and not a motion to dismiss. *See, e.g.*, *King*, 885 F.3d at 552-53; *Leer*, 844 F.2d at 634.

[9] April 2016 is the same month Erika committed suicide.  If Allison was not already working for CDCR at the time of Erika's death, the Court would be inclined to grant dismissal as to her.

in his individual capacity."). The Court does not believe that the individualized analysis of causation called for in *Leer* raises the pleading standard to one more akin to particularity under Rule 9(b). At this stage, the Court thinks that Plaintiffs' allegations that "Defendants Kernan, Toche, Harrington, Tebrock, Hughes, and Elliott were required to take steps to implement the changes set forth in the Special Master's recommendations to address unreasonable risk of harm by suicide at CIW," establishes the individuals' connections to prisoners similarly situated to Erika, *i.e*., inmates at CIW at risk for suicide. *See* SAC ¶ 51. The alleged failure of the Headquarters Defendants to implement the *Coleman* changes, as described in the 2016 Re-Audit, is sufficient to plead that they knowingly ignored a substantial risk to such inmates. *See id.* ¶ 55. And, for the reasons stated above in the Supervisory Defendants section, the fact that some of the continuing deficiencies described in the 2016 Re-Audit are those alleged to have contributed to Erika's death leads the Court to conclude that Plaintiffs have stated a claim. *See id.* ¶¶ 94, 96.

### 3. *Qualified Immunity*

As stated above, the Court will not consider whether the Provider Defendants are entitled to qualified immunity at this stage because Plaintiffs have not stated a claim against them. The Court will, however, analyze whether the Supervisory and Headquarters Defendants are entitled to qualified immunity. *See* HQ Motion 16-18; CIW Motion 18-19. "When, as here, defendants assert qualified immunity in a motion to dismiss under Rule 12(b)(6), dismissal is not appropriate unless we can determine, based on the complaint itself, that qualified immunity applies." *O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016) (internal quotation marks omitted).

The doctrine of qualified immunity protects government officials "from liability insofar as their conduct does not violate clearly established or constitutional rights of which a reasonable person would have known." *Stanton v. Sims*, 571 U.S. 3, 4-5 (2013) (*per curiam*) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Whether a defendant is entitled to qualified immunity is a two-part inquiry that asks: "(1) Was the law governing the official's conduct clearly established? (2) Under that law, could a reasonable officer have believed the conduct was lawful?" *Mackinney v. Nielsen*, 69 F.3d 1002, 1005 (9th Cir. 1995) (quoting *Act Up! Portland v. Bagley*, 988 F.2d 868, 871 (9th Cir. 1993)). In *Anderson v. Creighton*, the Supreme Court instructed courts to examine whether the "contours of the right" in the action were sufficiently clear so that a reasonable official would understand that he or she was violating the right. 483

U.S. 635, 640 (1987).  The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).  "The dispositive question is whether the violative nature of *particular* conduct is clearly established."  *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (internal quotation marks omitted).

Plaintiffs bear the burden of proving the existence of a clearly established right at the time of the allegedly impermissible conduct.  *See Plumhoff v. Rickard*, 134 S. Ct. 2012 (2014); *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1038 (9th Cir. 2018); *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 947 (9th Cir. 2017); *Maraziti v. First Interstate Bank of California*, 953 F.2d 520, 523 (9th Cir. 1992).  Put simply, "Plaintiffs must point to prior case law that articulates a constitutional rule specific enough to alert *these* [Defendants] *in this case* that *their particular conduct* was unlawful."  *See Sharp v. Cty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017).  The case law "must be 'controlling' − from the Ninth Circuit or Supreme Court − or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction."  *Id.* "For a constitutional or statutory right to be clearly established, there does not need to be a factually indistinguishable case spelling out liability, but existing precedent 'must have placed the statutory or constitutional question beyond debate.' "  *NeSmith v. Cty. of San Diego*, No. 15CV629 JLS (JMA), 2016 WL 4515857, at *5 (S.D. Cal. Jan. 27, 2016) (quoting *al-Kidd*, 131 S. Ct. at 2083).

