# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | EDCV 17-869-GW(FFMx) | Date | March 13, 2019 |
|---|---|---|---|
| Title | *Geraldine Rocha v. Scott Kernan, et al.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Javier Gonzalez | None Present | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Present | None Present |

PROCEEDINGS:     **IN CHAMBERS - FINAL RULING ON DEFENDANTS K. HUGHES, J. ELLIOT, M. PULLING AND P. VELEZ'S MOTION TO DISMISS THIRD AMENDED COMPLAINT [123]**

Attached hereto is the Court's Final Ruling. The Court would GRANT in part and DENY in part the CIW and HQ Motions. The Court would grant the motions as to the State Law Claims, Reza's substantive due process claim, and the ADA claim; but deny the motions as to the Eighth Amendment causes of action. Because Plaintiffs have had numerous opportunities to plead their State Law, substantive due process, and ADA claims, the Court would now dismiss those claims with prejudice.

:

Initials of Preparer     JG

*Rocha v. Kernan, et al.*; Case No. 5:17-cv-00869-GW-(FFMx)
Final Ruling on Motions to Dismiss Third Amended Complaint

## I.    Background

The estate of Erika Rocha, by and through Geraldine Rocha and Freida Rocha; and Linda Reza (collectively, "Plaintiffs") bring this lawsuit[1] against: 1) the California Department of Corrections and Rehabilitation ("CDCR"); 2) Scott Kernan; 3) Diana Toche; 4) Kelly Harrington; 5) Kathleen Allison; 6) Katherine Tebrock; 7) Kimberley Hughes; 8) Jim Elliot; 9) Paloma Velez; 10) Matthew Pulling; and 11) D. Jaimez.[2]    *See generally* Third Amended Complaint ("TAC"), Docket No. 116.   Plaintiffs claim that Defendants: 1) violated Erika Rocha's rights under the Eight Amendment of the United States Constitution by failing to provide mental health treatment; 2) violated Erika Rocha's rights under the Eight Amendment of the United States Constitution by failing to protect her from harm; 3) violated Reza's rights under the First and Fourteenth Amendments of the United States Constitution by depriving Reza of her liberty interest in her parent-child relationship with Erika Rocha without due process of law; 4) discriminated against Erika Rocha in violation of the Americans with Disabilities Act ("ADA") and Rehabilitation Act; 5) violated California state law through negligent supervision, hiring, training, and retention; 6) took action resulting in Erika Rocha's wrongful death; 7) were negligent with respect to Erika Rocha's death; and 8) failed to furnish or summon medical care for Erika Rocha.   *See generally id.*

Plaintiffs allege:  Erika Rocha was born on November 7, 1980 and her mother died when she was seven years old.   *Id.* ¶ 65.   Because her father was incarcerated at that time, from ages seven until approximately fourteen Erika lived with various family members, some of whom

---

[1] This lawsuit was initially filed on May 4, 2017 pro se by Geraldine Rocha as "Successor in Interest to Erika Rocha." Docket No. 1.   After certain defendants filed a motion to dismiss, but prior to a hearing on said motion, a First Amended Complaint ("FAC") was filed on January 31, 2018, by Plaintiffs' present counsel.  Docket Nos. 13, 24.  On July 30, 2018, the Court granted in part Defendants' motion to dismiss the FAC with leave to amend.  Docket No. 71. Plaintiffs filed a Second Amended Complaint ("SAC") on September 17, 2018 (Docket No. 79); and, following Defendants' motion to dismiss, the Court dismissed the causes of action but with leave to amend.  *See* Second Dismissal Order, Docket No. 110.  The present Third Amended Complaint ("TAC") was filed on January18, 2019. Docket No. 116.

[2] Defendant D. Jaimez was not named in the FAC.  *See* Docket No. 24.  Jaimez was added to the SAC but was not served until October 17, 2018.  *See* Proof of Service, Docket No. 92.  Therefore, this is the Jaimez's first involvement in a motion to dismiss.

physically and sexually abused her.  *Id.* ¶¶ 65-66.  When she was approximately fourteen years old, Erika was ultimately removed from her maternal grandfather's home by the California Department of Child Protective Services.  *Id.* ¶ 67.  At that point, Erika was placed in a series of group homes.  *Id.*  Before being placed in the group homes, Erika frequently stayed with her father's partner Linda Reza and her family.[3]  *Id.* ¶ 67.  When living in the group homes, Erika would periodically run away and live with Reza, and Erika and Reza "developed a close relationship."[4]  *Id.* ¶ 68.

On or about February 2, 1996, Erika was placed in the group home: International Home for Girls.  *Id.* ¶ 69.  Around this time, Erika's social worker interviewed Reza to determine if Reza's home would provide a stable environment for Erika.  *Id.*  Ten days after Erika was placed in International Home for Girls, and before she could be moved to Reza's abode, Erika and another resident of the group home were arrested.  *Id.*  Erika was fifteen years old and was set to be tried as an adult.  *Id.* ¶ 70.  She pled guilty and was sentenced to a prison term of nineteen years.  *Id.* She spent the first two years in solitary confinement to protect her from the adult population.  *Id.* In September 2011, she was transferred from the Central California Women's Facility to the California Institution for Women ("CIW"), specifically to be closer to Reza.  *Id.* ¶¶ 74-75.  Erika referred to Reza as "mom" and considered herself to be Reza's daughter.  *Id.* ¶ 75.  After spending close to two decades incarcerated, Erika was scheduled to meet the Parole Board on April 15, 2016.  *Id.* ¶ 76.  Erika took her life the day before the hearing, on April 14, 2016.  *Id.* ¶ 1.

Erika's CDCR records reflect that she began experiencing auditory hallucinations when she was seven years old and that she attempted suicide approximately eight times between the ages of seven and fourteen.  *Id.* ¶¶ 71-72.  While in CDCR custody, Erika was diagnosed with amphetamine dependence, antisocial personality disorder, psychosis, psychotic disorder, adjustment disorder with anxiety, and continuing diagnoses of major depressive disorder.  *Id.* ¶¶ 72-73.  While incarcerated, Erika was admitted to a Mental Health Crisis Bed ("MHCB") a total of nine times.  *Id.* ¶ 77.  On or around 2013, after her third admission to a crisis bed unit, Erika's mental health level of care was elevated to the Enhanced Outpatient Program ("EOP").  *Id.* ¶ 78.

---

[3] Erika's father died in July 2008.  *Id.* ¶ 75.  Reza was Erika's father's "partner" for 21 years at the time of his death (*id.* ¶ 19), which means that they began that relationship in 1987-88.

[4] There is no indication that Erika's father, Reza or anyone else attempted to place Erika with Reza at any time prior to 1996, despite Erika's problems with her living arrangements with family members and/or in group homes.

As defined by CDCR policy, the EOP level of care is for prisoners with "acute onset or significant decompensation of a serious mental disorder" or "[i]nability to function in [the] General Population." *Id.* As such, Erika was house on the "Support Care Unit," an EOP-level housing unit. *Id.* CDCR clinicians usually assessed Erika's chronic risk for suicide as "high." *Id.* ¶ 80.

On February 29, 2016, Erika told Velez (her clinician at the time) that her upcoming parole hearing was making her anxious. *Id.* ¶ 82. Velez, who had been Erika's assigned clinician for approximately two years, and was also aware of Erika's high chronic suicidality, did not make any changes to Erika's treatment plan to address this escalating mental health symptoms. *Id.* On March 1, 2016, Velez transferred responsibility for Erika's care to another clinician, Pulling. *See id.* From March 2015 until Erika's death on April 14, 2016, all of the clinical summaries regarding Erika were identical despite medical records reflecting increased depression and suicidal ideation. *See id.* ¶ 81. Before transferring responsibility for Erika's care, Velez did not create a transition plan for Erika, or ensure that the transfer would not have negative effect on Erika's mental health. *Id.* ¶ 82. Erika met with Pulling a number of times in March 2016, but Pulling often left the "treatment plan" section of the clinical summaries blank. *Id.* ¶¶ 84-85.