The Court would narrowly define the particular conduct at issue as mandated in recent Supreme Court cases.  *See e.g. Mullenix*, 136 S. Ct. at 308.  The most interesting question is whether Supervisory and Headquarters Defendants' failure to implement court-ordered policies to fix known deficiencies in mental health care and suicide prevention policies, which increased the risks of inmate suicide, violates a clearly established right.  On one hand, of course the right to adequate mental health care is clearly established.  But on the other hand, is it not clearly established how quickly any Defendant needed to have fixed the known deficiency and whether that deficiency bears a sufficient connection to imminent risk of harm to inmates?

Ultimately, based on the discussion at the November 8, 2018 hearing on the motions to dismiss, the Court thinks that the qualified immunity question may be better suited to a determination on summary judgment because of potential factual questions about the scope and import of the *Coleman* court orders.  However, as currently alleged and briefed, Plaintiffs have

not met their burden of directing the Court to a case that clearly establishes that, in light of the facts in this case, the Defendants violated clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982)). Nonetheless, because of some tricky questions about the relation of the *Coleman* court orders to this case, the Court would grant leave to amend and ask the parties to re-brief the qualified immunity issue.

The Court provides the following commentary as a guide to its thinking on the parties' past briefing.

In *Taylor v. Barkes*, the Supreme Court held that an incarcerated person's right to "the proper implementation of adequate suicide prevention protocols" was not clearly established in November 2004. 135 S. Ct. 2042, 2044 (2015); *see also NeSmith*, 2016 WL 4515857, at *8 (citing *Taylor*, 135 S. Ct. at 2044-45) (entitling an official who had policymaking authority and implementation oversight over a jail's suicide prevention policy to qualified immunity from claims of indifference to an inmate's suicide). Defendants rely on this case in asserting that "[t]he specific contours of an inmate or detainee's right to 'adequate suicide prevention protocols' and the implementation of such policies . . . has not been clearly established." *See* HQ Motion at 17; *see also* CIW Reply at 10.

In response, Plaintiffs direct the Court to one Supreme Court and four Ninth Circuit cases to argue that it is clearly established that the failure of officials to ensure compliance with suicide prevention policies is violative conduct under the Eighth Amendment.[10] First, Plaintiffs cite *Brown v. Plata*, 563 U.S. 493 (2011), an appeal of a remedial order issued in the *Coleman* litigation referenced throughout Plaintiffs' SAC. In that case, the Supreme Court found that severe overcrowding of California prisons led to the provision of medical and mental health care that fell short of the minimum constitutional requirements imposed by the Eight Amendment and failed to meet prisoners' basic health needs. *Id.* at 501. Plaintiffs highlight *Brown*'s discussion of placing prisoners in cells with known suicide hazards as evidence that the Defendants would be on notice that they could face an Eighth Amendment claim for deliberate indifference. *See* HQ Opp'n at 18. Defendants do not respond to these arguments.

*Brown* strikes the Court as being indicative of the right to be free from substandard

---

[10] Plaintiffs also cite three district court cases. *See* CIW Opp'n at 17-18. The Court does not believe that these cases affect whether an alleged right was clearly established because they are not "controlling." *See Sharp*, 871 F.3d at 911.

mental health care in a general sense, but thinks it is a closer question as to whether the conduct in *Brown* is sufficiently similar to the conduct alleged here to clearly establish Plaintiffs' right. The Court would conclude that *Brown* is not particularly relevant to the inquiry.  The gravamen of Plaintiffs' claims against the Supervisory and Headquarters Defendants is that they failed in their individual capacities to implement policies to reduce the risk of inmate suicide.  *Brown*, on the other hand, deals with the structural problem of overcrowding in prison and its affect on constitutionally protected medical care.   The Court thinks *Brown* too distinct to put the Defendants on notice that their actions would have violated Plaintiffs' constitutional rights.