Later that month, on March 31, 2016, Erika expressed suicidal ideation and was placed on continuous observation. *Id.* ¶ 88. Per CDCR policy, the required placement for a prisoner on suicide watch was an MHCB, but the MHCBs were full. *Id.* Therefore, a staff psychiatrist placed Erika in "alternative housing" overnight. *Id.* The alternative housing location for suicide watch at CIW was easily observable by other prisoners and inmates placed in this location were clothed only in a suicide smock that left their backside exposed to view of other prisoners. Placement in such "alternative" suicide watch often resulted in prisoners retracting statements about suicidal ideation in order to be discharged from that location and be in a less vulnerable position vis-à-vis other prisoners. *Id.*

The following day, a psychiatrist assessed that Erika was expressing increasing anxiety about her upcoming parole hearing. *Id.* ¶ 89. Erika denied suicidal ideation, however, and Erika was removed from continuous observation. *Id.* Despite upcoming hearing and potential release dates being well-established suicide risk factors, the psychiatrist did not include any other treatment modifications for Erika. *Id.* A different clinician determined at that time that Erika had "high" chronic risk of suicide but "low" acute risk of suicide as she denied suicidal ideation. *Id.* ¶ 89. This clinician failed to adequately complete the evaluation, however, leaving key sections

3

blank and employing cut-and-pasted information from previous assessments that was inaccurate. *Id.*

Defendant Pulling subsequently failed to comply with the "five day step down" discharge procedure. He did not conduct the required clinical evaluations of Erika for day 1 or day 2, and, on day 3 (April 4), discontinued the five-day follow-up completely, without completing a suicide risk assessment, and without including any clinical justification. *Id.* ¶ 91. Defendant Pulling's early termination of the five-day discharge procedure violated CDCR's own policies, and is the type of treatment deficiency identified by the *Coleman* Special Master. *Id.* The point of the suicide risk assessment that Pulling was supposed to have completed was to determine whether the suicide risk that caused Erika to be placed on suicide watch had subsided. *Id.* ¶ 92.

Over the next two weeks until her death, staff and prisoners observed "noticeable behavioral changes," including that Erika was keeping to herself, stayed in her cell, refused psychotropic medication, and fought with her cellmate. *Id.* ¶ 94. On the evening of April 2, 2016, Erika punched a locker. *Id.* During the April 4 meeting, in regards to Erika's recent placement on continuous observation, Pulling noted:

> Discussed the events with [Erika] and asked her to take responsibility for using suicidal threats to get what she wanted, that the behavior was childish and most serious as people do kill themselves. Discussed [Erika's] need to learn different coping mechanisms to get her needs met. Discussed the difference between a child and an adult. Challenged [Erika] to act in an adult fashion."

*Id.* ¶ 93.

In "Therapeutic Notes" taken on April 11 and April 13 – after Erika was released from suicide watch – Erika's "Problems/Diagnoses" included "major depressive disorder," PTSD, "high risk for self harm," and "impulsive." *See id.* ¶ 95; Ex. 12. Both Velez and Pulling signed these notes. *Id.*

On April 14, 2016, Defendant Jaimez found Erika hanging in her cell. When she was discovered, Erika was already in a state of rigor mortis and Plaintiffs allege that Jaimez had not conducted a safety check for more than two hours. *Id.* ¶ 98.

After her death, a review of Erika's case by a CDCR Suicide Case Review Committee identified significant lapses in her care, including violations of CDCR's policies and procedures, and determined that Erika's suicide was both foreseeable and preventable. *Id.* ¶ 102. Additionally, Erika's death was reviewed by the Special Master Appointed in *Coleman v. Brown*, E.D. Cal. Case

4

No. 2:90-cv-00520-KJM-DB,[5] a class action filed on behalf of California inmates with serious mental health illness. *See id.* ¶ 105. The Special Master affirmed the CDCR Suicide Case Review Committee findings. *Id.* ¶ 106.

Plaintiffs allege that the Headquarters Defendants were responsible for reviewing the *Coleman* Special Master's findings and recommendations and the court's orders. *Id.* ¶ 41. In April 2013, the *Coleman* court issued an order stating:

> [F]or over a decade a disproportionately high number of inmates have committed suicide in California's prison system. Review of those suicides shows a pattern of identifiable and describable inadequacies in suicide prevention in the CDCR. Defendants have a constitutional obligation to take and adequately implement all reasonable steps to remedy these inadequacies. The evidence shows they have not done so. In addition, while defendants represent that they have fully implemented their suicide prevention program, they have not. An ongoing constitutional violation therefore remains.

*Id.* ¶ 43. On February 3, 2015, the *Coleman* Court entered an order adopting the Special Master's recommendations addressing deficiencies in CDCR's provision of mental health care to prisoners at risk of suicide, including: (i) improved training for dealing effectively with prisoners perceived to be manipulative and those at risk for suicide despite their denials of suicidality; (ii) improved training regarding the completion of accurate Suicide Risk Evaluations and regular audits to ensure compliance; (iii) implementation of policies that require "[a]ny inmate discharged from suicide observation status . . . [to] be initially housed in a suicide-resistant, retrofitted cell"; (iv) implementation of training on treatment planning for suicidal prisoners; (v) corrective training regarding "[t]he perception that all inmates who threaten suicide are manipulative"; and (vi) complete revision of the "Five-Day Follow-up" protocol. *Id.* at ¶¶ 49-50. In early 2016, the *Coleman* Special Master conducted a "Re-Audit and Update on Suicide Prevention in the Prisons of the [CDCR].)" *Id.* ¶ 52. The Re-Audit found ongoing problems with the issues highlighted in the 2015 report. *See id.* ¶¶ 53-55. The *Coleman* court issued a new order on April 5, 2016, directing again that the responsible official follow the February 3, 2015 order. *Id.* at ¶¶ 56-57. In 2016, the California State Auditor also reviewed the CDCR policies, procedures, and practices for suicide prevention and reduction. *Id.* ¶ 59. The State Auditor found several failures by CDCR,

---

[5] The *Coleman* court ruled that the State of California, through CDCR, was violating the Eighth Amendment of the U.S. Constitution by failing to provide adequate mental health treatment to prisoners with serious mental illness. *See Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal. 1995).

including that leadership had known about issues related to suicide prevention and response for years but failed to implement solutions. *See id.* ¶¶ 60-64. Specifically, the Auditor explained that the CDCR and CIW officials had failed to address the *Coleman* Special Master's January 2015 recommendation:

> [T]hat Corrections expand the length and content of certain suicide prevention trainings by including various topics, such as dealing with effectively with inmates perceived to be manipulative . . . . Without required content, Corrections' training will lack effectiveness in preventing suicides and improving responses to attempted suicides. For example, if Corrections' staff assume inmates are expressing suicidal thoughts in order to obtain some benefit—in other words, are being manipulative—the staff may miss important warning signs of impending suicide attempts.

*Id.* ¶ 64.

Defendant Kernan is CDCR's Secretary, its highest-ranking official, responsible for administering and overseeing its operations. *Id.* ¶ 21. Defendant Toche is CDCR's Undersecretary of Health Care Services, responsible for the administration of the provision of healthcare to inmates. *Id.* ¶ 22. Defendant Harrington was CDCR's Director of the Division of Adult Institutions from January 2015 until March 2016, and in that role was responsible for supervising the administration of CDCR's adult prison facilities. *Id.* ¶ 23. In April 2016, Defendant Allison replaced Defendant Harrington in that role. *Id.* ¶ 24. Defendant Tebrock is the CDCR's Deputy Director of its Statewide Mental Health Program, responsible for overseeing the provision of mental health care to inmates. *Id.* ¶ 25. Defendant Hughes is the Warden of CIW, the institution where Erika was incarcerated from September 2011 until the time of her death. *Id.* ¶ 26. Defendant Elliot was CIW's CEO, and had hiring authority for all health care staff in the institution. *Id.* ¶ 27.

Defendants filed two motions to dismiss, categorizing themselves as belonging to the group of "Headquarters Defendants," *i.e.*, Defendants Kernan, Toche, Harrington, Allison, Tebrock, and Jaimez, *see generally* Headquarters Defendants' Motion to Dismiss TAC ("HQ Motion"), Docket No. 128); or the "CIW Defendants," *i.e.*, Defendants Hughes, Elliot, Pulling and Velez (*see generally* CIW Defendants' Motion to Dismiss ("CIW Motion"), Docket No. 123).[6] Plaintiffs oppose both motions. *See generally* Opposition to HQ Motion ("HQ Opp'n"), Docket No. 134;

---

[6] The CIW Defendants further differentiate between the "Supervisory Defendants," *i.e.*, Hughes and Elliot; and the "Provider Defendants," *i.e.*, Pulling and Velez. *See generally* CIW Motion.

Opposition to CIW Motion ("CIW Opp'n"), Docket No. 133.

## II.      Legal Standard

Under Federal Rule of Civil Procedure ("Rule") 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A complaint may be dismissed for failure to state a claim for one of two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal theory. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) ("Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.").

In deciding a Rule 12(b)(6) motion, a court "may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007). The court must construe the complaint in the light most favorable to the plaintiff, accept all allegations of material fact as true, and draw all reasonable inferences from well-pleaded factual allegations. *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001), *amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001); *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). A court is not required to accept as true legal conclusions couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Where a plaintiff facing a Rule 12(b)(6) motion has pleaded "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," the motion should be denied. *Id.*; *Sylvia Landfield Trust v. City of Los Angeles*, 729 F.3d 1189, 1191 (9th Cir. 2013). But if "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged − but it has not show[n] . . . the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (citations omitted).