Next, Plaintiffs cite *Clouthier v. County of Contra Costa*, for the premise that an inmate's right to adequate suicide prevention measures was clearly established by 2005.  *See* 591 F.3d 1232, 1245 (9th Cir. 2010) *overruled on other grounds by Castro v. Cty. of L.A.*, 833 F.3d 1060 (9th Cir. 2016).  *Clouthier*, however, dealt with an individual mental health professional that "was tasked with caring for a pretrial detainee who had recently expressed suicidal intent," yet removed the detainee from an "Observation Log, told the deputies he could be given regular clothes and regular bedding, and failed to instruct [another defendant] to keep [the detainee] in the Observation Room."  *Id.* at 1244-45.  The Court does not think that *Clouthier* is sufficient to find that "the violative nature" of the Supervisory or Headquarters failure to implement system or prison-wide suicide prevention policies is clearly established.

Plaintiffs also cite *Conn* in their opposition to Defendants' motions for qualified immunity.  *See* 591 F.3d at 1094-95, 1102.  *Conn*, even with its complicated procedural history, does not support that it is clearly established that policy makers must implement sufficient suicide prevention protocols.  *Id.* at 1102.  While, *Conn* states "[i]t is clearly established that the Eighth Amendment protects against deliberate indifference to a detainee's serious risk of suicide," again it was discussing individual officers' reactions to an individual detainee's attempted suicide.  *Id.*  Likewise, in *Simmons*.  *See Simmons*, 609 F.3d at 1018.

Lastly, Plaintiffs cite to *Cabrales v. County of Los Angeles*, 864 F.2d 1454, 1461-62 (9th Cir. 1988), *cert. granted, judgment vacated*, 490 U.S. 1087 (1989), *and opinion reinstated*, 886 F.2d 235 (9th Cir. 1989), which upheld a district court's denial of summary judgment to the defendant-county.  In essence, the court concluded that it was a factual issue as to whether the county's alleged policy of understaffing the psychiatric staff "was the 'moving force' behind the deprivation of the decedents constitutional rights without due process."  Plaintiffs do not clearly

21

explain their cite to *Cabrales*.

In sum, by the time Erika took her life in April 2016, the Eighth Amendment's application to the provision of mental health care was well established as a general matter.  *See Brown*, 563 at 201; *see also Simmons*, 609 F.3d at 1018.  Plaintiffs, however, have failed to direct the Court to any case law that the Supervisory and Headquarters Defendants' *particular* conduct – failure to implement fixes to known deficiencies in suicide prevention – was a clearly established Eighth Amendment violation.  As such, the Court would dismiss Plaintiffs' first and second causes of action against the Supervisory and Headquarters Defendants but grant leave to amend.

B.  Third Cause of Action: Substantive Due Process Violation

In the third cause of action, Plaintiff Reza alleges that Defendants' "aforementioned acts and/or omissions" of deliberate indifference to Erika's serious medical need deprived Reza of her liberty interest in the parent-child relationship in violation of Reza's substantive due process rights pursuant to the First and Fourteenth Amendments of the United States Constitution."  *See* FAC ¶ 53.

Defendants argue that the claim must be dismissed because Reza was not a natural, adoptive, or custodial parent of Erika, and did not have a tie with Erika "demonstrating an enduring assumption of parental responsibility."  *See* HQ Motion at 7.  Defendants therefore argue the relationship is not afforded constitutional protection.  *See id.*

"[I]ntimate association receives protection as a fundamental element of personal liberty. Such protection, however, extends only to certain kinds of highly personal relationships."  *Erotic Serv. Provider Legal Educ. & Research Project v. Gascon*, 880 F.3d 450, 458 (9th Cir. 2018) (citations omitted).  Neither side has directed the Court to any case in which a "parental figure" (as opposed to an actual parent) was held to have a substantive due process right to familial association.  Similarly, neither side has directed the Court to any case in which such an argument was advanced and rejected.  In the absence of binding or even persuasive authority on this point, the Court must consider whether any precedent lends support to the notion that a "parental figure" may raise a constitutional claim predicated on a state actor's alleged interference with the right to intimate association.