If a court dismisses certain claims, "[l]eave to amend should be granted unless the district court 'determines that the pleading could not possibly be cured by the allegation of other facts.'" *Knappenberger v. City of Phoenix*, 566 F.3d 936, 942 (9th Cir. 2009) (quoting *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc)).

## III.     Discussion

### A.  First and Second Causes of Action: Eighth Amendment Violations

Prison officials violate the Eighth Amendment if they are "deliberate[ly] indifferen[t] to [a

prisoner's] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A medical need is serious if failure to treat it will result in "'significant injury or the unnecessary and wanton infliction of pain.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc)). The Ninth Circuit recognizes that a heightened risk of suicide can present a serious medical need. *Simmons v. Navajo Cty., Arizona*, 609 F.3d 1011, 1018 (9th Cir. 2010) *overruled on other grounds by Castro v. Cty. of L.A.*, 833 F.3d 1060 (9th Cir. 2016) (en banc). In the context of an Eighth Amendment claim stemming from a prisoner's suicide, a plaintiff states an actionable claim if an official knows of an inmate's particular vulnerability to suicide and was recklessly or deliberately indifferent to that vulnerability. *See Taylor v. Barkes*, 135 S. Ct. 2042, 2045 (2015) (citing *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (1991)). However, deliberate indifference is a high legal standard; mere malpractice or negligence does not constitute an Eighth Amendment violation. *See Estelle*, 429 U.S. at 105-06; *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004).

To establish an Eighth Amendment violation, a prisoner "must satisfy both the objective and subjective components of a two-part test." *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (citation omitted). First, there must be a demonstration that the prison official deprived the prisoner of the "minimal civilized measure of life's necessities." *Id*. (citation omitted). Second, a prisoner must demonstrate that the prison official "acted with deliberate indifference in doing so." *Id*. (citation and internal quotation marks omitted).

A prison official acts with "deliberate indifference . . . only if the [prison official] knows of and disregards an excessive risk to inmate health and safety." *Gibson v. County of Washoe, Nevada*, 290 F.3d 1175, 1187 (9th Cir. 2002) (citation and internal quotation marks omitted). Under this standard, the prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but that person "must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk." *Gibson*, 290 F.3d at 1188 (citation omitted). This "subjective approach" focuses only "on what a defendant's mental attitude actually was." *Farmer*, 511 U.S. at 839. Of course, whether a defendant possessed subjective knowledge is a factual question that is "subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*,

511 U.S. at 842.

Under 42 U.S.C. § 1983, supervisory officials are not liable for actions of subordinates on any theory of vicarious liability. *See Hansen v. Black*, 885 F.2d 642, 645-46 (9th Cir. 1989). A supervisor may be liable only if: (1) he or she is personally involved, or (2) there is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. *Snow v. McDaniel*, 681 F.3d 978, 989 (9th Cir. 2012), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014). A causal connection can include: "1) [the supervisors'] own culpable action or inaction in the training, supervision, or control of subordinates; 2) their acquiescence in the constitutional deprivation of which a complaint is made; or 3) [their] conduct that showed a reckless or callous indifference to the rights of others." *See Lemire v. Cal. Dept. of Corr. and Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013) (quoting *Cunningham v. Gates*, 229 F.3d 1271, 1292 (9th Cir. 2000)).

Where a plaintiff seeks damages against an official in his or her individual capacity, "the causation inquiry between the deliberate indifference and the eighth amendment deprivation must be more refined [than the inquiry for injunctive or declaratory relief.]" *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988). Courts "must take a very individualized approach which accounts for the duties, discretion, and means of each defendant." *Id.* at 633-34. And courts "must focus on whether the individual defendant was in a position to take steps to avert the [incident giving rise to the deprivation], but failed to do so intentionally or with deliberate indifference." *Id.* at 633. The Ninth Circuit recently stated that "[t]he requisite causal connection [for liability in a defendant's individual capacity] can be established . . . by [the defendant] setting in motion a series of acts by others, or by knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury." *King v. Cty. of L.A.*, 885 F.3d 548, 559 (9th Cir. 2018) (quoting *Starr v. Baca*, 652 F.3d 1202, 1207–08 (9th Cir. 2011)) (alterations in *King*)

Alternatively, a plaintiff may state a claim if policymakers knew that their policy, practice or order would pose a serious risk to someone in plaintiff's situation and nevertheless made that decision which resulted in injury. *See Lemire*, 726 F.3d at 1078 (in a facility housing mentally-ill inmates where an extended absence of floor officers is generally considered unacceptable, evidence of supervisory defendants' decision to remove all floor officers from the ward for a period of three and a half hours was sufficient to establish an objectively substantial risk of harm to

9

unsupervised mentally-ill inmates).

    *1.  CIW Defendants*

        i.  Provider Defendants (Velez and Pulling)

      The Provider Defendants first argue that Plaintiffs have not sufficiently alleged facts that demonstrate that Velez[7] or Pulling knew of and disregarded a substantial acute risk of suicide. CIW Motion at 5-6.  Specifically, Provider Defendants assert that there are no allegations that Erika told Pulling or Velez that she was contemplating suicide in the days immediately before her death, or that there are allegations that Velez and Pulling received any information from anyone else that Erika was an acute risk of suicide.  *Id.* at 6.  Plaintiffs respond that allegations of circumstantial evidence demonstrate Provider Defendants' subjective knowledge.  CIW Opp'n at 15-17.

      As mentioned, Plaintiffs only bring the first cause of action (for failure to provide mental health treatment) against Velez.  Plaintiffs allege that despite Erika's long history of mental health issues, Velez: (1) failed to update Erika's medical treatment plans to include interventions to address Erika's symptoms; (2) ignored Erika's statement that she was feeling anxious about her upcoming parole hearing; and (3) transferred Erika's care to Pulling without a transition plan, thereby failing to ensure that the transfer would not negatively impact Erika's mental health.

      In its previous rulings, this Court focused on whether Velez subjectively knew that Erika was a substantial suicide risk, but Plaintiffs state that their "claim against Defendants Pulling and Velez is broader than suicide risk, encompassing failure to provide necessary mental health treatment to address Erika's mental illness, resulting in exacerbation of Erika's symptoms including depression and anxiety."  *See* CIW Opp'n at 10.  The inquiry for a failure to provide medical care under the Eighth Amendment is slightly different than a claim for failure to protect. *See Lemire*, 726 F.3d at 1081.

> "To set forth a constitutional claim under the Eighth Amendment predicated upon the failure to provide medical treatment, first the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition *could result in further significant injury or the unnecessary and wanton infliction of pain*.  Second, a plaintiff must show the defendant's response to the need was deliberately indifferent."

---

[7] Plaintiffs do not allege the second cause of action against Velez.

*Id.* (quoting *Conn*, 591 F.3d at 1094-95) (emphasis added). "The 'deliberate indifference' prong requires '(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need, and (b) harm caused by the indifference.'" *Id.* (quoting *Jett*, 439 F.3d at 1096).

At the motion to dismiss stage, and making all reasonable inferences in favor of Plaintiffs, the Court thinks that Plaintiffs have sufficiently alleged that Velez was deliberately indifferent to Erika's mental health needs. Velez was Erika's assigned clinician for approximately two years until Velez transferred Erika to a different clinician on March 1, 2016. TAC ¶ 82. As such, Velez would be well aware that Erika had been admitted to a MHCB on multiple occasions, *id.* ¶ 77, that Erika was housed on the Support Care Unit at CIW because of her mental health issues, *id.* ¶ 78, that Erika had twice tried to commit suicide, *id.* ¶ 79, that Erika had expressed suicidal ideations on other occasions, *id.*, and that Erika's chronic risk for suicide was high, *id.* ¶ 80. Further, Erika expressed anxiety to Velez about her upcoming parole hearing, *id.* ¶ 82, and Velez signed therapeutic notes as late as April 11, 2016 indicating that Erika was at a high risk for self harm, *id.* ¶ 95. Therefore, in light of Erika's long history of mental illness, Velez would certainly have been aware of Erika's "possible medical need." *Lemire*, 726 F.3d at 1081; *see also Farmer*, 511 U.S. at 842 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.").