> It is well established that a parent has a "fundamental liberty interest" in "the companionship and society of his or her child" and that "[t]he state's interference with that liberty interest without due

> process of law is remediable under Section 1983." *Kelson v. City
> of Springfield*, 767 F.2d 651, 654-55 (9th Cir. 1985) (citing
> *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed.
> 2d 599 (1982)). "[T]his constitutional interest in familial
> companionship and society logically extends to protect children
> from unwarranted state interference with their relationships with
> their parents." *Smith v. City of Fontana*, 818 F.2d 1411, 1418 (9th
> Cir. 1987) *overruled on other grounds by Hodgers-Durgin v. de la
> Vina*, 199 F.3d 1037 (9th Cir. 1999). Moreover, "the First
> Amendment protects those relationships, including family
> relationships, that presuppose 'deep attachments and commitments
> to the necessarily few other individuals with whom one shares not
> only a special community of thoughts, experiences, and beliefs but
> also distinctively personal aspects of one's life.'" *Board of Dir. v.
> Rotary Club*, 481 U.S. 537, 545, 107 S. Ct. 1940, 95 L. Ed. 2d 474
> (1987) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609,
> 619-20, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984)); *see also Conti
> v. City of Fremont*, 919 F.2d 1385, 1388-89 (9th Cir. 1990).

*Lee v. City of Los Angeles*, 250 F.3d 668, 687 (9th Cir. 2001). In *Roberts v. United States Jaycees*, 468 U.S. 609 (1984), the Supreme Court considered a large civic organization's categorical exclusion of women. The state of Minnesota enacted legislation requiring the organization to admit women; the organization brought suit in federal district court seeking declaratory and injunctive relief to prevent enforcement of the legislation. *See id.* Beginning with the proposition that "[t]he Court has long recognized that, because the Bill of Rights is designed to secure individual liberty, it must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State," the Court went on to describe in *dicta* the potential application of this right. *See id.* at 618-19.

> The personal affiliations that exemplify these considerations, and
> that therefore suggest some relevant limitations on the
> relationships that might be entitled to this sort of constitutional
> protection, are those that attend the creation and sustenance of a
> family – marriage, *e.g.*, *Zablocki v. Redhail*, [434 U.S. 374, 383-86
> (1978)]; childbirth, *e.g.*, *Carey v. Population Services
> International*, [431 U.S. 678, 684-86 (1977)]; the raising and
> education of children, *e.g.*, *Smith v. Organization of Foster
> Families*, [431 U.S. 816, 844 (1977)]; and cohabitation with one's
> relatives, *e.g.*, *Moore v. East Cleveland*, [431 U.S. 494, 503-04
> (1977) (plurality opinion)]. Family relationships, by their nature,
> involve deep attachments and commitments to the necessarily few
> other individuals with whom one shares not only a special

> community of thoughts, experiences, and beliefs but also
> distinctively personal aspects of one's life.  Among other things,
> therefore, they are distinguished by such attributes as relative
> smallness, a high degree of selectivity in decisions to begin and
> maintain the affiliation, and seclusion from others in critical
> aspects of the relationship.  As a general matter, only relationships
> with these sorts of qualities are likely to reflect the considerations
> that have led to an understanding of freedom of association as an
> intrinsic element of personal liberty.  Conversely, an association
> lacking these qualities − such as a large business enterprise −
> seems remote from the concerns giving rise to this constitutional
> protection.  Accordingly, the Constitution undoubtedly imposes
> constraints on the State's power to control the selection of one's
> spouse that would not apply to regulations affecting the choice of
> one's fellow employees.  *Compare Loving v. Virginia*, 388 U.S. 1,
> 12 (1967), *with Railway Mail Assn. v. Corsi*, 326 U.S. 88, 93-94
> (1945).