Although the issue is far closer, the Court would find that Plaintiffs sufficiently allege that Velez failed to respond to Erika's possible medical need. While it is clear that Velez provided some treatment to Erika, she also allegedly "failed to create treatment goals or sufficiently track Erika's progress to identify whether interventions were needed to address these symptoms of her mental illness." TAC ¶ 81. Velez further failed to provide treatment goals or documentation regarding Erika's progress after the Interdisciplinary Treatment Team ("IDTT") meetings. *See id.* ¶ 104; Ex. 7 at 42.[8] Additionally, in the leadup to the parole hearing, Erika told Velez that she was anxious about the hearing, that she had been isolating herself, and that the other inmates were making her stressed. *Id.* ¶ 82. Despite these expressed (and specific) mental health issues, Velez did not change Erika's treatment plan. *Id.* In fact, Velez transferred Erika to a different clinician and, as the *Coleman* Special Master noted, failed to "to make a transition plan with Erika, or

---

[8] According to CDCR policy, IDTT meetings were required at least every 90 days for the purpose of identifying treatment needs, developing treatment plans, assessing treatment progress, and updating/revising individual treatment plans in according with the inmate-patient's needs and progress. TAC ¶ 104.

conduct any transitional or closure sessions with Erika prior to the transfer in order to ensure that the transfer would not negatively impact Erika's mental health." *Id.* ¶ 82.  The CDCR reviewer that analyzed Erika's death noted that clinical summaries of Erika's care "were identical in all plans since March 2015, and absent of any update of current clinical information." *Id.* ¶ 107-08; Ex. 7 at 42.

Taking all reasonable inferences in favor of Plaintiffs, the Court would find that Plaintiffs have alleged that Velez was deliberately indifferent to Erika's mental health needs.  Specifically, based on Velez's failure to change any of Erika's treatment plans from March 2015 onward – seemingly copying and pasting plans from previous clinical summaries – raises the inference that Velez was just going through the motions and not actually offering substantive treatment to Erika. The Court thinks it relatively obvious that failing to address two years' worth of serious mental health problems, including suicide attempts and suicidal ideation, would create a substantial risk that Erika would suffer further harm.  Moreover, Erika's expressed anxiety about her upcoming parole hearing, and admitted change in behavior leading up to the hearing, are other obvious red flags that could have put Velez on notice about Erika's serious medical need.  Additionally, Velez's alleged deviation from CDCR policies – including failing to offer individualized treatment plans after IDTT meetings, *see* TAC ¶ 104 – is circumstantial evidence that Velez was deliberately indifferent to Erika's medical needs.  *See Lemire*, 726 F.3d at 1078-79 (recognizing that officers' failure to follow policies that were in place to protect inmates could allow a jury to conclude that the officers were aware that their actions would result in a substantial risk of harm).

Finally, and most directly, the fact that three days before Erika committed suicide, Velez signed therapeutic notes listing Erika as at high risk for self harm, suggests that Velez was actually on notice about the potential risk to Erika.  *See* TAC ¶ 95; Ex. 12.  Provider Defendants respond to the new allegation about the signed therapeutic notes by arguing that "[i]t is illogical to read this list as anything other than a brief history of Rocha's medical and psychological issues, particularly given the listing of medical issues such as right-hand pain and gynecological issues alongside Rocha's psychological diagnoses."  However, on a motion to dismiss, the Court disagrees.  Even if the listed diagnoses represented a history of Erika's medical problems, there is nothing on the document indicating that Erika was not currently a high risk for self harm.  Reading the document as Provider Defendants request would require the Court to ignore its duty to make all reasonable inferences in favor of Plaintiffs.  At a basic level, just days before Erika committed suicide, Velez

12

(and Pulling) signed documents that listed Erika as a high risk for self harm.  If that alleged document is not sufficient to plead subjective awareness of the risk, the Court is not sure what would be.  As such, the Court would find that Plaintiffs sufficiently pleaded that Velez was deliberately indifferent to Erika's medical needs.

The allegations regarding Pulling's subjective knowledge are even stronger as to both the failure to treat claim and failure to protect claims.  For example, on March 4, Pulling met with Erika and Erika told him that she needed help with anxiety, but Pulling failed to provide a treatment plan.  *See* TAC ¶ 84.  At their next meeting, Pulling observed that Erika was "agitated," "feeling overwhelmed" in part about her "self-doubt about her ability to successfully parole and remain out of prison."  *Id.*  Nonetheless, Pulling left the "Plan/Disposition" section of the report blank.  *Id.* On March 21, 2016, Erika told Pulling that she was experiencing increasing fear of never going home, and was isolating herself and refusing treatment groups.  *Id.* ¶ 86.  On March 28, 2016, Erika expressed she was really paranoid and that her paranoia might turn into suicidal ideation. *Id.* ¶ 87.  Pulling gave her a treatment plan consisting of a Tibetan chant as a calming tool, which Plaintiffs allege did not meet the standard of care.  *Id.* ¶ 87.

Then, on March 31, 2016, Erika expressed suicidal ideation and was placed under continuous observation in "alternative housing" overnight.  *Id.* ¶ 88.  The next day, based on Erika's denial of suicidal ideation, a psychiatrist discharged Erika from alternative housing.  *Id.* ¶ 89.  Plaintiffs allege that placement in alternative housing, where the subject prisoner would have had to wear a smock that revealed their backside to the other prisoners, often resulted in the subject prisoner retracting statements of suicidal ideation.  *Id.* ¶ 88.  Regardless, Erika retracted her suicidal ideation, yet still told the psychiatrist that she was feeling increasing anxiety about her upcoming parole hearing.  *Id.* ¶ 89.  The psychiatrist adjusted Erika's medication and ordered a "five day step down."  *Id.*  Another clinician conducted a Suicide Risk Evaluation on Erika and concluded that Erika posed a high chronic risk of suicide, but a low acute risk.  *See* Ex. 7 at 41. However, the Suicide Risk Evaluation was incomplete, included copied information from previous assessments, and stated inaccurate information such as that Erika was "looking forward to paroling later this year to be with her children," when in fact Erika did not have children.  *See* TAC ¶ 90.

Pulling was in charge of the five day step down, but did not conduct the required evaluations on day one or two.  *Id.* ¶ 91.  Then, on day three (April 4), he discontinued the follow up without completing a suicide risk assessment and without providing a clinical justification.  *Id.*

13

¶ 91.  Discontinuing the follow up was a breach of CDCR policy.  *Id.*  That same day, Pulling asked Erika to take responsibility for using suicidal threats to get what she wanted.  *Id.* ¶ 93. Plaintiff alleges that Pulling's comments (that Erika was being manipulative) demonstrate a failure to meaningfully assess Erika's suicide risk and constituted a violation of *Coleman*-ordered training.  *Id.*  Further, Plaintiffs allege that Pulling ended Erika's suicide watch follow-up precautions on April 6, 2016 without conducting a suicide risk assessment.  *Id.* ¶ 98.  Pulling's last meeting with Erika occurred on April 11, where Erika "became labile and wanted to go," but Pulling did not schedule a follow-up meeting or make any substantive changes to Erika's treatment plan.  *See id.* ¶ 96.  On April 13, 2016, Pulling signed therapeutic notes that listed Erika as a high risk for self harm.  *Id.* ¶ 95.  As previously mentioned, the CDCR reviewer classified Erika's death as foreseeable and preventable.  *See id.* ¶ 102.

Reading the allegations in the light most favorable to Plaintiffs, the Court would conclude that they have sufficiently alleged that Pulling was deliberately indifferent to Erika's medical needs and subjectively aware of the substantial risk of her suicide.  From the time Pulling took over as Erika's clinician, Erika expressed increasing anxiety about her upcoming parole hearing, isolated herself from other inmates, and (most seriously) expressed suicidal ideation.  In response, Pulling failed to offer Erika updated treatment plans and removed her from the five day step down without assessing her risk of suicide.  Declining to conduct a suicide risk assessment (in violation of CDCR policy) on someone who had just recently expressed suicidal ideation seems a clear case of being indifferent to the risk of suicide.  By declining to conduct the assessment, Pulling deliberately chose not to determine whether Erika was a high risk for suicide.  Intentional ignorance of an obvious risk is not a defense.  *See Farmer*, 511 U.S. at 842 ("We doubt that a subjective approach will present prison officials with any serious motivation to take refuge in the zone between ignorance of obvious risks and actual knowledge of risks." (internal quotation marks omitted)). Moreover, at this stage the Court does not think that Pulling can rely on the psychiatrist's assessment that Erika represented a low risk of acute suicide because that psychiatrist's assessment was incomplete and based in part on the false information that Erika had children that she was looking forward to seeing.

Even if the Court were to discount all of Pulling's actions leading up to Erika's suicide as not indicative of a subjective awareness of the risk of suicide, the fact that Pulling signed a form stating that Erika was a high risk for self harm one day before she committed suicide is

determinative. *Id.* ¶ 95.  Moreover, in conjunction with the CDCR's conclusion that Erika's death was foreseeable and preventable, the Court would conclude that Plaintiffs have sufficiently pleaded that Pulling had subjective knowledge of the risks of harm to Erika.