*Id.* at 619-20.  The Court further stated that determining whether a relationship is afforded constitutional protection "unavoidably entails a careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments."  *Id.* at 621.  The Court declined to "mark the potentially significant points on this terrain with any precision" and instead noted that factors that may be relevant include "size, purpose, policies, selectivity, congeniality, and other characteristics that in a particular case may be pertinent."  *Id.*[11]

The Ninth Circuit recently addressed a similar question in *Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1058 (9th Cir. 2018).  There, the decedent's biological son had been adopted as a child yet maintained a "close relationship with [his biological mother] during part of his childhood and throughout his adult life."  *Id.* at 1050.  The court rejected Wheeler's loss of companionship claim because Wheeler did not plead that he and his biological mother had a

---

[11] Application of this standard produces somewhat inconsistent results as the objective characteristics of any particular relationship will vary and must be carefully assessed.  For instance, in *Piscottano v. Murphy*, 511 F.3d 247, 278-80 (2d Cir. 2007), the Second Circuit entertained an argument that members of the Outlaws Motorcycle Club could assert a claim predicated on "close personal friendship" but found that the friendships there did not meet the *Roberts* standard because there was insufficient evidence to show the Outlaws were either a small or particularly selective group.  On the other hand, some cases have found that friendships, seemingly regardless of the degree of closeness, are not afforded constitutional protection.  *See, e.g.*, *Silverstein v. Lawrence Union Free Sch. Dist. No. 15*, No. 10-CV-10-933, 2011 U.S. Dist. LEXIS 34200, 2011 WL 1261122, at *6 (E.D.N.Y. Feb. 15, 2011), *report and recommendation adopted*, No. 10-CV-10-933, 2011 U.S. Dist. LEXIS 34239, 2011 WL 1261114 (E.D.N.Y. Mar. 30, 2011); *Cf. Dupont v. New Jersey State Police*, No. 08-CV-10220, 2009 U.S. Dist. LEXIS 71990, 2009 WL 2486052, at *9 (S.D.N.Y. Aug. 14, 2009) (finding no clearly established law protecting friendship in the qualified immunity context).

sufficiently protectable relationship.  *Id.* at 1058.  First, the court expressed that "[j]udicially enforceable Fourteenth Amendment interests require enduring relationships reflecting an assumption of parental responsibility and stem from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in promoting a way of life through the instruction of children."  *Id.* at 1058 (internal quotation marks and alterations omitted). Wheeler, the Court concluded could not demonstrate this type of relationship because "[Wheeler's biological mother] surrendered Wheeler for adoption as an infant − choosing to legally sever her relationship with him and to give up all rights and responsibilities related to his care . . . [and did not] raise[] him, otherwise resume[] responsibility for his upbringing, or even maintain[] consistent contact with him during his childhood."  *Id.*  Although, the court dismissed Wheeler's claim, it was quick to state, "[w]e confine our holding to the case before us, arising from the particular nature of Wheeler and Colbert's relationship as alleged. Questions concerning all adopted-out children or those raised in non-traditional family arrangements are not before us today."  *Id.*

Here, Plaintiffs allege that Reza was Erika's stepmother and Erika's father's partner for 21 years.  *See* SAC ¶ 19.  Reza and Erika "maintained their close relationship" while Erika was incarcerated and Reza visited her at CIW.  *Id.*  Plaintiffs further state:

> During this period, Erika frequently stayed with her father's partner, Plaintiff Linda Reza, and their family. When initially placed with her paternal grandmother, Erika visited Linda Reza's house once or twice a month on the weekend. Later, when placed in group homes, Erika would periodically run away to live instead at Linda's home. During this period they lived together, Linda and Erika developed a close relationship. They cooked together and spent time as a family with Linda's other children, including Erika's sister Geraldine.