The Court recognizes that all of Velez's and Pulling's alleged actions could also be explained by negligence, or even gross negligence, which would not subject them to Plaintiffs' Eighth Amendment claims.  However, the Court thinks that at the pleading stage, it is premature to draw that line and where, as here, the allegations raise suggestions of deliberate indifference, the Court must let the case proceed to discovery.  In fact, the vast majority of cases that Defendants cite in their briefs were decided on summary judgment.  *See, e.g.*, *Simmons*, 609 F.3d at 1018 ("We cannot agree, however, that the *evidence* supports the inference that Nurse Jones knew that Jasper 'was at *acute* risk of harm' at the time he killed himself." (first emphasis added); *Toguchi*, 391 F.3d at 1056.  That is not to say that courts may never dismiss Eighth Amendment cases on motions to dismiss (indeed, this Court has previously done so, albeit with leave to amend), but just to point out that here there are sufficient allegations of the Provider Defendant's culpable mindsets.

Provider Defendants also argue that Plaintiffs did not allege a causal connection between Provider Defendants' actions or omissions and Erika's suicide.  CIW Motion at 8-9.  Plaintiffs argue that they have established causation by citing Paragraphs 109 and 110 of the TAC, which state:

> 109.  Defendants Pulling and Velez failed to provide necessary treatment to Erika, despite being on actual notice that she was experiencing increased symptoms of mental illness and risk factors for suicide. Defendants Pulling and Velez failed to meaningfully implement individualized treatment planning for Erika to reduce future suicidal ideation, anxiety, and depression, given her reported symptoms, in violation of CDCR policy and training. Rather than meaningfully assess Erika's treatment needs, Defendant Pulling simply copied and pasted formulaic prior descriptions. Defendant Pulling further discounted Erika's expressed symptoms of suicidal ideation, and, rather than conducting a comprehensive suicide risk assessment, accused her of being manipulative and acting like a child. This lack of treatment in the face of Erika's growing anxiety and depression led directly to her death and violated CDCR policy and training.

> 110. The *Coleman* Court orders and CDCR policies and procedures requiring mental health clinicians to implement individualized treatment planning, to conduct meaningful assessments of patient needs, and to complete comprehensive suicide risk assessments

15

> exist in order to prevent the deaths of prisoners with serious risk of
> suicide. Erika's death was a direct and foreseeable consequence of
> her clinicians' failure to comply with these requirements.

TAC ¶¶ 109-10.

Although the Court must engage in an individualized causation analysis, *see Leer*, 844 F.2d at 633-34, "[a]s a practical matter, plaintiffs who have already demonstrated a triable issue of fact as to whether prison officials exposed them to a substantial risk of harm, and who actually suffered precisely the type of harm that was foreseen, will also typically be able to demonstrate a triable issue of fact as to causation," *see Lemire*, 726 F.3d at 1080-81.  The Court thinks that *Lemire* answers the causation question here.  The Court thinks that allegations about Pulling and Velez failing to: (1) offer individualized mental health plans, (2) respond to increasing anxieties about the parole hearing, or (3) assess Erika's risk for suicide, are all actions or omissions that could plausibly have led to Erika's declining mental health and suicide.  As explained, "CDCR's own internal review concluded that Erika's death was both foreseeable and preventable." TAC ¶ 102.  At the pleading stage it is reasonable to conclude that if Provider Defendants had acted differently, they may have prevented Erika's death.

The Court recognizes that it may seem that it is changing its tune from previous rulings, but after further briefing, more research on the subjective knowledge requirement at the pleading stage, and more time spent analyzing the factual allegations, the Court would conclude that Plaintiffs have pleaded Eighth Amendment violations against Provider Defendants.  Plaintiffs' allegations may ultimately not be born out, but accepting the allegations as true and construing them in the light most favorable to Plaintiffs, the Court would conclude that Plaintiffs have stated claims under their first and second causes of action.

## ii. Supervisory Defendants (Hughes and Elliot)

The Supervisory Defendants did not re-raise their argument that Plaintiffs failed to state Eighth Amendment claims against them.  *See* Reply ISO CIW Motion, Docket No. 136, at 9-10.  The TAC is substantially similar to the SAC regarding the Supervisory Defendants.  As such, the Court is not inclined to reconsider its previous ruling and would adopt the reasoning set forth in its December 21, 2018 Final Order on Defendants' Second Motion to Dismiss (Second Dismissal Order).  *See* Docket No. 110, at 12-16.  In a nutshell, the Court previously concluded that Plaintiffs had sufficiently alleged that the Supervisory Defendants were responsible for implementing the *Coleman* orders and that they had failed to do so.  *Id.* at 15.  As to causation, the Court concluded

that Plaintiffs had sufficiently alleged that the Supervisory Defendants' failure to implement the policies caused Erika's injury because some of the policies were meant to remediate the type of problems that occurred during Erika's care.  *See id.*

      *2. Headquarters Defendants*

The Court has already ruled that Plaintiffs sufficiently alleged that the Headquarters Defendants violated Erika's Eighth Amendment right.  *See* Second Dismissal Order at 16-18.  The Headquarters Defendants nonetheless rehash their argument that their inaction did not cause Erika's death.  *See* HQ Motion at 8-9.  In addition, the Headquarters Defendants argue that the exhibits attached to the TAC actually contradict Plaintiffs' allegations of deliberate indifference.  *Id.* 9-11.

The Court would not reconsider its causation analysis.  At the motion to dismiss stage, there is not a high burden to pleading causation.  *See* Second Dismissal Order at 17-18; *see also Lemire*, 726 F.3d at 1080-81.

As to Defendants' argument about the exhibits, the Court is hesitant to weigh the import of 600 pages of documents on a motion to dismiss.  While the exhibits do include some statements that prison officials were working toward implementing the Special Master's recommendations, *see* Ex. 3 at 2-3, the exhibits also describe previously-revealed deficiencies that officials had not remediated, *see* Ex. 7 at 41-42.  For example, Plaintiffs allege that in the 2015 Audit, the Special Master described deficiencies regarding clinicians perceiving inmates to be manipulative, and failure to complete Suicide Risk Evaluations.  *See* TAC ¶ 49.  The 2017 report about Erika's death noted that Pulling discussed that Erika needed to take responsibilities for her actions, suggesting that Pulling thought she was being manipulative.  *See* Ex. 7 at 42.  The 2017 report also noted that the Suicide Risk Evaluation form that a clinician filled out on April 1, 2016 was not complete, did not include an update of current information, and carried over information from previous assessments.  *Id.* at 43.  Even if the Special Master commended officials for working towards bettering the prisons' suicide prevention protocols, on a motion to dismiss, the failure to implement certain specific policies (or ensure that they were being followed) is sufficient to state a claim at this stage.

      *3. Defendant Jaimez*

Plaintiffs did not serve Defendant Jaimez until October 17, 2018 and, as such, this is the first time he has moved to dismiss the claims against him.  *See* Proof of Service, Docket No. 92.

In the TAC, Plaintiffs allege that Jaimez was the correctional officer at CIW responsible for conducting safety checks of Erika's cell in the early morning of April 14, 2016. TAC ¶ 30. Jaimez allegedly failed to perform the safety check in violation of CDCR policy and also failed to timely summon or provide medical care for Erika. *See id.* When Jaimez discovered Erika hanging in her cell, she was in a state of rigor mortis, suggesting that she had been hanging for several hours. *Id.* ¶¶ 97-98. Jaimez had not conducted a safety check for more than two hours prior to finding Erika's body, in violation of CDCR policy. *Id.* ¶ 98.

Jaimez argues that the Eighth Amendment claims against him must be dismissed because Plaintiffs cannot allege that Jaimez knew that Erika was in substantial danger of suicide. *See* HQ Motion at 13. Jaimez continues that Plaintiffs have not specifically alleged that he knew Erika's medical history, or that he knew she was suicidal just because she was housed in the Support Care Unit. *Id.* Plaintiffs respond that Jaimez knew that inmates housed in the Support Care Unit were at a greater risk for suicide and that "CDCR policy required regular checks by custody staff over inmates housed in the Support Care Unit specifically to intervene should a prisoner have a medical crisis." TAC ¶ 99.

Jaimez's focus on his subjective knowledge as to Erika specifically is misguided. In *Lemire*, the Ninth Circuit held that the proper deliberate indifference inquiry is whether defendants knew that their actions posed a serious risk of substantial harm to any prisoner similarly situated to the one who ultimately ended up suffering harm. *See Lemire*, 726 F.3d at 1078-79 ("The appropriate inquiry was whether the Supervisory Defendants were aware that removing all floor officers from Building 8 for over three and a half hours would pose a substantial risk of serious harm to someone in St. Jovite's situation, not simply whether they were subjectively aware of St. Jovite's specific medical needs."). Moreover, Jaimez did not need to know that his failure to conduct the required checks led to a substantial risk of suicide – it would be enough to know that someone in Erika's position would be "exposed to a substantial risk of some range of serious harms; the harm [the inmate] actually suffered need not have been the most likely result among this range of outcomes." *Id.* at 1076.