> On or around February 2, 1996, Erika was placed in a group home called the International Home for Girls. It quickly became clear that this was not a good placement for Erika, who would prefer to live with her father, Linda, and her sister Geraldine. Erika's social worker at the time interviewed Linda and determined that her home would be a stable environment for Erika; the social worker told Linda that she would recommend the placement at Linda's house. However, on February 12, 1996, Erika was arrested along with another resident of the International Home for Girls.

*Id.* ¶¶ 68-69.

Although *Wheeler* did not deal with the exact type of relationship at issue here, the Court

25

thinks it persuasive support in favor of granting Defendants' Motions on this claim.  While Reza was Erika's stepmother, purportedly "maintained a close relationship with Erika," and periodically let Erika live with her when she was young, Plaintiffs do not allege that Reza ever assumed "parental responsibility" for Erika or even that they had "the intimacy of daily association" other than during certain periods.[12]  And while Erika may have been about to move into Reza's home before she was arrested, this assumption of responsibility did not occur.  The Court recognizes that this is a tough issue but would grant Defendants' Motion as to the third cause of action.

   C.  Fourth Cause of Action: Violations of the ADA and Rehabilitation Act

Plaintiffs allege that CDCR "violated the ADA and Rehabilitation Act by: (a) failing to provide services or reasonably accommodate Erika Rocha with access to CDCR programs and services; (b) failing to properly train and supervise CDCR staff, employees and officers on how to appropriately treat, monitor, and interact with disabled persons, such as Erika Rocha; (c) discriminating against Erika Rocha on the basis of disability by dismissing her mental health complaints as childish and manipulative and failing to provide her necessary treatment."  SAC ¶ 134.

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  The Rehabilitation Act similarly prohibits discrimination based on disability, and the same factors apply for analyzing a Rehabilitation Act claim and an ADA claim.  *See Duffy v. Riveland*, 98 F.3d 447, 455 (9th Cir. 1996).  To state a claim, the plaintiff must allege that: (1) she is an individual with a disability; (2) she is otherwise qualified to participate in or receive the benefit of the public entity's services, programs, or activities; (3) she was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of her disability.  *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002).

Both the ADA and the Rehabilitation Act apply in the state prison context, and prevent

---

[12] It is noted that the Coleman Report indicated that Erika "had marginal family support, with the last visit occurring in January 2016."  *See* Docket No. 79-1, Exhibit 7 at 40.

disabled prisoners from being excluded from participation in prison programs or discriminated against in the various aspects of prison life. *Armstrong v. Wilson*, 124 F.3d 1019, 1022-24 (9th Cir. 1997). However, courts have held that the ADA and Rehabilitation Act are not violated by a prison's failure to adequately address the medical needs of disabled inmates. *See Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) (so holding, and noting that "the courts have labored mightily to prevent the transformation of the Eighth Amendment's cruel and unusual punishments clause into a medical malpractice statute for prisoners. We would be exceedingly surprised to discover that Congress had made an end run around these decisions in the Americans with Disabilities Act"); *see also Simmons*, 609 F.3d at 1022 ("The ADA prohibits discrimination because of disability, not inadequate treatment for disability."); *Arreola v. California Dept. of Corrections and Rehabilitation*, Case No. CV-16-3133-JD, 2017 WL 1196802, at *2-3 (N.D. Cal. Mar. 31, 2017) (dismissing prisoner's ADA claim for failure to allege denial of participation in prison programs or services for being disabled).