The Court would conclude that Plaintiffs have sufficiently pleaded that Jaimez ignored a substantial risk of harm when he failed to follow the CDCR policy and conduct the required check. Inmates in the Support Care Unit were housed there because they were part of the EOP, which is for prisoners with "acute onset or significant decompensation of a serious mental disorder" or

18

"[i]nability to function in [the] General Population."  TAC ¶ 78.  Reading the allegations in the light most favorable to Plaintiffs, it is reasonable to conclude that an officer that failed to check on a specialized population of inmates at the required intervals would know that he was exposing the inmates to a substantial risk.  *See Lemire*, 726 F.3d at 1069 (noting that the housing unit at issue was for "CCCMS inmates, meaning they suffered from any of a variety of psychiatric illnesses. CCCMS is the lowest level of care in the State's prison mental health delivery system, and is designed to provide a level of care equivalent to that received by non-incarcerated patients through outpatient psychiatric treatment.").

### 4. *Qualified Immunity*

"When, as here, defendants assert qualified immunity in a motion to dismiss under Rule 12(b)(6), dismissal is not appropriate unless we can determine, based on the complaint itself, that qualified immunity applies."  *O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016) (internal quotation marks omitted).  The doctrine of qualified immunity protects government officials "from liability insofar as their conduct does not violate clearly established or constitutional rights of which a reasonable person would have known."  *Stanton v. Sims*, 571 U.S. 3, 4-5 (2013) (*per curiam*) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  Whether a defendant is entitled to qualified immunity is a two-part inquiry that asks: "(1) Was the law governing the official's conduct clearly established? (2) Under that law, could a reasonable officer have believed the conduct was lawful?"  *Mackinney v. Nielsen*, 69 F.3d 1002, 1005 (9th Cir. 1995) (quoting *Act Up! Portland v. Bagley*, 988 F.2d 868, 871 (9th Cir. 1993)).  In *Anderson v. Creighton*, the Supreme Court instructed courts to examine whether the "contours of the right" in the action were sufficiently clear so that a reasonable official would understand that he or she was violating the right.  483 U.S. 635, 640 (1987).  The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).  "The dispositive question is whether the violative nature of *particular* conduct is clearly established."  *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (internal quotation marks omitted).

Plaintiffs bear the burden of proving the existence of a clearly established right at the time of the allegedly impermissible conduct.  *See Plumhoff v. Rickard*, 134 S. Ct. 2012 (2014); *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1038 (9th Cir. 2018); *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 947 (9th Cir. 2017); *Maraziti v. First Interstate Bank of California*, 953 F.2d 520,

523 (9th Cir. 1992). Put simply, "Plaintiffs must point to prior case law that articulates a constitutional rule specific enough to alert *these* [Defendants] *in this case* that *their particular conduct* was unlawful." *See Sharp v. Cty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017). The case law "must be 'controlling' − from the Ninth Circuit or Supreme Court − or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction." *Id.* "For a constitutional or statutory right to be clearly established, there does not need to be a factually indistinguishable case spelling out liability, but existing precedent 'must have placed the statutory or constitutional question beyond debate.'" *NeSmith v. Cty. of San Diego*, No. 15CV629 JLS (JMA), 2016 WL 4515857, at *5 (S.D. Cal. Jan. 27, 2016) (quoting *al-Kidd*, 131 S. Ct. at 2083).

As previously stated, the Court thinks that the questions of qualified immunity in this case are better suited to determination on summary judgment because of potential factual questions. *See* Second Dismissal Order at 19-20. The Court's feeling has not changed after this round of briefing. While the Court would narrowly define the particular conduct at issue as mandated in recent Supreme Court cases, *see e.g. Mullenix*, 136 S. Ct. at 308, the Court thinks that no matter how it defines the right at issue, the Defendants' subjective knowledge of certain facts will determine whether the unlawfulness of Defendants' actions was "beyond debate," *see Taylor*, 125 S. Ct. at 2044.

First, as to the Provider Defendants and Defendant Jaimez, the Court thinks it is beyond debate that: (1) deliberately ignoring certain policies designed to protect inmates suffering from mental health issues, and (2) deliberately ignoring other red flags that an inmate may be at risk of substantial harm is unconstitutional. *See Lemire*, 726 F.3d at 1078-79 (holding that removing all floor officers from a housing unit of inmates with mental health problems, such that nobody could conduct the required cell checks, can sustain an Eighth Amendment claim); *Clouthier v. Cty. of Contra Costa*, 591 F.3d 1232, 1245 (9th Cir. 2010) (holding that mental health professional that removed key suicide prevention measures from suicidal plaintiff was not entitled to qualified immunity) *overruled on other grounds by Castro*, 833 F.3d 1060. Accepting all of Plaintiffs' allegations as true, Jaimez deliberately failed to follow a policy designed to keep inmates with mental health problems safe, TAC ¶¶ 97-99; Velez failed to offer Erika personalized treatment for her severe mental health issues, *id.* ¶¶ 81-83; and Pulling failed to assess Erika's risk of suicidality, in violation of CDCR policy, despite obvious red flags about Erika's mental state, *id.* ¶¶ 91-93. As such, the Court would deny these Defendants qualified immunity at this stage.

20

The qualified immunity question as to the Supervisory and Headquarters Defendants is more interesting.  Plaintiffs, again, have not directed the Court to a precedential case for the premise that that the Supervisory and Headquarters Defendants' *particular* conduct – failure to implement fixes to known deficiencies in suicide prevention – was a clearly established Eighth Amendment violation.  *See* Second Dismissal Order at 22.  Instead, Plaintiffs argue that the Supervisory and Headquarters Defendants' conduct is obviously violative of the Eighth Amendment.  *See* HQ Opp'n at 11-12.  The Court is inclined to agree with Plaintiffs at the motion to dismiss stage because it must assume the truth of the allegations.

If, as Plaintiffs argue, the Supervisory and Headquarters Defendants are deliberately refusing to implement *Coleman* court orders designed to remediate *constitutionally-deficient care*, then the violative nature of their conduct is obvious.  *See Sharp*, 871 F.3d at 911 ("[I]n a sufficiently 'obvious' case of constitutional misconduct, we do not require a precise factual analogue in our judicial precedents." (citing *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam) ("[I]n an obvious case, [highly generalized] standards can 'clearly establish' the answer, even without a body of relevant case law.")).  While, such "obvious" cases are rare, *Sharp*, 871 F.3d at 911, refusing to implement constitutionally-required policies would seemingly fit the bill.  The constitutional nature of the *Coleman* court orders also distinguishes the instant case from *Taylor*, where the Supreme Court held that an incarcerated person's right to "the proper implementation of adequate suicide prevention protocols" was not clearly established in November 2004.  135 S. Ct. at 2044.  Here, reading the allegations in the light most favorable to Plaintiffs, they are not only arguing that the Supervisory and Headquarters Defendants failed to adopt *adequate* suicide prevention policies, but rather that the Defendants intentionally disobeyed the *Coleman* court ordered policies, which represented some constitutionally-mandated minimum standard or care.  *See Coleman v. Brown*, 938 F. Supp. 2d 955, 972-73 (E.D. Cal. 2013) ("Over the past seventeen years this court has issued over one hundred other substantive orders to defendants in an ongoing effort to bring the CDCR's mental health care delivery system into compliance with Eighth Amendment standards.  Those orders have been focused on core issues including . . . suicide prevention.").

As this Court previously recognized, there may be other issues about how quickly the Supervisory and Headquarters Defendants would have to comply with the *Coleman* orders, *see* Second Dismissal Order at 19, but the Court thinks that factual development will aid the inquiry.

*See* CIW Reply at 12 ("There remain many questions and uncertainties regarding when a supervisory employee's alleged failure to implement policies to address deficiencies will rise to the level of a constitutional violation.").   Therefore, the Court would deny without prejudice qualified immunity to the Supervisory and Headquarters Defendants on the first and second causes of action at this time.

    B.  Third Cause of Action: Substantive Due Process Violation[9]

    In the third cause of action, Plaintiff Reza alleges that Defendants' "aforementioned acts and/or omissions" of deliberate indifference to Erika's serious medical need deprived "Reza of her liberty interests in the parent-child relationship in violation of their substantive due process rights as defined by the First and Fourteenth Amendments of the Constitution."  *See* TAC ¶ 159.