The Court would find that the SAC's allegations relate to the treatment Erika received while incarcerated. Plaintiffs argue that CDCR's failure "to properly train and supervise CDCR staff, employees and officers on how to appropriately treat, monitor, and interact with disabled persons" violated her rights to equal treatment on the basis of her disability. SAC at ¶ 164. But the Court cannot see how this is different than a complaint about "inadequate treatment for a disability." Plaintiffs allege that the care she received was inadequate, negligent, or worse, but that is insufficient to state a claim under the ADA or Rehabilitation Act. *See Bryant*, 84 F.3d at 249. Accordingly, the Court would dismiss Plaintiff's fourth cause of action for failure to state a claim.

D.  Fifth, Sixth, Seventh and Eighth Causes of Action: State Law Claims

CIW Defendants first argue that the Court should decline supplemental jurisdiction if it grants the Motions as to all of the federal claims. *See* CIW Motion at 21. Plaintiffs and Headquarters Defendants do not address this request. The Court is not inclined to decline supplemental jurisdiction at this time.

Defendants argue that the fifth through eighth claims ("State Law Claims") asserted by the estate of Erika Rocha should be dismissed for failure to comply with the California Government Claims Act ("GCA"), Cal. Gov't Code §§ 900 *et seq*. *See* HQ Motion at 20-22. The GCA states that the "failure to timely present a claim for money or damages to a public

entity bars a plaintiff from filing a lawsuit against that entity." *State of California v. Superior Court (Bodde)*, 32 Cal. 4th 1234, 1239 (2004); Specifically, Defendants argue that Geraldine and Freida Rocha filed the governmental claim only in their individual capacities as Erika's sisters, and not as representatives of Erika or her estate. *See* HQ Motion at 21.[13]

Under the GCA, "[w]here two or more persons suffer separate and distinct injuries from the same act or omission, each person must submit a claim, and one cannot rely on a claim presented by another." *Nelson v. Cty. of L.A.*, 113 Cal. App. 4th 783, 796 (2003). Therefore, neither a wrongful-death claimant nor a personal representative pursuing a survival cause of action may rely on the other's claim. *See Castaneda v. Dep't of Corr. & Rehab.*, 212 Cal. App. 4th 1051, 1062 (2013); *Estate of McDaniel v. Cty. of Kern*, No. 1:15-cv01320-JAM-JLT, 2015 WL 7282881, at \*4 n.3 (E.D. Cal. Nov. 18, 2015).

Plaintiffs do not dispute that the GCA requires the estate and individuals to file separate claims. *See* HQ Opp'n 21-22. Instead, Plaintiffs argue: (1) that they in fact filed the government claim on behalf of the estate and as individuals; (2) that even if they failed to comply with the technical requirements of the GCA, they filed *pro se* and still put Defendants on notice as to the nature of their claims; and (3) that even if the Court finds that the government claim did not preserve the estate's State Law Claims, the wrongful death claim would survive on behalf of Geraldine and Freida Rocha. *Id.* at 22-23.

Plaintiffs argue that they satisfied the GCA requirements by filling in "Erika Rocha" under a section in the government claim form that states "[i]f your claim relates to another claim or claimant, please provide the claim number or claimant's name in section 8." *See* RJN Exhibit A at 4. Plaintiffs further assert that Geraldine and Freida listed themselves under the "Attorney or Representative Information" section as the "sisters" of the claimant. *Id.* As Defendants point out in Reply, however, simply listing Erika in section 8 does not provide notice that Geraldine and Freida were trying to encompass individual *and* estate claims. *See* HQ Reply, Docket No. 94, at 14. The inclusion of Erika's name under section 8 could just as easily refer to a separately-filed claim related to Geraldine and Freida's claim. In fact, this seems the most likely

---

[13] Defendants request the Court take judicial notice of "Records for all claims filed by or on behalf of Erika Rocha, Geraldine Rocha, and Freida Rocha stating a date-of-incident from April 1, 2016, through April 30, 2016." *See* Request for Judicial Notice ("RJN"), Docket No. 85, at 2. Plaintiffs do not oppose. *See* Notice of Non-Opposition to RJN, Docket No. 91. The Court will grant Defendants' request and take judicial notice of Exhibit A of the RJN as an official state record whose accuracy cannot reasonably be questioned.

reading considering that Geraldine and Freida listed themselves as the claimants.  RJN Exhibit A at 4.  The form, at best, is ambiguous and the Court would not find that it satisfies the GCA requirements.