    Defendants argue that the claim must be dismissed because Reza was not a natural, adoptive, or custodial parent of Erika, and did not have a tie with Erika "demonstrating an enduring assumption of parental responsibility."  *See* HQ Motion at 7.  Defendants therefore argue the relationship is not afforded constitutional protection.  *See id.*

    "[I]ntimate association receives protection as a fundamental element of personal liberty. Such protection, however, extends only to certain kinds of highly personal relationships."  *Erotic Serv. Provider Legal Educ. & Research Project v. Gascon*, 880 F.3d 450, 458 (9th Cir. 2018) (citations omitted).  Neither side has directed the Court to any case in which a "parental figure" (as opposed to an actual parent) was held to have a substantive due process right to familial association.  Similarly, neither side has directed the Court to any case in which such an argument was advanced and rejected.  In the absence of binding or even persuasive authority on this point, the Court must consider whether any precedent lends support to the notion that a "parental figure" may raise a constitutional claim predicated on a state actor's alleged interference with the right to intimate association.

> It is well established that a parent has a "fundamental liberty interest" in "the companionship and society of his or her child" and that "[t]he state's interference with that liberty interest without due process of law is remediable under Section 1983."  *Kelson v. City of Springfield*, 767 F.2d 651, 654-55 (9th Cir. 1985) (citing *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599

---

[9] Defendants argue that the Court did not grant leave to amend as to any claims except for the Eighth Amendment claims.  *See* HQ Motion at 15-16; CIW Motion at 10-11.  The Court recognizes that it could have been clearer on the issue, but it intended to grant leave to amend as to all claims.  As such, "law of the case" considerations are not at issue here.

(1982)).  "[T]his constitutional interest in familial companionship and society logically extends to protect children from unwarranted state interference with their relationships with their parents."  *Smith v. City of Fontana*, 818 F.2d 1411, 1418 (9th Cir. 1987) *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999).  Moreover, "the First Amendment protects those relationships, including family relationships, that presuppose 'deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.'"  *Board of Dir. v. Rotary Club*, 481 U.S. 537, 545, 107 S. Ct. 1940, 95 L. Ed. 2d 474 (1987) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 619-20, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984)); *see also Conti v. City of Fremont*, 919 F.2d 1385, 1388-89 (9th Cir. 1990).

*Lee v. City of Los Angeles*, 250 F.3d 668, 687 (9th Cir. 2001).  In *Roberts v. United States Jaycees*, 468 U.S. 609 (1984), the Supreme Court considered a large civic organization's categorical exclusion of women. The state of Minnesota enacted legislation requiring the organization to admit women; the organization brought suit in federal district court seeking declaratory and injunctive relief to prevent enforcement of the legislation.  *See id.*  Beginning with the proposition that "[t]he Court has long recognized that, because the Bill of Rights is designed to secure individual liberty, it must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State," the Court went on to describe in *dicta* the potential application of this right.  *See id.* at 618-19.

The personal affiliations that exemplify these considerations, and that therefore suggest some relevant limitations on the relationships that might be entitled to this sort of constitutional protection, are those that attend the creation and sustenance of a family – marriage, *e.g.*, *Zablocki v. Redhail*, [434 U.S. 374, 383-86 (1978)]; childbirth, *e.g.*, *Carey v. Population Services International*, [431 U.S. 678, 684-86 (1977)]; the raising and education of children, *e.g.*, *Smith v. Organization of Foster Families*, [431 U.S. 816, 844 (1977)]; and cohabitation with one's relatives, *e.g.*, *Moore v. East Cleveland*, [431 U.S. 494, 503-04 (1977) (plurality opinion)].  Family relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life. Among other things, therefore, they are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship.  As a general matter,

23

> only relationships with these sorts of qualities are likely to reflect the considerations that have led to an understanding of freedom of association as an intrinsic element of personal liberty. Conversely, an association lacking these qualities − such as a large business enterprise − seems remote from the concerns giving rise to this constitutional protection. Accordingly, the Constitution undoubtedly imposes constraints on the State's power to control the selection of one's spouse that would not apply to regulations affecting the choice of one's fellow employees. *Compare Loving v. Virginia*, 388 U.S. 1, 12 (1967), *with Railway Mail Assn. v. Corsi*, 326 U.S. 88, 93-94 (1945).

*Id.* at 619-20.   The Court further stated that determining whether a relationship is afforded constitutional protection "unavoidably entails a careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments." *Id.* at 621.   The Court declined to "mark the potentially significant points on this terrain with any precision" and instead noted that factors that may be relevant include "size, purpose, policies, selectivity, congeniality, and other characteristics that in a particular case may be pertinent." *Id.*[10]

The Ninth Circuit recently addressed the contours of protectable familial relations in *Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1058 (9th Cir. 2018).   There, the decedent's biological son had been adopted as a child yet maintained a "close relationship with [his biological mother] during part of his childhood and throughout his adult life." *Id.* at 1050.   Among other claims resulting from his biological mother's being killed by police, Wheeler brought a Section 1983 cause of action under the Fourteenth Amendment for loss of companionship resulting from her death.   The court rejected that claim because Wheeler did not plead that he and his biological mother had a sufficiently protectable relationship. *Id.* at 1058.   First, the court observed that, in this area, "[j]udicially enforceable Fourteenth Amendment interests require enduring relationships

---

[10] Application of this standard produces somewhat inconsistent results as the objective characteristics of any particular relationship will vary and must be carefully assessed.   For instance, in *Piscottano v. Murphy*, 511 F.3d 247, 278-80 (2d Cir. 2007), the Second Circuit entertained an argument that members of the Outlaws Motorcycle Club could assert a claim predicated on "close personal friendship" but found that the friendships there did not meet the *Roberts* standard because there was insufficient evidence to show the Outlaws were either a small or particularly selective group.   On the other hand, some cases have found that friendships, seemingly regardless of the degree of closeness, are not afforded constitutional protection. *See, e.g.*, *Silverstein v. Lawrence Union Free Sch. Dist. No. 15*, No. 10-CV-10-933, 2011 U.S. Dist. LEXIS 34200, 2011 WL 1261122, at *6 (E.D.N.Y. Feb. 15, 2011), *report and recommendation adopted*, No. 10-CV-10-933, 2011 U.S. Dist. LEXIS 34239, 2011 WL 1261114 (E.D.N.Y. Mar. 30, 2011); *Cf. Dupont v. New Jersey State Police*, No. 08-CV-10220, 2009 U.S. Dist. LEXIS 71990, 2009 WL 2486052, at *9 (S.D.N.Y. Aug. 14, 2009) (finding no clearly established law protecting friendship in the qualified immunity context).

reflecting an assumption of parental responsibility and stem from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in promoting a way of life through the instruction of children." *Id.* at 1058 (internal quotation marks and alterations omitted). Wheeler, the Court concluded could not demonstrate this type of relationship because "[Wheeler's biological mother] surrendered Wheeler for adoption as an infant − choosing to legally sever her relationship with him and to give up all rights and responsibilities related to his care . . . [and did not] raise[] him, otherwise resume[] responsibility for his upbringing, or even maintain[] consistent contact with him during his childhood." *Id.*   Although, the court dismissed Wheeler's claim, it was quick to state, "[w]e confine our holding to the case before us, arising from the particular nature of Wheeler and Colbert's relationship as alleged. Questions concerning all adopted-out children or those raised in non-traditional family arrangements are not before us today." *Id.* However, the court additionally noted that: "Few close relationships − even between blood relatives − can serve as a basis for asserting Fourteenth Amendment loss of companionship claims. *See Ward v. City of San Jose*, 967 F.2d 280, 284 (9th Cir. 1991) (finding siblings could not maintain a claim for loss of their brother's companionship)."

Here, Plaintiffs allege that Reza was Erika's "stepmother," Erika's father's partner for 21 years, and Erika's half-sisters' mother.  *See* TAC ¶ 19.  Reza and Erika "maintained their close relationship" while Erika was incarcerated and Reza visited her at CIW.  *Id.*  Plaintiffs further state:

> During this period, Erika frequently stayed with her father's partner, Plaintiff Linda Reza, and their family. When initially placed with her paternal grandmother, Erika visited Linda Reza's house once or twice a month on the weekend. Later, when placed in group homes, Erika would periodically run away to live instead at Linda's home. During this period they lived together, Linda and Erika developed a close relationship. They cooked together and spent time as a family with Linda's other children, including Erika's sister Geraldine.

> On or around February 2, 1996, Erika was placed in a group home called the International Home for Girls. It quickly became clear that this was not a good placement for Erika, who would prefer to live with her father, Linda, and her sister Geraldine. Erika's social worker at the time interviewed Linda and determined that her home would be a stable environment for Erika; the social worker told Linda that she would recommend the placement at Linda's house. However, on February 12, 1996, Erika was arrested along with another resident of the International Home for Girls.