Plaintiffs' second assertion that, even if they did not technically comply with the GCA, they put the government on notice about the nature of their claims is likewise unavailing.  Even if the government claim form somehow put the government on notice about all of Plaintiffs' claims, "[i]t is well-settled that claims statutes must be satisfied even in face of the public entity's actual knowledge of the circumstances surrounding the claim."  *City of Stockton v. Sup. Ct.*, 42 Cal. 4th 730, 738 (2007) (citations and internal quotation marks omitted).  Further, the doctrine of "substantial compliance" does not apply where the estate failed to file its own claim.  *See Nelson*, 113 Cal. App. 4th at 797.  Plaintiffs argue that they "did not narrow their damages to loss of companionship, but rather indicated the damages included those belonging to Erika," thus indicating that their claims were both on behalf of themselves and the estate.  HQ Opp'n at 22.  However, Plaintiffs do not cite where they indicated such damages.  On the addendum to the government claim form, under the question "Explain how you calculated the claim amount," Plaintiffs stated, "The damages in this case stem from General Damages, Special Damages, and Punitive Damages."  RJN, Exhibit A at 6.  Further, in response to the instruction, "Describe the specific damage or injury," Plaintiffs stated, "Our sister, Erika Rocha, died at the [CIW] . . . ." *Id.*  The Court does not think that these descriptions of the damages suggest that Geraldine and Freida were asserting claims on their own behalves and on the estate's behalf.  The responses instead indicate that the sisters were focused on Erika's death, rather than any harm Erika suffered before her death.  *See Nelson*, 113 Cal. App. 4th at 797.  Although the Court recognizes that there is some ambiguity on the claim form because Geraldine and Freida seemed to indicate both that they were claimants and representatives for Erika, the Court does not think that the form substantially complied with the requirements of the GCA.  *See Garcia v. Santa Clara Cty.*, No. C-02-04360-RMW, 2004 WL 2203560, at *11 (N.D. Cal. Sept. 29, 2004) *aff'd*, 268 F. App'x 588 (9th Cir. 2008).  Without more, the government claim form would not put the government on notice about *who* was claiming damages and for *what*.

As such, the Court would dismiss all of the State Law Claims brought by the estate.

Because the State Law Claims are subject to dismissal under the GCA, the Court will not address the other grounds asserted for dismissal but will note that its reasoning in the First

Dismissal Order would likely remain the same as to the State Law Claims asserted in the SAC.

## IV.     Conclusion

Based on the foregoing discussion, the Court would grant the Motions.  While Plaintiffs sufficiently alleged that the Supervisory and Headquarter Defendants violated Erika's Eighth Amendment rights, the Court would conclude that the violative nature of those Defendants' particular conduct was not clearly established, and that they are therefore entitled to qualified immunity on the first and second causes of action.  Plaintiffs additionally failed to state a claim under the third cause of action because they have not pleaded that Reza and Erika had a sufficiently protectable relationship.  Plaintiffs' allegations as to the fourth cause of action were conclusory and failed to state a claim.  And, lastly, all of Plaintiffs' State Law Claims would be dismissed for failure to comply with the GCA.  All causes of action against Defendants would therefore be dismissed.  The Court would dismiss the SAC but grant Plaintiffs one final chance to amend consistent with this ruling.  Plaintiffs have until January 18, 2019 to file a Third Amended Complaint.  Additionally, the Court recognizes that Defendant Jaimez has filed a motion to dismiss.  *See generally* Jaimez Motion to Dismiss SAC, Docket No. 105.  The Court would vacate the Jaimez Motion to Dismiss and ask him to refile the motion as to the potential Third Amended Complaint.