25

*Id.* ¶¶ 68-69.  As newly delineated in the TAC, Plaintiffs aver that "Erika wanted the [2011] transfer to CIW specifically so she could be closer to Linda and her sisters, who live in Southern California. After the death of her father, in July 2008, Linda Reza became Erika's sole living parent.  Erika referred to Linda as 'mom' and considered herself to be Linda's daughter." *Id.* ¶ 75

Although *Wheeler* did not deal with the exact type of relationship at issue here, the Court thinks it provides persuasive support in favor of granting Defendants' motions on this claim.  While Reza claims to be Erika's stepmother, purportedly "maintained a close relationship with Erika," and periodically let Erika live with her when she was young, Plaintiffs do not allege that Reza ever assumed "parental responsibility" for Erika or even that they had "the intimacy of daily association" other than during brief periods which occurred decades before Erika's death.[11]  Based on the allegations, the period when Erika and Reza "lived together" could not have been more than two years and even then it appears that the actual periods of "living together" were at best sporadic. *Id.* ¶¶ 67-69 (describing that Erika was born in November 1980, sent to live with various relatives in 1987, placed in group homes when she was approximately 14 (1994), would periodically run away from the group homes to live with Reza, until in February 1996 she was placed in the International Home for Girls.  And while Erika may have been about to move into Reza's home before she was arrested in 1996, this assumption of parental responsibility did *not* occur nor was it apparently even attempted during the period from 1988 to February of 1996 when Erika was suffering the assaults and deprivations while living with other family members and in group homes.  Finally, even if Reza's visits to CIW were "frequent," they still would only be periodic rather than the type of "daily association" that *Wheeler* references.  In a lot of ways, Reza and Erika's relationship resembles the one alleged in *Wheeler* (albeit without any biological connection): "a close relationship with [Reza] during part of [her] childhood and throughout [her] adult life." *Wheeler*, 894 F.3d at 1058.  But as the court held in *Wheeler*, that is not enough.  The Court does not think that Erika's referring to Reza as "mom" and requesting a move to CIW to be closer to Reza significantly changes the analysis.  As such, the Court would conclude that pursuant to *Wheeler*, Reza's substantive due process claim fails.

C.  Fourth Cause of Action: Violations of the ADA and Rehabilitation Act

Plaintiffs allegations regarding violations of the ADA and Rehabilitation Act are exactly

---

[11] It is noted that the *Coleman* report indicated that Erika "had marginal family support, with the last visit occurring in January 2016." *See* Exhibit 7 at 40.

the same as those in the SAC.  The Court would not reconsider its ruling on this cause of action and adopts its reasoning from the Second Dismissal Order.  *See* Second Dismissal Order at 15-16.

### D.  Fifth, Sixth, Seventh and Eighth Causes of Action: State Law Claims

Defendants argue that the fifth through eighth claims ("State Law Claims") asserted by the estate of Erika Rocha should be dismissed for failure to comply with the California Government Claims Act ("GCA"), Cal. Gov't Code §§ 900 *et seq*.  *See* HQ Motion at 20-22.  The Court is not inclined to revisit its previous ruling that the Estate did not comply with the GCA.  *See* Second Dismissal Order 27-29.[12]  As such, the Court would dismiss all State Law Claims brought by the Estate.

Plaintiffs now contend that Geraldine and Freida (Erika's sisters) also assert the wrongful death claim[13] in their individual capacities rather than just as representatives of the Estate. Therefore, the Court must (for the first time) decide whether Geraldine and Freida are individual plaintiffs or are exclusively representatives of the Estate.

Plaintiffs argue that "ALL Plaintiffs" assert the sixth cause of action against all Defendants except CDCR, and that because the TAC describes Erika's sisters as "heirs," they are included in "ALL Plaintiffs" as individuals.  *See* HQ Opp'n at 22-23.  The problem the Court has with this contention is that the description of Geraldine and Freida in the operative complaint clearly characterizes them not as individual plaintiffs, but as representatives of the Estate: "Plaintiff ESTATE OF ERIKA ROCHA brings this action by and through successors-in-interest and heirs GERALDINE ROCHA and FREIDA ROCHA, pursuant to California Code of Civil Procedure § 377.30 and § 377.60."  TAC ¶ 18.  Nowhere does the TAC describe Geraldine and Freida as "Plaintiffs" distinct from their representation of the Estate.  There is no separate paragraph in the TAC that says, "Plaintiff Geraldine" or "Plaintiff Freida."  The Court thinks that the most obvious reading of the TAC does not include Geraldine and Freida as individual plaintiffs.  *See id.* ¶ 18.[14]

---

[12] The Court explained that both the purported individual claimants (Geraldine and Freida) and the estate claimant were required under applicable law to file GCA forms.  *See* Second Dismissal Order at 28.  It was and is undisputed that Geraldine and Freida filled out the form on their own behalf, in their individual capacities.  However, the Court concluded (and here again concludes) that the mere listing of Erika's name in Geraldine and Freida's form, under the section for "related claims," was not sufficient to satisfy the requirement that Erika's estate file a separate GCA form. *Id.* at 28-29.  Thus, Erika's estate did not comply with the GCA.

[13] Plaintiffs do not argue that Geraldine and Freida assert any of the other State Law Claims.

[14] Plaintiffs' argument that "ALL Plaintiffs" must include someone other than the Estate and Reza is unconvincing. For one, Plaintiffs did not disclaim that Reza was not pursuing the State Law Claims until their opposition.  *See* HQ Opp'n at 21.  Further, the reference to "ALL Plaintiffs" for the wrongful death cause of action is likely just a drafting

Concluding that the TAC does not include Geraldine and Freida as individual plaintiffs does not end the Court's analysis, however. The original *pro per* Complaint filed in this action adds another wrinkle. In the original Complaint, Geraldine (but not Freida)[15] was the only Plaintiff and listed herself as such: "Plaintiff GERALDINE ROCHA is the sister, successor in interest, and an heir at law of Erika Rocha, the deceased." *See* Complaint, Docket No. 1, ¶ 5. The FAC dropped Geraldine as a named plaintiff and instead included the same language as the TAC: "Plaintiff ESTATE OF ERIKA ROCHA brings this action by and through successors-in-interest and heirs GERALDINE ROCHA and FREIDA ROCHA." FAC ¶ 12.

Defendants argue that by omitting Geraldine as a nominal individual plaintiff, the FAC constituted a voluntary dismissal of Geraldine's individual claims. Both sets of Defendants rely on *Spreckels v. Spreckels*, 172 Cal. 789 (1916)[16] for their assertion that the change in parties between the Complaint and FAC acted as a voluntary dismissal of Geraldine's individual claims. Plaintiffs do not address the argument.

The Court would agree with Defendants that by clearly filing the original complaint as an individual plaintiff, but then omitting herself as an individual plaintiff in the FAC, Geraldine voluntarily dismissed her claims against Defendants. *Spreckels* decided as much on similar facts. In *Spreckels*, Claus and Rudolph Spreckels filed a complaint as executors of a will of the decedent, *and* as individuals asserting their own claims. *See* 172 Cal. at 790. By leave of court, the Spreckels filed a second amended complaint as executors, but this time omitted themselves as individuals. *Id.* The California Supreme Court held that the omission of their names "worked a discontinuance of the action" as to their being individual plaintiffs and was "equivalent to a voluntary dismissal." *Id.*; *see also Contract Eng'rs v. California-Doran Heat Treating Co.*, 258 Cal. App. 2d 546, 550-551 (1968) (recognizing that voluntary withdrawal of plaintiffs constituted a discontinuance of the action so far as those plaintiffs were concerned).

---

error, as evidenced by the fact that there is some unexplained reference to "Sandra Vela's rights." TAC ¶ 182. This is the only mention of a Sandra Vela, suggesting that it may have been copied from a previous complaint in a different case.

[15] Because Freida was never included in any of the complaints as an individual plaintiff, the Court would conclude that she is not a plaintiff here either.

[16] Defendants also rely on *Lamoreux v. San Diego and Arizona Eastern Railway Co.*, 48 Cal. 2d 617 (1957), but the Court does not find that case particularly relevant. *Lamoreux* held that omitting a *defendant* from a second complaint constituted a voluntary dismissal of that party. *See id.* at 627.

Following *Spreckels*, the Court would conclude that although Geraldine was a plaintiff in her individual capacity at the commencement of this action when she acted in pro se, she voluntarily dismissed herself as a plaintiff when she was represented by counsel and decided instead to pursue the claims as a representative of Erika's estate.  Because neither Geraldine nor Freida asserted any claims as individuals, the Court need not reach any of Defendants' other arguments in favor of dismissing the State Law Claims.

IV.    **Conclusion**

Based on the foregoing discussion, the Court would **GRANT in part** and **DENY in part** the CIW and HQ Motions.  The Court would grant the motions as to the State Law Claims, Reza's substantive due process claim, and the ADA claim; but deny the motions as to the Eighth Amendment causes of action.  Because Plaintiffs have had numerous opportunities to plead their State Law, substantive due process, and ADA claims, the Court would now dismiss those claims **with prejudice.**